NO. 01-15-00267-CV

IN THE COURT OF APPEALS
FOR THE 1ST JUDICIAL DISTRICT OF TEXAS
AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/25/2015 12:01:47 PM
CHRISTOPHER A. PRINE
Clerk

IN RE SOLID SOFTWARE SOLUTIONS, INC., d/b/a EDIBLE SOFTWARE

Original Proceeding from the 215th Judicial District
Of Harris County, Texas
Trial Court Cause No. 2013-74668

**RELATOR SOLID SOFTWARE SOLUTIONS INC. d/b/a EDIBLE SOFTWARE' S APPENDIX E-F TO PETITION FOR WRIT OF MANDAMUS**

Gregg M. Rosenberg
Texas State Bar No. 17268750
Tracey D. Lewis
Texas State Bar No. 24090230
ROSENBERG SPROVACH
3518 Travis, Suite 200
Houston, Texas 77002
Telephone (713) 960-8300
Facsimile (713) 621-6670
gregg@rosenberglaw.com

*Attorneys for Relators*

# TAB E

CAUSE NO. 2013-74668

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and SOLID SOFTWARE | § | |
| SOLUTIONS, INC. d/b/a EDIBLE | § | |
| SOFTWARE | § | 215TH JUDICIAL DISTRICT |
| Defendant. | § | |

## DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY TRADITIONAL MOTION FOR SUMMARY JUDGMENT

COMES NOW, Henri Morris ("Defendant Morris") and Solid Software Solutions, Inc. d/b/a Edible Software ("Defendant Edible Software"), collectively ("Defendants"), in the above-styled and numbered cause of action, filing this Reply to Plaintiff's Response to Defendant's Motion to Dismiss or, alternatively, Motion for Summary Judgment on Plaintiff's claims of assault and invasion of privacy on the basis of Defendants' affirmative defense of limitations and failure to adhere to the TCHRA administrative requirements.

## I.   INTRODUCTION

Plaintiff's response does not question any of the facts applicable to Defendants' bases for its Motion to Dismiss or alternatively its Motion for Summary Judgment. Instead, Plaintiff's factual and legal assertions urge this Court to ignore the fact that Plaintiff did not plead a claim of sexual assault because the requisite elements are not present based on the facts of this case and Plaintiff's own testimony. Plaintiff attempts to characterize Defendants' Motion as "cynical" and "delusional" however, Defendants have taken the clear language of the applicable Sections of the Texas Penal Code, that she now attempts to apply to avoid dismissal based on statute of

1

limitations, and applied that law to the facts as they stand. Defendants have no intent or expectation that the plea agreement signed by Defendant Morris in the criminal proceedings against him be ignored by this Court. Defendants, however respectfully request that Plaintiff not be allowed to sidestep the law in this case, ignore its own pleadings, and assert unmeritorious arguments to avoid the clearly applicable two year statute of limitations on her assault and invasions of privacy claims that she pled as well as the administrative pre-requisites under the Texas Commission on Human Rights Act (TCHRA), directly related to employer liability in sexual harassment cases that she wholly failed to satisfy.

Plaintiff's urging misses the mark and her arguments are not enough to save her claims from dismissal under the law. As Defendants have already outlined the pertinent facts in its Motion, Defendants will spare the court a recitation of the facts in this reply and squarely address Plaintiff's Response. As outlined herein, Defendants respectfully requests that Plaintiff's claims for assault and invasion of privacy be dismissed or alternatively, Defendants' Motion for Summary Judgment be granted.

## II. ARGUMENT AND AUTHORITIES

### A. Plaintiff never pled sexual assault in this case and her pleading contains no facts or citation to any law or statute that would put Defendant on sufficient notice of such a claim.

Plaintiff attempts to cure her failure to plead sexual assault and/or assert any facts to meet the requisite elements of sexual assault in her petition by asserting that Defendants want to take the claims that were actually pled, "assault" and "invasion of privacy" "at face value."[1] The Texas Rules of Civil Procedure specifically state that pleadings shall "consist of a statement in plain and concise language of the plaintiff's cause of action..."[2] Liberal construction of the

---

[1] Pl.'s Resp. to Def.'s M/MSJ, at p. 14.
[2] Tex. R. Civ. P. 45(b).

2

petition is not a license to read into the petition a claim that it does not contain. The petition must give fair and adequate notice of the claims being asserted. If it cannot be reasonably inferred that the petition contains a given claim, then the claim cannot be somehow created to for instance, avoid a statute of limitations defense.[3] As will be further explained herein, the five year statute of limitations for a suit for personal injury is applied only when the injury is as a result of conduct that violates sexual assault, aggravated sexual assault, continuous sexual abuse of a young child or children, trafficking of persons, or compelling prostitution.[4] Plaintiff now claims that this is a sexual assault action but has pled nothing to give Defendants fair notice that such a claim was being made. Therefore, Defendants' taking the claims at "face value" is exactly in line with what the Texas Rules of Civil Procedure mandate.

Plaintiff pled the following:

> Defendant MORRIS intentionally caused physical contact with Plaintiff FARMER directly and through the instrumentality of drugs, while he knew or should reasonably have known that FARMER would find that contact offensive or provocative.[5]

Assault occurs when:

> A person intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.[6]

The Plaintiff's petition mirrors, almost exactly, the language of assault, not sexual assault.

In support of her proposition that §16.0045(a)(1) should apply in the instant case, Plaintiff cites to *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W. 3d 656, 659 (Tex. App. – Houston [14th Dist.] 2011, rev. den'd). First, in *Coptic Orthodox* the issue was, "whether the five year statute of limitations applicable to personal injury claims

---

[3] *Flowers v. Flowers*, 407 S.W.3d 452, 457-458 (Tex. App. – Houston, 2013).
[4] Tex. Civ. Prac. & Rem. Code §16.0045(a)(1)-(5).
[5] Pl.'s Original Petition, at ¶ 10.
[6] Tex. Penal Code §22.01(a)(3).

arising as a result of sexual assault applied only to suits against the perpetrator of the sexual assault, not to suits against third-parties who are alleged to have negligently supervised the perpetrator or negligently failed to institute policies or procedures designed to prevent such behavior."[7] That is not the issue here. Defendants have asserted in their motion to dismiss or alternatively motion for summary judgment that the two-year statute of limitations applies because this is a civil assault and invasion of privacy claim not a sexual assault claim.

Additionally, the petition in *Coptic Orthodox* clearly put the Defendants in that case on notice that the cause of action was for sexual assault, not assault. Specifically the plaintiff's petition read as follows under "cause of action":

> Upon trial of this case, the evidence will show that Stephanie M., whose date of birth is November 24, 1986, was sexually assaulted, as defined by §22.011 of the Texas Penal Code, in Harris County, Texas, by Defendant...[8]

In the Appellate Court's opinion reviewing the trial court's grant of the defendant's motion for summary judgment based on statute of limitations, the court did state that "taken together, the provisions of section 16.0045 unambiguously show a legislative intent to provide victims of sexual assault ...more time to seek damages for their injuries."[9] The key phrase in that conclusion is "sexual assault." In this case, Plaintiff did not plead sexual assault and does not assert facts to fall under Section 22.011(a)(1)(A) of the Penal Code which Plaintiff claims is applicable.[10] Instead, Plaintiff asserts language that mirrors the civil assault elements and/or cause of action.

---

[7] *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W. 3d 656, 657 (Tex. App. – Houston [14th Dist.] 2011, rev. den'd).

[8] *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W. 3d 656, 657 (Tex. App. – Houston [14th Dist.] 2011, rev. den'd)(Second Amended Original Petition, NO. 2008-52382, at p.2), Ex. A.

[9] *Stephanie M. v. Coptic Orthodox Patriarchate Diocese of S. U.S.*, 362 S.W. 3d 656, 659 (Tex. App. – Houston [14th Dist.] 2011, rev. den'd); see also Pl.'s Resp. to Def.'s M/MSJ at p. 18.

[10] Pl.'s Resp. to Def.'s M/MSJ, at pp. 16-17.

4

Plaintiff indicates that Defendants "never once" cited the statute, Texas Civil Practice & Remedies Code Section 16.003(a) in its Motion to Dismiss and Motion for Summary Judgment to imply that Defendants did not cite to the statute because it does not apply. This is simply not the case. Interestingly, although Plaintiff does not apply that same assertion to her own Petition which also does not once cite the Texas Penal Code for sexual assault, Section 22.001(a)(1) , even though she goes to great lengths to convince this court that it somehow should apply now in order to avoid the correct, two year statute of limitations for her assault and invasion of privacy causes of action.

**B. Civil Practice and Remedies Code §16.0045(a) is inapplicable to the facts of this case and therefore the five-year statute of limitations cannot apply.**

Plaintiff now asserts that this case is "clearly governed by the provisions of Civ. Prac. & Rem. Code §16.0045(a) which provides for an applicable five (5) year statute of limitations."[11] First, Plaintiff admits that her petition asserts causes of action for assault and invasion of privacy. Now, in order to avoid the statute of limitations of these claims, Plaintiff suddenly asserts that "her claims fall more reasonably within the parameters of Civ. Prac. & Rem. Code §16.0045(a), which provides for a five (5) year limitation period in cases involving sexual abuse..."[12]

(a) A person must bring suit for personal injury not later than five years after the day the cause of action accrues if the injury arises as a result of conduct that violates:

(1) Section 22.011. Penal Code (sexual assault).[13]

Section 22.011 of the Penal Code, "**Sexual Assault**" states in pertinent part as follows:

A person commits an offense if the person:

(1) intentionally or knowingly:

---

[11] Pl.'s Resp. to Def.'s M/MSJ, at p. 12.
[12] Pl.'s Resp. to Def.'s M/MSJ, at p. 14.
[13] Civ. Prac. & Rem. Code §16.0045(a)(1) (West 2015).

(A) causes the penetration of the anus or sexual organ of another person by any means, without the person's consent;

(B) causes the penetration of the mouth of another person by the sexual organ of the actor, without the person's consent; or

(C) causes the sexual organ of another person, without the person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor...[14]

Defendants are not attempting to ignore the facts of the case or diminish or disrespect the events that Plaintiff has alleged occurred. Additionally, Defendants are not blind to the Plea Agreement signed by Defendant Morris and/or the Superseding Indictment in the criminal case. However, as is necessary and appropriate, Defendants must apply the law as it stands to the facts as they are in this case.

The five year statute of limitations as stated in the Civil Practice & Remedies Code §16.0045(a), on which Plaintiff now intends to rely, is only applicable if the injury to plaintiff arises as a result of conduct that violates Section 22.011 of the Texas Penal Code. Plaintiff even admits this and refers to the requirement of penetration of the sexual organ of another person by any means, without that person's consent.[15] Plaintiff attempts to gloss over and ignore the meaning of "sexual assault" and the elements necessary for a person to be guilty of such offense. Thus Defendants will address each in turn to show the inapplicability to the causes of action herein and therefore the reason why Plaintiff plead assault and invasion of privacy not personal injury caused by sexual assault as she now claims.

Sexual assault with regard to Civil Practice and Remedies Code §16.0045(a) is governed by the definition contained within Section 22.011 of the Penal Code as clearly delineated within its text. Therefore, as Plaintiff is not a child, in order for §16.0045(a) to apply, Defendant would

---

[14] Penal Code §22.011(a)(1)(A)-(C) (West 2015)(Note: Defendants did not include the text of §22.011(a)(2) because it applies to a child and is therefore inapplicable in this case).

[15] Pl.'s Resp. to Def.'s M/MSJ at p. 16.

6

have had to commit sexual assault under Section 22.011(a)(1) of the Penal Code.

As to the first two ways to meet the requisite element of sexual assault, "penetration" is required. In her recitation of the facts, Plaintiff states that she felt certain that "she was physically violated because she had redness in her vaginal area and bruises on her arm and "hip area." Although she did not feel she had been raped, she felt like she had "been touched" and she was sore in her "female regions", especially on the outside."[16] Specifically, Plaintiff testified as follows:

Q: ...Do you believe you have been sexually violated?

A: Yes.

Q: In what fashion?

A: I was having pictures taken of me with my clothes off.

Q: Okay. Anything else that would lead you to believe you had been sexually violated?

A: I felt like I had been like touched, but not like – like it didn't feel like anybody had sex with me.

Q: but I was like kind of sore in my female regions.

A: You believed you were sore in your female regions.

Q: Yeah – but not – like on the outside.[17]

Plaintiff's own testimony indicates that no penetration as set forth in Texas Penal Code Section 22.011(a)(1)(A) or (B) took place. Plaintiff also offers no facts to support an offense of sexual assault under Section 22.011(a)(1)(C).[18]

---

[16] Pl.'s Resp. to Def.'s MSJ, at p. 7 (citing Farmer Dep., at 99:12-22).
[17] Farmer Dep., at pp. 99:20-100:10, Ex. B.

7

In evaluating a similar situation where the plaintiff did in fact plead assault and sexual assault but the facts revealed that the statute of limitations had expired on the assault claim and the alleged actions of Defendants did not meet the elements and/definition of sexual assault in the Texas Penal Code, the court determined that the defendant's motion for summary judgment on those grounds should be granted with prejudice.[19] Similarly here, Plaintiff cannot simply avoid the two-year statute of limitations for personal injury although she does not meet the requisite elements for sexual assault in which the five-year statute of limitations would apply.

Plaintiff incorrectly concludes that, "Ms. Farmer made very clear in both her FBI statement and her deposition testimony that her vaginal region was red and sore, indicating to her at least some degree of penetration, although she did not believe she had been raped."[20] As outlined in the excerpted deposition testimony of Plaintiff above, she did not say that there was "some degree of penetration." Plaintiff now makes this factually baseless conclusion to attempt to push her claims into §16.0045 to avoid Defendants statute of limitations defenses.

Plaintiff cites to *Mayzone v. Missionary Oblates of Mary Immaculate of Texas*, to support its assertion that a five year statute of limitations applies where the plaintiff brings suit for personal injury caused by sexual assault or aggravated sexual assault.[21] However, in *Mayzone*, plaintiff Mayzone filed a lawsuit alleging that he was sexually abused by Defendant when he was a minor. Therefore, the claims asserted therein were related to Section 22.011(a)(2) as to the sexual abuse of a minor child. The instant case is clearly distinguishable from sexual abuse of a child.

---

[19] *Carrion v. Asrawi*, No. DC1403691, 2014 WL 6682548 (Tex. Dist. – Dallas County, Nov. 10, 2014)(citing Tr. Ct. Order, 101st Judicial Dist.), Ex. C.

[20] Pl.'s Resp. to Def.'s M/MSJ, at p. 16-17(citing Farmer Dep. 99:20-100:7).

[21] Pl.'s Resp. to Def.'s M/MSJ, at p. 19 (citing *Mayzone v. Missionary Oblates of Mary Immaculate of Texas*, No. 04-13-00275-CV, 2014 WL 3747249, at *3(Tex. App. – San Antonio, July 3, 2014).

As to Plaintiff's invasion of privacy claim, Plaintiff asserts that the "claim is a part and parcel of her sexual violation."[22] It seems that Plaintiff is trying to assert that the invasion of privacy claim must then have a five-year statute of limitations instead of a two-year limitations. As set forth in Defendant's Motion, the invasion of privacy statute of limitation is clearly stated within Texas law as being two years. The fact that nude pictures were taken of Plaintiff does not suddenly extend the two year statute of limitations on an invasion of privacy claim, and Plaintiff's point to no case law stating same. In fact, in *Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084 (5th Cir. 1984) plaintiff and her husband brought an action against Hustler magazine alleging invasion of her privacy when it published a nude photograph of her. In finding that Texas law applied to the case, the Court determined a two-year statute of limitations for the invasion of privacy claim. "Texas courts construe statutes of limitations strictly, requiring that an action be specifically excepted in order to avoid application of the general statute of limitations."[23] Similarly here, the two-year statute of limitations must apply as Plaintiff's claim is clearly pled as "invasion of privacy."

Plaintiff's sudden reliance on Tex. Civ. Prac. & Rem. Code §16.0045 is simply an attempt to defeat Defendants' limitations defense and a futile attempt to utilize the extended five-year statute to bring assault and invasion of privacy claims under the purview of sexual assault.

## C. The Statute of Limitations should not be Tolled

Plaintiff's assertion of fraudulent concealment as an affirmative defense to a statute of limitations is misplaced and inapplicable to the instant case. Plaintiff claims that fraudulent concealment makes her invasion of privacy claim timely even if the Court were to apply the two-year statute of limitations because Plaintiff allegedly "learned of the photos and what they

---

[22] Pl.'s Resp. to Def.'s M/MSJ, at p. 17.
[23] *Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084, 1089 (5th Cir. 1984).

9

showed only after the FBI seized them from Morris and showed them to her in May, 2012."[24] This assertion is without merit.

Fraudulent concealment is based upon the doctrine of equitable estoppel. If proved, the defense of fraudulent concealment estops a defendant from relying on the statute of limitations as an affirmative defense until the plaintiff discovers or, through reasonable diligence, could discover its cause of action.[25] Therefore, under the facts of the present case, Defendants challenge Plaintiff's fraudulent-concealment defense, and in essence her equitable-estoppel defense.

Fraudulent concealment is an affirmative defense and therefore, the burden is on Plaintiff to present summary judgment evidence to support such defense. Plaintiff failed to meet this burden. To show that the defendant engaged in fraudulent concealment for purposes of estopping the assertion that limitations has run, the plaintiff must show that the defendant had actual knowledge that a wrong had occurred and had a fixed purpose to conceal facts necessary for the plaintiff to discover that its cause of action had accrued. The estoppel effect is not permanent, but merely tolls limitations until the plaintiff learns of the facts that give rise to its cause of action or should learn of the facts in the exercise of reasonable diligence.[26]

Plaintiff attempts to ignore or gloss over the fact that Plaintiff knew of her cause of action by May 2011. She testified in her deposition that in May 2011 she had reason to believe she was violated because she had "pictures take on [her] with [her] clothes off."[27] Plaintiff in fact knew that pictures had been taken of her as of May 2011. "Reliance is not reasonable when

---

[24] Pl.'s Resp. to Def.'s M/MSJ, at p. 41.
[25] *Robinson v. Ultramar Diamond Shamrock Corp.*, No. 01-02-00738, 2003 WL 21101730, at * (Tex. App. – Houston [1st Dist.] May 15, 2003).
[26] *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 746 (Tex. App. 1993), writ denied (Apr. 28, 1994).
[27] Farmer Dep., at 99:12-100:10, Ex. B; *see also* Def.'s M/MSJ, at p. 15.

10

information revealing the truth could have been discovered within the limitations period." In the instant case, Plaintiff had knowledge that pictures were taken of her as she testified "...I heard the sound of a Blackberry camera..." "Like a clicking, like the picture sound that a Blackberry makes when it's taking a picture."[28] She also testified, "I was having pictures taken of me with my clothes off" when asked if she had reason to believe she had been violated as of May 2011.[29]

Knowledge of facts, conditions, or circumstances which would cause a reasonable person to make inquiry leading to the discovery of the concealed cause of action is in the law equivalent to knowledge of the cause of action for limitation purposes.[30] Even where a child has been sexually abused, and claims "chronic psychological condition" prevented him from understanding his injuries were as a result of the sexual abuse and other actions of defendants, Texas courts have found that fraudulent concealment will not toll the statute of limitations.[31] Plaintiff's assertion that she "first saw the photos only after the FBNI [sic] seized them" does not remove the clear fact that she knew pictures were taken of her while she was naked in May 2011, as she clearly testified.[32]

Despite Plaintiff's burden to meet all the elements of fraudulent concealment in order for it to apply, Plaintiff buries those elements in its Response and fails to provide competent summary judgment evidence that each of the elements are met.

**D. Defendants' Motion to Dismiss based on the affirmative defense of limitations is timely.**

---

[28] Farmer Dep., at 97:15-20, Ex. B; *see also* Def.'s M/MSJ, at p. 4.
[29] Def.'s M/MSJ, at p. 5 (citing Famer Dep. 197:15-198:3, Ex. A; *see also* Farmer 2.2.12 Interview FBI, at 33:9-15, Ex. D).
[30] *Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.*, 866 S.W.2d 740, 747 (Tex. App. 1993), writ denied (Apr. 28, 1994).
[31] Doe v. Roman Catholic Archdioceses of Galveston- Houston ex rel. Dinardo, 362 S.W.3d 803, 814 (Tex. App. – Houston [14th Dist.] 2012.
[32] Pl.'s Resp. t o Def.'s M/MSJ, at p. 21.

11

Plaintiff's assertion that Defendants have waived their right to file a motion to dismiss in this case based on the affirmative defense of limitations pursuant to Texas Rule of Civil Procedure Rule 91a is flatly incorrect. Texas Rule of Civil Procedure Rule 91a states;

> Except in a case brought under the Family Code or a case governed by Chapter 14 of the Texas Civil Practice and Remedies Code, a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact. A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought. A cause of action has no basis in fact if no reasonable person could believe the facts pleaded.[33]

The clear language of Rule 91 states that a party may move to dismiss a cause of action on the grounds that it has no basis in law or fact. Rule 91 does not mandate that a party must take this action pursuant to this rule. Plaintiff claims that a Rule 91a motion to dismiss is the proper vehicle to assert an affirmative defense of limitations.[34] Then Plaintiff attempts to stretch this assertion to cover her own creative assertion that this automatically means that a motion to dismiss at any other time is suddenly "untimely." This is not the scope of Rule 91a. Instead the rule is a vehicle to provide an expedited way to get the court to review a baseless claim early on in the litigation because the court must grant or deny the motion within 45 days and is not required to even conduct a hearing before ruling on the motion.[35] Alternatively, Defendants also asserted such affirmative defense in its motion for summary judgment which is also a proper vehicle for such defenses.

**E. The TCHRA is the appropriate vehicle for Plaintiff to bring a claim against Defendant Edible however she failed to do so and is now precluded pursuant to its administrative requirements.**

---

[33] Tex. R. Civ. P. 91a.
[34] Pl.'s Resp. to Def.'s M/MSJ, at p. 24.
[35] Tex. R. Civ. P. 91a.

12

In response to Plaintiff's assertion that the TCHRA only applies to "actions in the workplace which implicate the conditions of employment" Defendants first assert that the location of the sexual actions being on business trips does not negate the applicability and subsequent administrative requirement of the TCHRA. In *Dorn Hecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 308 (5th Cir. 1987), the district court found for a plaintiff employee who resigned because of sexual harassment that involved the following incidents that occurred on out-of-town business trips; (1) a marketing consultant hired by Malibu and sent on a business trip with plaintiff employee put his hands on her hips in an airport ticket line and dropped his pants in front of the passengers while waiting to board the airplane, (2) he touched her breasts and (3) he put his stocking feet on a cocktail table directly in front of her and "playfully" choked her when she complained. The plaintiff in *Dorn Hecker* filed suit for sexual harassment pursuant to Title VII and the court considered it as such although the actions took place away from the actual workplace while on business trips, analogous to the incidents in the instant case. In *Gazda v. Pioneer Chlor Alkall Co., Inc.*, 10 F.Supp.2d 656, 665 (5th Cir. 1997) the plaintiff-employee was subjected to unwanted sexual conduct while on a business trip and such actions were evaluated by the Court under Title VII sexual harassment. All of the incidents related to the case took place on a business trip away from the plaintiff's usual workplace however, this did not negate the application of Title VII sexual harassment claim. Therefore, Plaintiff's assertion that the alleged sexual actions took place "outside the workplace, in fact in a remote state" are truly irrelevant.[36]

Second, Plaintiff's assertion that the TCHRA has no application here is also without merit especially to Defendant Edible Software. In *Waffle House, Inc. v. Williams*, the Texas Supreme Court held that **"employer liability for unwanted sexual touching by a coworker**

[36] Pl.'s Resp. to Def.'s M/MSJ, at p. 31.

13

(simply assault under Texas law given its 'offensive or provocative' nature) **is limited to a tailored TCHRA scheme that specifically covers employer liability for sexual harassment.**"[37] Plaintiff contends that this is manifestly distinguishable because "Morris didn't abuse Ms. Farmer to "affect a tangible aspect of the employment relationship."[38]

> To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The alleged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." Further, it is examined under a "totality of the circumstances" test, which considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.[39]

Plaintiff misstates the meaning of "affect a term, condition or privilege" of employment by stating that the conduct that forms the basis of Plaintiff's claims must not be applicable to the TCHRA because Defendant Morris did not take such actions with the intention to make an employment decision or affect a condition of her employment. This argument is in fact nonsensical. There is no requirement that there be evidence that the employer "intended" to make an employment decision or affect a condition of her employment. The key is the conditions imposed, not the employer's state of mind.[40] Here Defendant Morris' unwanted sexual touching, as alleged by Plaintiff, is governed by the TCHRA as to employer liability (Defendant Edible liability). As Defendant pointed out in its Motion, Plaintiff testified that this unwanted sexual touching did affect terms and conditions of her employment because she felt uncomfortable around her supervisor Defendant Morris and began looking for other employment

---

[37] *Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 802-803 (Tex. 2010).
[38] Pl.'s Resp. to Def.'s M/MSJ, at p. 30.
[39] *Paul v. Northrop Grumman Ship Sys.,* 309 F. App'x 825, 827-28 (5th Cir. 2009)(internal citations omitted).
[40] *McCowan v. Software Spectrum, Inc.,* No. 08-00-00077-CV, 2002 WL 505138, at *7 (Tex. App. – El Paso April 4, 2002).

14

because of the sexual harassment.[41] Therefore, Defendant's assertion that Plaintiff cannot point to a single, "term, condition, or privilege of the plaintiff's employment" affected by the harassment is untrue.

Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." By Plaintiff's own recitation of the facts, Defendant Morris' conduct had the effect of unreasonably creating an intimidating, hostile and/or offensive environment. She testified that she spoke with Defendant Morris about what happened while on the business trip and told him it was inappropriate, wrong and that she needed to find a different job.[42] Plaintiff did in fact start looking for another job due to Defendant Morris' conduct.[43] Her actions and feeling that she could not work with Defendant Morris anymore also gives rise to a constructive alteration of the terms or conditions of employment although not culminating in a tangible employment action.[44] Plaintiff cannot try to avoid the administrative pre-requisites of the TCHRA now by asserting that there was no creation of an intimidating, hostile or offensive environment. This is wholly inapposite to Plaintiff's own testimony.

A hostile work environment sexual harassment claim was the exclusive remedy for Plaintiff to bring a claim against Defendant Edible for such conduct as asserted here, which took place on a business trip during her employment by Defendant Edible. The law is clear and also the legislative intent is also clear related to damage caps that common law claims do not have.

In determining that the sexual harassment statutes precluded state common-law claims, the Texas Supreme Court noted that the state statutes

---

[41] Def.'s M/MSJ, at p. 11 (citing Farmer Dep., at 27:13-16; 133:21-134:10, Ex. A).

[42] Farmer Dep., at 106:5-7, Ex. B.

[43] Farmer Dep., at 29:18-25, Ex. B.

[44] *Twigland Fashions, Ltd. v. Miller*, 335 S.W.3d 206, 217 (Tex. App. – Austin, 2010).

15

have caps on compensatory and punitive damages available to a plaintiff that the common law claims did not have. Title VII has similar caps. The court noted that allowing common law claims to be pursued would allow plaintiffs to avoid those damage limitations.[45]

Allowing a common law claim to be pursued against Defendant Edible when the case falls within the purview of the TCHRA would be allowing Plaintiff not only to avoid the mandatory administrative requirements but also to avoid damage limitations.

## F. Defendants meet their burden to establish the affirmative defense of limitations and therefore the alternative motion for summary judgment should be granted.

Plaintiff is misplaced in her assertion that Defendant cannot meet the summary judgment standard in this case that the Plaintiff cannot meet the elements of her causes of action. That argument is inapplicable because the summary judgment motion before the court is based on affirmative defenses.[46] A defendant is entitled to summary judgment on an affirmative defense, such as limitations, if the defendant conclusively proves all the elements of the affirmative defense. To conclusively prove all of the elements of the affirmative defense, the movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. If the defendant meets this burden, the plaintiff must then produce evidence raising a genuine issue of material fact to avoid summary judgment on the affirmative defense.[47] Plaintiff asserts that it has "more than met that obligation by compellingly demonstrating that her claims are governed by the Civ. Prac. & Rem. Code §16.0045(a)(1)'s five (5) year limitation period." However, as explained herein, Plaintiff has brought forth no competent summary judgment evidence that she in fact pled sexual assault or that the requirements of Section 22.011 of the Penal Code were met for her claims to fall under

---

[45] *Garcia v. Shell Oil Co.*, 355 S.W.3d 768, 777 (Tex. App. 2011).

[46] Pl.'s Resp. to Def.'s MSJ, at p. 35-36 ("Here, the Defendants have negated nothing, much less any prima facie elements of Ms. Farmer's claims.").

[47] *Vu v. ExxonMobil Corp.*, 98 S.W.3d 318, 320 (Tex. App. 2003).

16

§16.0045(a)(1) for sexual assault. Without such evidence, Plaintiff's attempt to raise a genuine issue of material fact to avoid summary judgment on Defendants' statute of limitations defense fails.

## III. CONCLUSION

For the foregoing reasons, Defendants respectfully requests that this Court grant its Motion to Dismiss or alternatively, Motion for Summary Judgment and order that Plaintiff take nothing for her claims against Defendants. Defendants further requests all other relief to which it is entitled.

Respectfully Submitted,

*/s/ Gregg M. Rosenberg*
Gregg M. Rosenberg
Texas State Bar ID 17268750
ROSENBERG & SPROVACH
3518 Travis, Suite 200
Houston, Texas 77002
Tel: (713) 960-8300
Fax: (713) 621-6670
Attorney-in-Charge for Defendants

OF COUNSEL:
ROSENBERG & SPROVACH                    ATTORNEYS FOR DEFENDANTS

17

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing instrument has been forwarded via electronic transmission and hand delivery on this the 26th day of February 2015 to:

Jeffrey N. Todd
312 S. Friendswood Drive
Friendswood, Texas 77546
(281) 992-8633 (Tel)
(281) 648-8633
jeff@actlaw.com

/s/ Gregg M. Rosenberg
GREGG M. ROSENBERG

Unofficial Copy Office of Chris Daniel District Clerk

# EXHIBIT A

Unofficial Copy Office of Chris Daniel District Clerk

1

CAUSE NO. 2012-65503

| | | |
|---|---|---|
| KERI HILL and | § | IN THE DISTRICT COURT |
| MICHELLE BARNETT | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | 55TH JUDICIAL DISTRICT |
| | § | |
| HENRI MORRIS and SOLID | § | |
| SOFTWARE SOLUTIONS, INC., | § | |
| d/b/a EDIBLE SOFTWARE | § | |
| Defendants | § | HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
.ORAL AND VIDEOTAPED DEPOSITION OF
ANDREA FARMER
JULY 11, 2013
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of ANDREA FARMER, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 11th of July 2013, from 10:09 a.m. to 3:56 p.m., before Molly Carter, CSR in and for the State of Texas, reported by machine shorthand, at the offices of U.S. Legal Support, 802 North Carancahua, Suite 2280, Corpus Christi, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

APPEARANCES

FOR THE PLAINTIFF(S):
MR. JEFFREY N. TODD
The Law Firm of Alton C. Todd
312 South Friendswood Drive
Friendswood, Texas 77546
Phone: (281) 992-8633
Fax:   (281) 648-8633
jeff@actlaw.com

FOR THE DEFENDANT(S):
MR. GREGG M. ROSENBERG
Rosenberg & Sprovach
3555 Timmons Lane, Suite 610
Houston, Texas 77027
Phone: (713) 960-8300
Fax:   (713) 621-6670
gregg@rosenberglaw.com

FOR THE DEFENDANT HENRI MORRIS:
MR. DAN COGDELL
Cogdell Law Firm
402 Main Street, 4th Floor
Houston, Texas 77002
Phone: (713) 426-2244
Fax:   (713) 426-2255
dan@cogdell-law.com

ALSO PRESENT:
MR. TOMMY KLING, VIDEOGRAPHER
MR. DESTRY QUIROZ, VIDEOGRAPHER
MR. TREVOR MORRIS
MS. BETH JACKSON (Present from 10:09 to 10:38)

3

INDEX

Appearances ........................................ 2

ANDREA FARMER

Examination by Mr. Rosenberg ................... 5
Examination by Mr. Cogdell ..................... 148
Re-Examination by Mr. Rosenberg ............... 222

Certified Question ............................ 143
Signature and Changes ......................... 239
Reporter's Certificate ........................ 241

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Photo of Andrea and Comedian | 85 |
| Exhibit 2 | Photo of Henri and Comedian | 95 |
| Exhibit 3 | Email from Andrea to Henri | 125 |
| Exhibit 4 | Handwritten Notes on Back of Statement | 149 |
| Exhibit 5 | 5/9/11 Facebook Post | 193 |
| Exhibit 6 | 5/9/11 Facebook Post | 193 |
| Exhibit 7 | 5/10&11/11 Facebook Posts | 222 |
| Exhibit 8 | 5/9/11 Facebook Post | 222 |
| Exhibit 9 | 5/11&12/11 Facebook Posts | 222 |

4

| Exhibit 10 | 5/12 & 7/27/11 Facebook Posts | 222 |
|---|---|---|
| Exhibit 11 | 7/27&29/11 Facebook Posts | 222 |
| Exhibit 12 | 8/2/11 Facebook Post | 222 |
| Exhibit 13 | 8/2&8/11 Facebook Posts | 222 |
| Exhibit 14 | 8/8/11 Facebook Post | 222 |

**Page 5**

THE VIDEOGRAPHER: Time is 10:09 a.m., July 11th, year 2013. We are recording.

ANDREA FARMER, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ROSENBERG:

Q. Can you please state your name, state and spell your name for the record?

A. Andrea Farmer.

Q. Okay. Ms. Farmer, we're going to put you on hold for just one second. There's a technical issue that Mr. Todd and I need to address that really doesn't concern you. So we're just going to forget about you for a second and address this, get it on the record, and continue with your deposition.

MR. ROSENBERG: Jeff, tell me if I'm wrong, you lodged an objection prior to the deposition starting contending that Ms. Jackson should not be here, and you were invoking the rule. My position was that we noticed that Ms. Jackson and Mr. Morris, Trevor Morris would be here, in accordance with the appropriate Rules of Civil Procedure, and our position is you didn't object. You said you're invoking the rule.

We agreed to take it up later, with my risking the fact that Ms. Jackson might not be able to testify at

**Page 6**

trial.

MR. TODD: That is correct.

MR. ROSENBERG: Okay.

MR. TODD: Counsel for Plaintiff objects to the attendance of Beth Jackson. It's not necessarily -- it's not an objection. I'm invoking the rule at this time. It's anticipated that she's going to testify at trial. As such, I'm invoking the rule. If they don't mind the rule, then she shall be excluded from testifying live at trial.

I further am objecting to her attendance at any other depositions, as she is anticipated to be a witness in this matter. She's not a corporate rep. We haven't objected to any attendance by Trevor Morris because he is the corporate rep.

We will also be quashing any other depositions of nonparties in this matter at this time.

Q. (By Mr. Rosenberg) Okay. Where do you reside, ma'am?

A. 3418 Austin Street in Corpus Christi.

Q. How long have you lived at that address in Corpus Christi?

A. A year and three months.

Q. Bringing us back to approximately March of 2012?

**Page 7**

A. Yes.

Q. Where did you live prior to that?

A. 1117 North Austin Street in Rockport, Texas.

Q. And Rockport is in a neighboring county. Correct?

A. Yeah, it's like 45 minutes away.

Q. Okay. And how long did you live there?

A. It was my parents' residence, so it was sort of like my permanent residence, I guess. But I lived there from September -- six months.

Q. Where did you live prior to the Rockport address?

A. 3000 Studemont -- I can't remember my old address -- Studemont and Washington, Houston, Texas.

Q. What do you do for a living today?

A. I work for Konica Minolta, with a K. It's a business solutions company, so I sell hardware and software to different businesses.

Q. And how long have you been working for Konica Minolta?

A. Since February.

Q. Do you have a territory?

A. Yes.

Q. Where is the territory?

A. Well, I have vertical, so anywhere in Corpus

**Page 8**

and the surrounding area, and I'm verticalized into legal oil and gas, education, finance.

Q. So you cover Corpus Christi in a multifaceted area of their, of Konica Minolta's --

A. Right, so as far east as Victoria and as far west as Kingsville.

Q. Okay. Have you ever provided deposition testimony such as what we're doing this morning?

A. No.

Q. Have you spoken with anybody in preparation of this deposition?

A. Yes.

Q. Who have you spoken with?

A. Sherri Zack, and her assistant, John -- I'm at a loss for John's name. I didn't know him that well.

Q. It's a him?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Sean is a man?

A. John.

Q. Oh, John.

A. I think his name is John.

Q. Okay. Who else did you speak to in preparation for this deposition?

9

A. That's it.

Q. Okay. You spoke to Jeff Todd?

A. Not in preparation, but yes, I've spoken to him.

Q. When did you speak with Mr. Todd?

A. Last Wednesday, the 3rd.

Q. In person or over the phone?

A. Over the phone.

Q. When you met with Sherri Zack and this person John, when was that?

A. Yesterday.

Q. Was that in person or over the phone?

A. It was a video meeting, conference.

Q. Okay. So you were here in Corpus Christi?

A. Uh-huh.

Q. And she was somewhere else?

A. In Houston.

Q. Okay. Because you haven't provided deposition testimony before and we're going along in a dialogue, I want to just point out a few things that are a little bit different in a deposition than are, than would be in normal conversation.

Obviously, you're being videotaped. And obviously I'm sitting here at a table with various attendees around the table, and we all know what each other's saying.

10

Correct?

A. Uh-huh.

Q. But the most important, the way we get this record official is by the presence of the court reporter sitting between us.

A. Uh-huh.

Q. And she has this little machine with all these buttons.

A. Uh-huh.

Q. Unfortunately, there's no button for "uh-huh" or "huh-uh." So even though I know what you mean when you say "uh-huh" or "huh-uh" or something of that nature, I'm going to ask you if that's a "yes" or if that's a "no." We all know what it is, but the way the record is official is if I do that.

A. Okay.

Q. Okay? So I'm not, I'm not going to be -- I'm not picking on you. I just, it's something we've got to do until they figure out a way to get an extra button on those machines --

A. Uh-huh.

Q. -- we're done. Okay?

A. Okay.

Q. If at any time today you want to take a break, except when a question's pending, of course, use the

11

restroom, to do whatever, maybe have a cigarette, whatever it is you want to do, let us know. But I think you heard -- or if you didn't hear, I'll remind you -- the video disks or tapes last for about an hour, so there will be a natural hour break.

A. Okay.

Q. Even though you can anticipate what my question may be, allow me to finish the question before you begin your answer. It, again, allows the court reporter to get a question-and-answer transcript in sequence.

A. I do have a question.

Q. Sure.

A. Some of the testimony that I gave in my statement to the FBI is actually about Beth, so I don't understand how that's an appropriate -- like will you just not ask me questions about her or about the statement that I made about her, or -- that's what I'm having a hard time with her being here.

Q. Yeah.

A. Because like some of my testimony is about her.

Q. I understand that. All I can tell you in response to that is my role here is to defend the company in a case that other people have brought against it.

A. Right.

Q. You have provided information about allegations

12

of conduct that relates to these claims. And I'm going to be asking you what I believe I need to ask you in defense of the claims brought by those three people against my two clients. Okay?

A. What three people?

Q. Well, let me ask you -- let me ask you, do you know who the three people who brought suit against Edible Software and Henri Morris are?

A. I mean, I know the people that it says on this paper.

Q. What paper are you referring --

A. Keri Hill and Michelle Barnett.

Q. Barnett. And --

A. This is my subpoena.

Q. Right. I -- thank you. I see it. There's an additional person who's joined named Stacy Stewart.

A. Right.

Q. Okay. So those three people --

A. Okay.

Q. -- have brought lawsuits. Let me clarify. Those three people have joined in one lawsuit --

A. I understand.

Q. -- against my two clients. Okay? I may be asking you questions about comments you may or may not have made to Ms. Jackson, but at this point, I'm not

## 13

certain.

A. Okay.

Q. Okay. Where were you when you provided the video conference discussion with Ms. Zack and this gentleman named John yesterday?

A. At the U.S. Attorney office at One Shoreline, the Bank of America building.

Q. What time of day was that?

A. It was 2:30.

Q. How long did it last?

A. Two hours.

Q. Was that the first time you've ever spoken with Ms. Zack?

A. No.

Q. On how many other occasions have you spoken with Ms. Zack?

A. Four to six.

Q. Four to six occasions?

A. (Nodding head.)

Q. Yes?

A. Yes.

Q. Nods of head, there's no button for that either.

A. Right.

Q. Have you spoken with anybody else from the U.S.

## 14

Attorney's Office?

A. John, who was there at the video deposition.

Q. Right. Video deposition?

A. Or not video deposition, video conference.

Q. Okay.

A. And then anyone who answers the phone when I call.

Q. Okay. Have you spoken with a gentleman named Jocher?

A. Maybe that's who was --

Q. The other, that -- that might be John?

A. Yes.

Q. Okay. Makes sense. I just want to make sure that --

A. Well, I don't want to say that, because I'm not sure what his name was.

Q. Okay. Have you spoken with anybody with the office of the Federal Bureau of Investigations?

A. Yes.

Q. On how many occasions?

A. Fifty.

Q. About fifty times?

A. I mean, once a month for the past two -- or maybe less than fifty. I would say twenty.

Q. Okay. So you're --

## 15

A. Once a month for the past year, and then sometimes a couple of times a week, depending on what's going on with the criminal trial.

Q. Okay. Let's go to your conversation yesterday with Ms. Zack and this gentleman, John.

A. Uh-huh.

Q. What did y'all discuss?

A. They just, you know, told me to be honest and tell the truth and take my time with my answers. And it was more of me soliciting, wanting to feel more comfortable, because obviously I don't have any representation in this room, and I wanted to get an idea of what was going to happen and what a deposition is like.

Q. Okay. Are you comfortable that you know what a deposition is like and what it's used for?

A. Yes.

Q. You understand your testimony is under oath?

A. Yes.

Q. And that's the same oath that you will be provided if you testify live at any other proceeding, not necessarily this one.

A. So this, and possibly including the criminal case.

Q. Well, the oath is the same. I'm not here about

## 16

the criminal case.

A. Right.

Q. I'm here about the facts. Some of the facts overlap, and I'm here about certainly those facts. I'm certainly not going to mislead my, my goal in asking you questions. There's -- as you know, there's some commonality in the facts.

A. Yes.

Q. Correct? But I can tell you, since you did ask, and I think it's a fair question, my understanding is that the oath is the same in federal -- in criminal court and civil court.

A. Okay.

Q. No different than what you just were administered.

A. Okay.

Q. Okay. Did you and Ms. Zack, at your video conference yesterday, go over any of the facts giving rise to experiences you had that concern Henri Morris or Edible Software?

A. Yes.

Q. What experiences did you discuss?

A. There were some unclear points in my original statement to the FBI, as far as dates were concerned and which city I was in, and so it was clarification on times

17

and dates.

MR. COGDELL: Do you need some water?

THE WITNESS: No, thank you.

MR. COGDELL: Anybody?

MR. TODD: No thanks.

Q. (By Mr. Rosenberg) For example, what times and dates were you concerned about?

A. For example, one instance, I -- in my deposition, I started talking about something that had happened in Washington, D.C., and it was -- I was talking about it as if it had happened in Chicago. But then I remembered that it had happened in Washington, D.C.

Q. Now, you referred to it as your deposition.

A. My statement.

Q. Okay. And I know what you mean, and I'm going to just clarify --

A. I feel like we called it my deposition for so long, and I know that it wasn't, that it's hard to get out of the habit of calling it that.

Q. Who called it your deposition?

A. I think Glenn Gregory.

Q. Tell us who Mr. Gregory is.

A. Glenn Gregory is the FBI Agent that originally called me on the allegations against Henri Morris.

Q. Okay. Up until the time that Mr. Gregory

18

called you, is it fair to say that regarding the allegations and the treatment you personally endured while employed at Edible Software, you had, you hadn't reported that to anybody?

A. No.

Q. It's not fair to say that?

A. It is fair to say that.

Q. Okay.

A. No, I had not reported it to anybody.

Q. Okay. And there are, however, allegations that you have relating to Henri Morris and Edible Software?

A. Yes.

Q. Can you tell me approximately when it was that Mr. Gregory first contacted you?

A. It was early December 2011.

Q. And how did he contact you?

A. He called me on my cell phone.

Q. How did he initiate the conversation?

A. Can you clarify that question?

Q. Yeah. I mean, it's the first time you've ever had contact with this, with this gentleman.

A. Uh-huh.

Q. Correct?

A. Yes.

Q. He's calling you on your cell phone. Correct?

19

A. Yes.

Q. If your cell phone is like my cell phone and any others, if the number is not engaged in your contacts, it will come up as just a number, without knowing who it is.

A. Uh-huh.

Q. Correct?

A. Yes, sir.

Q. And is it fair to say that there are times when you will receive a call that has a number that's not engaged or aligned with any of your contacts, that you'll just let it go to voicemail and figure out who it is?

A. Yes. But it was a 713 number, and I have several close friends who work in the Houston area. I was living in Rockport at the time. And I answered it, assuming that it was one of my close associates.

Q. So you spoke to Mr. Gregory head on. You didn't have to return the call?

A. No.

Q. You were engaged in conversation immediately?

A. Yes.

Q. What did he tell you about allegations that were being made against Mr. Morris?

A. He didn't say much at all. And I remember thinking, just kind of letting my mind run, like, "Oh, my

20

God, what did he do?" Knowing what --

Q. What did who do?

A. Henri.

Q. Okay.

A. Knowing what I had experienced, I assumed that it had to have been somewhere along those lines. I didn't really know anything at that point, because like I mentioned earlier, I hadn't told anybody or even really thought about it at all.

So he just mentioned that there had been some concern with Henri when he's in his relationship with his female employees, specifically when he's traveling, if I had anything that I might care to add to that or to say about it. And I said, "Yes, I do." And so then they arranged a meeting down here to meet with me. I believe it was in February.

Q. All right. So you have this conversation with Mr. Gregory December of 2011 asking you about conduct or allegations against Mr. Morris, who was your boss at Edible Software.

A. Uh-huh.

Q. Correct?

A. Yes.

Q. He was the President of the company?

A. Yes.

**21**

Q. And did you report to him?

A. Yes.

Q. So did he tell you what other people were alleging?

A. No.

Q. He just, you just told him that you did have some experience traveling with Mr. Morris.

A. Yes. And I think initially going in, I was more going to talk about, you know, since this was something that I was keeping to myself, that I was more going to talk about his relationship with his other employees, and maybe some --

I didn't know what had happened. So obviously, I had good and bad experiences at Edible Software. So I knew that they were, depending on the nature of what was going on, I would definitely have something to say regarding that.

Q. So you, you felt that the nature of the conversation Mr. Gregory was having with you related to Henri's relationship with other employees.

A. Yes.

Q. Did you observe Henri's relationship with other employees?

A. Yes.

Q. Which other employees did you observe Henri

**22**

interacting with?

A. I mean, I worked there for a --

Q. Okay. Let me give you a better question. Thank you. Sometimes lawyers ask bad questions.

A. Uh-huh.

Q. Did you observe anything untoward or inappropriate with the way Henri treated other employees? Not talking about you, but other employees.

A. Yes.

Q. Okay. What did you observe?

A. Saying things that were inappropriate in the office, drinking excessively. What I deemed as inappropriate?

Q. Sure.

A. Hugging.

Q. Okay. Anything else?

A. And I thought it was inappropriate when I saw him pour something into Beth Jackson's drink at the Hancock Center in Chicago.

Q. Okay. What's the Hancock Center? I should know this, but --

A. It's like one of the tallest buildings in Chicago. It's on Michigan Avenue.

Q. What else did you observe that was inappropriate?

**23**

A. There's probably more. That's all I can think about, of right now.

Q. Okay. What are the things that Henri said that you observed or heard that were inappropriate?

A. I can't think of a specific dialogue.

Q. Okay. I know that it's been some time since your disaffiliation --

A. Uh-huh.

Q. -- since you left Edible Software, but you've had time to think about what was going to happen today and what was going to take place. You knew that we were asking questions about a case that at least two people, from looking at the style of your subpoena --

A. Uh-huh.

Q. -- had against Mr. Morris. Correct?

A. Correct.

Q. So looking back today, even though you remember that Henri said things inappropriate, is it fair to say that you're unable to recall anything specific that you recall him saying in the workplace that was inappropriate?

A. I can recall things that he said that were inappropriate to me.

Q. Okay.

A. But I'm not keeping a dialogue of every

**24**

inappropriate thing that Henri Morris said while I was in that office. It would be too much.

Q. So your, is it your testimony that Mr. Morris was constantly inappropriate in the workplace?

A. Yes.

Q. So it never, it never stopped? There wasn't a time that he was appropriate?

A. I feel that in a given day, there may have been times in the day that he was appropriate, and times of the day that were inappropriate. But I would say on days that I did interact with him and with other employees, there was at least one thing in the day I would say that I felt uncomfortable with.

Q. And you worked there for how long?

A. Three months.

Q. And obviously, if I refer back to your prior testimony, despite the fact that this happened on a daily basis, you didn't report it to anybody. Correct?

A. Who would I report it to? His son in HR?

Q. That would be one.

A. Uh-huh. Actually, I think I did report it to Henri and Allen and -- or sorry, Trevor and Allen and had conversations with them about the way that Henri spoke to me and how it made me uncomfortable. And not necessarily -- when I say "inappropriate," it doesn't

Unauthorized Copy/Service of Christi of David Clerk

25

necessarily have to mean sexual.

Q. I understand. Inappropriate has --

A. Inappropriate is just unprofessional. And you know, I feel that given the short time I was there, yes, there were times that I brought it up to him, I brought it up to Trevor, and I brought it up to Allen that there were things that made me uncomfortable about the way that he spoke to his employees and myself.

Q. Well, I'm confused, because you just, in response to my question, you asked me a question -- I don't want to assign a definition to the way you were asking me, but almost dismissively, "Who would I report it to? His son?"

A. Right.

Q. And then, but then tell me that that's who you did report it to.

A. So I guess there were two times that I had a conversation with Allen about Henri and his behavior.

Q. Now, stop for a second. Allen, what do you --

A. Morris, who was the HR representative for Edible Software.

Q. Thanks. That's what I was going to ask you.

A. So, but I guess to answer your question, this is somebody that was very infrequently in the office. The times that he did come into the office, it was for

26

some sort of reprimanding. And I didn't feel like it was a situation where I could sit down and have a conversation with him about that.

And I think that when I did talk to Trevor about it, it was the response of, "Well, that's just the way he is," and "Just ignore him."

Q. Okay. Did you ever receive a personnel manual or harassment policy of any of that type of information --

A. No.

Q. -- from Edible Software?

A. I was being told that it was being revised or that it wasn't current.

Q. So your testimony is you've never --

A. No.

Q. -- received it. Forgetting for a second about inappropriate and narrowing it down --

A. Uh-huh.

Q. -- to either something that falls into the category of sexually inappropriate or sexually offensive at the workforce, do you recall anything that Mr. -- that Henri Morris did in that definition?

A. Yes.

Q. Tell us.

A. Can you be more specific?

27

Q. Well, you just said you could recall, so I want to know what it is you recall.

A. Specifically with me, or with others?

Q. Let's start with you first.

A. Can you repeat the question?

Q. Yes. Can you recall any instance where you observed Henri Morris act in either a sexually offensive or sexually inappropriate method to you, or manner to you?

A. Can I take a break?

Q. Not when a question's pending. Yes, you can, but I want the question answered.

A. Yes, there were two times -- well, I would say every time that I traveled with Henri, I observed him being sexually inappropriate with either Beth Jackson, one of our clients, or myself.

Q. All right. You did want a break, and I told you I'd give it to you after the question, but before we take a break, is there anything you need to elaborate on that, before I ask you more questions?

A. If you're okay with that answer, I'm okay with it.

Q. Okay. I just want to, like I told you, I'll give you a break any time you want it, except when a question's pending. So you did answer it. I have a

28

follow-up, but if you need a break, let's go off the record now.

A. Okay.

THE VIDEOGRAPHER: Time is 10:38 a.m. We're off the record.

(Recess from 10:38 a.m. to 10:50 a.m.)

THE VIDEOGRAPHER: Time is 10:50 a.m. We are recording.

Q. (By Mr. Rosenberg) Ms. Farmer, during the break, did you have any contact, e-mail, telephone or otherwise, with the FBI, U.S. Attorney's Office?

A. Yes, with the U.S. Attorney's Office.

Q. Who did you speak with?

A. Sherri Zack.

Q. What did you and Ms. Zack discuss?

A. My objection to Beth Jackson being in the room.

Q. Okay. And what did she tell you?

A. She can't be in the room, because she's a witness.

Q. That's what she told you?

A. (Nodding head.)

Q. Okay. Well, prior to you speaking with Ms. Zack, we made a decision internally, and we asked -- we realized it was making you uncomfortable, and we asked Ms. Jackson to leave.

29

So -- the camera's only on you, so would you verify that Ms. Jackson is no longer in the room?

A. Yes, she's no longer in the room.

Q. Okay. And you feel better about that?

A. Yes.

Q. All right. What was it about Ms. Jackson's presence that concerned you?

A. I just feel like -- the first time that the FBI contacted me -- you know, in my time at Edible Software, the one thing that really stood out and made me think, "Oh, my gosh, something's gone terribly wrong," was when I saw Henri pour something into Beth Jackson's drink at the Hancock Center.

And that was the first time that I was like something more may have gone on here than I'm aware of, and just the inappropriateness of, the immoralness of pouring something in a woman's drink without her knowing. And I think that was my biggest red flag. And when the FBI originally called me, that's what I had planned on going in and talking to them about.

Q. Okay. So you weren't -- I don't want to put words in your mouth, but let me just make sure we're --

A. Uh-huh.

Q. Excuse me, just to make sure we understand each other, your concern was the way Henri conducted himself

30

with other people, not necessarily you.

A. I mean, obviously I have concern for myself, and I felt very uncomfortable with what had transpired between Henri and I, in our travels, and I had a lot of guilt and uncomfortableness and trying to just forget about it, but I knew I had some responsibility to other people who might have been in the same situation.

Q. But that responsibility was something you didn't become aware of or recognize until the FBI contacted you. Correct?

A. I felt guilty about not being more vocal about seeing Henri pour something in Beth's drink. I felt like I should have said more about that. So when the FBI called me, I saw it as my opportunity to say more about it.

Q. But until then, you didn't feel guilty enough to report it, until then. Correct?

A. Correct.

Q. All right. Let's --

A. Well, no --

Q. Well, you just said it was correct.

A. I changed my mind.

Q. Okay. So tell me why you changed your mind.

A. I felt extremely guilty, but that's not the reason that I didn't report it. I didn't report it

31

because of the emotional state that I was in about what had happened with Henri and I at that time.

Q. We're going to get to -- I promise you we're going to get to Henri and you in a second.

A. I'm fine. I'm just trying to be as clear as I can, and there are, you know, a multitude of reasons why people do what they do. But at that time I just didn't feel like opening a can of worms.

Q. And you said "at that time." That's while you were going through it?

A. Right.

Q. All right. Let's talk first, we're -- we've come back to this incident at the Hancock --

A. Center.

Q. -- Center. And you, you're telling us that you saw Henri put something into Beth Jackson's drink.

A. Yes.

Q. Lay the foundation for us. And what I mean by that is I want to figure out what was taking place at the Hancock Center. For example, why were y'all there? Who was there? And I don't want to do it in a compound question, since you don't have representation here, but those are the types of things I'm looking for.

So what was the purpose you were at the Hancock Center?

32

A. It was having a drink after working at the National Sweets and Snacks convention.

Q. Okay. So there was a convention going on in Chicago --

A. Yes.

Q. -- that you all were there for?

A. Yes.

Q. Business related?

A. Yes.

Q. And who was there from Edible Software?

A. Henri Morris, Trevor Morris, Beth Jackson and myself.

Q. Those were the only four?

A. Yes.

Q. And it's a trade show that's open to the public in the industry, and people display what it is they're selling or providing?

A. Right. It's open to the public, but you have to have a ticket.

Q. Okay.

A. And you have to be invited, I believe.

Q. And after one day of the trade show, you -- you, Henri, Trevor and Beth gathered at the Hancock Center to have a drink.

A. Yes.

33

Q. What part of -- I just don't know what the Hancock Center is. So what part of the Hancock Center were you in? Was there a restaurant in there or --

A. There, at the top of the Hancock Center, there is a restaurant/bar area that overlooks Chicago, since it's a very high building and it's all windows. So I wanted to go up there and see Chicago. And Trevor and I had just got back from a baseball game, and so we had seen Henri on the street, I guess. He had been shopping, and then called Beth and had her join us as well.

Q. So you and Trevor went to a baseball game on a social basis. Right?

A. Yeah, like --

Q. It wasn't part of business?

A. It wasn't part of business. It was like working, social, you know.

Q. Which baseball game?

A. It was the Cubs at Wrigley Field.

Q. So after the game, which was a day game, I take it?

A. It was like, I don't know, 4:00 o'clock, 5:00 o'clock.

Q. What time did the game end?

A. We left early because it was cold.

Q. Okay. What time of the year was it?

34

A. May. But it was like 40 degrees, Chicago.

Q. Got it. So you get to the restaurant at the Hancock Center. I take it you have to take an elevator to get up there?

A. Uh-huh.

Q. And you meet up with the four people y'all are with --

A. Uh-huh.

Q. -- you met up with. Yes?

A. Yes. Trevor -- Trevor and Henri were, we met up with Henri on the street, and I guess he had been shopping. We called Beth, and she was already in her room in bed. And Trevor convinced her to go, with the guise of "Henri's not there."

Q. You heard that conversation?

A. Uh-huh.

Q. What did Trevor tell Henri?

A. He was like, "No, no" -- what did Trevor tell Henri, or what did Trevor tell Beth?

Q. I'm sorry. What did Trevor tell Beth? Thank you.

A. He was like, "No, it's just me and Andrea. Come have a drink with us at the Hancock Center. Henri's not here." But Henri was there, and they were kind of like playing a trick on her, laughing about it. And she

35

was like, "Well, I'm only coming because Henri's not there." So she came and met us.

Q. Were there any business-related people, clients, customers, vendors, anything like that?

A. No.

Q. Was there -- what time of day was this? I think you had left the game at about --

A. It was evening, so it was probably close to 10:00 p.m., I would say.

Q. Okay.

A. Maybe early -- maybe -- between 9:00 and 10:00.

Q. Had y'all already had dinner?

A. We ate at the game.

Q. When you got up to the restaurant of the Hancock Center, what happened?

A. We all ordered a drink, and we were just talking about the day. And I remember Henri being like really intoxicated. I guess he was drinking some sort of liquor in a Pepsi bottle that he had been walking around Michigan Avenue shopping and drinking.

Q. How do you know that?

A. That he was intoxicated?

Q. How do you know that he was walking around Michigan Avenue walking and drinking Pepsi with liquor in it?

36

A. Because he had the Pepsi bottle, and he was drunk, and we knew that he had been walking around.

Q. You didn't see him walking around Michigan Avenue?

A. He told us he was on Michigan Avenue. He was looking for a belt.

Q. But you didn't see him drinking on Michigan Avenue?

A. I saw him drinking out of a Pepsi bottle.

Q. When you got to the Hancock Center?

A. Uh-huh.

Q. Yes?

A. Uh-huh. Yes.

Q. Okay. But you didn't see him while he was walking on Michigan Avenue?

A. No.

Q. You didn't see when he filled up the Pepsi bottle with anything that wasn't a Pepsi?

A. No. So maybe -- no, okay, that's fine.

Q. Did y'all order drinks?

A. Yes.

Q. You ordered one as well?

A. Yes.

Q. What did you order?

A. I think I ordered a martini.

37

Q. Do you remember what the other people ordered?

A. Trevor ordered a Jack and Coke, and Beth ordered a vodka cranberry, and I don't recall what Henri ordered.

Q. Okay. But at some point, you said you saw Henri put something in Beth's drink.

A. Right.

Q. Tell us what you saw.

A. Well, we were all sitting there, and we had been looking around. Like I said, it's a panoramic view of Chicago. And all of a sudden, Henri pointed to the far window, like as if -- we're sitting at a cocktail table. I think Henri was here, Beth was -- Henri was to my left, Beth was to my right, and Trevor was across from me.

Q. Okay.

A. And so -- actually, I can't recall exactly. Maybe Henri was sitting -- I don't think Henri was sitting next to me. Maybe he was sitting across from me. Anyways, he pointed in the direction away from us, to where we were all looking away from the table. He was like, "Look, look, look. Look over there. Look over there. Look over there. Quickly, quickly, look, look, look."

So all of us, of course, turned to see what he was

38

fussing about. But in doing that, I was sitting -- and I guess he was kind of standing over me, and I see him like having something in his pocket and pouring like out of a small bottle, like from a mini bar, or the little bottles of liquor that you get at the, on the airport plane, into Beth's drink.

And Trevor and Beth are looking for this thing that -- we didn't see anything, so I don't know exactly what Henri was pointing at. I would assume that it was nothing.

And I started to almost reprimand Henri and say, "What are you doing?" You know, "Why are you doing that?"

And at that point, he was like, "Shh, it's fine. It's fine, it's fine. No, it's okay. Don't say anything." And at that point, in working with Edible Software, I just didn't feel like fighting with him.

And so I watched Beth, and I think that she acknowledged that her drink tasted stronger, like she wasn't really drinking it. And then I got up and went to the restroom. Then shortly thereafter, we left.

Q. Okay. The substance that you saw Henri put into Beth's drink, was it liquid or solid?

A. It was liquid, clear.

Q. Clear liquid. The color of the bottle was

39

what?

A. Clear.

Q. And you saw Henri pour into, that substance into what was Beth's drink.

A. Right.

Q. Did you see Beth drink the drink?

A. Yes.

Q. How much of it -- from that point forward, how much of it did she drink?

A. You know what, I think -- I don't think that she finished it. I don't recall.

Q. All right. Do you recall that Henri finished it?

A. No.

Q. Do you recall that anybody finished it?

A. No.

Q. But your best recollection is that Beth did not finish the drink.

A. I don't believe that she did.

Q. What do you base that belief on? I'm not quarreling with it. I just want to --

A. My memory.

Q. Okay.

A. I'm trying to remember something that happened two years ago.

40

Q. Sure.

A. And feeling uncomfortable with it, and then I think kind of watching. I don't know. Something happened to where -- I don't remember if Henri became like increasingly intoxicated and acting dramatic, or being sad, and then everybody was kind of ready to leave. I don't remember. But for some reason, we left. And I don't think that she finished her drink. I'm not 100 percent on that, though.

Q. Okay.

A. I don't remember me finishing my drink, so --

Q. Let's focus on what you remember, what you've already testified about.

A. Uh-huh.

Q. Your recollection was that on the street, or before you entered the restaurant --

A. Uh-huh.

Q. -- you recall a conversation where Trevor told Beth incorrect information as to whether or not Henri would be there, because your assumption, based on that, was that Beth didn't want to be there if Henri was going to be there.

A. Correct.

Q. So you at least reconciled in your mind that there was some issue going on between Beth and Henri --

41

A. Yes.

Q. -- that would warrant her not wanting to be there.

A. Correct.

Q. So if I'm understanding your testimony correctly, Beth was duped or tricked into going to some place she didn't want to be, to be with somebody who he didn't, she didn't want to be with?

A. She chose to go there, under the understanding that it would just be Trevor and I.

Q. She was tricked.

A. If that's what you choose to call it.

Q. Right? Well, Trevor didn't tell her the truth.

A. Okay.

Q. Is that right?

A. Yes.

Q. Okay. It's reasonable for you to assume that the reason why Beth went is because she thought Henri wasn't going to be there.

A. Yes.

Q. Okay. So you already, you know that there's some reason why Beth doesn't want to be there with Henri and you see Henri adding a substance to Beth's drink.

A. Right.

Q. He tells you not to tell her about it.

42

A. Correct.

Q. And based on that, with all that going on, you still didn't tell Beth, "Hey, wait, don't drink that."

MR. TODD: Form. You can still answer.

THE WITNESS: What?

MR. TODD: That's just, I'm preserving an objection on the record as to the form of the question, but you still have to answer it, to the best of your ability.

THE WITNESS: I was under the -- can you repeat the question?

Q. (By Mr. Rosenberg) I can paraphrase it.

A. Are you able to read back what you're saying?

Q. I can, I can.

A. Is that allowed?

Q. Yeah, it is allowed, and I can -- she can -- you want to read it back?

A. No, I want you to paraphrase it again.

Q. Sometimes that works best. Is it true that despite the fact that you had reason to believe Beth didn't want to be there with Henri, and you saw Henri adding a liquid substance to Beth's drink, that you chose not to tell Beth that this had happened?

MR. TODD: Form.

THE WITNESS: Yes.

43

Q. (By Mr. Rosenberg) Why?

A. Under the understanding or observation of their relationship, it was very tumultuous, and very, like they bickered a lot and argued a lot, and she acted very annoyed with Henri, but still chose to be around him and spend time with him.

And though it did appear as though she was being tricked, it seemed like something that was par for the course in this relationship. And it was my decision at that time, not knowing -- hindsight doesn't matter in this situation. At the time, I assumed it was vodka. I knew we were all having a drink. I knew he was encouraging Beth to get a double, and she didn't want a double.

And at that time, I just made the decision I'm not going to out and argue with a drunk person that's my boss. We're all having a drink here. She could taste the strongness in her drink. If she chooses not to drink the whole thing, then that's her decision.

Q. Did you believe that he was adding anything but alcohol to the drink?

A. No.

Q. Let me make sure I got the question out. I think I got it. Did you believe that he was adding anything but alcohol to the drink?

44

A. At that time, no.

Q. Okay. Subsequently, have you ever come to a conclusion that he was adding anything but -- had added anything but alcohol to the drink?

A. Yes.

Q. When?

A. The first time that I had a suspicion that it could have been something other than alcohol was when we were in Washington, D.C., for the Fancy Food Show. And we had all been doing something separate, but then ended up meeting later downstairs in the bar. And Henri and Beth were sitting at a table, and Henri was sort of slouched over Beth with his arm around her. And Trevor met us as well.

So it was the four of us, Beth, myself, Henri and Trevor. And Beth was just so intoxicated, just not making sense, all over the place, clearly just completely, like just completely wasted. And I had never seen her like that. I didn't feel that that was her demeanor or her personality, based on the way that she was acting, eyes closed, slumped on the table, arms everywhere.

So in my mind, I was like, it doesn't seem -- based on my experience with Beth, it doesn't seem like this is a normal thing for her to be acting this way and acting

45

this wasted. And I think at that time my suspicion was that there may have been something else involved, especially since she was with Henri at that time.

And then there was another time that she had come into town and was in Houston, and the whole interaction was kind of odd, because I know that Henri's wife, Ruth, was out of town and somewhere. And Henri came in, and he was very late, and his shirt was wrinkled, and he made some excuse that he couldn't get into the dry cleaners.

And then I remember Beth looking very, very ill, like grayish green, and just looking terrible. And she was like -- we were working on the computer, and her hands were shaking. And that was the same way that she looked the day after she had been acting so wasted in Washington, D.C.

So I'm -- I feel that I'm a perceptive person, and I just kind of, those two things in my mind stuck out to me. And I feel like at that point I started questioning is there maybe something else involved, some other substance. Certainly at that point I didn't think that it was -- I think that at that point I didn't have the ability to make assumptions about what it was.

Q. Okay. Help me timing-wise.

A. Okay.

Q. Tell me the relationship in time between the --

46

I believe it was Fancy Food --

A. Uh-huh.

Q. -- in D.C.?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And the Hancock Tower incident in Chicago. How much time transpired between those two events?

A. Between the Fancy Food Show and Hancock?

Q. Washington, D.C. -- well, yeah, I think the Fancy Food was after.

A. After, right. So Chicago was the last week of May. I remember because it was right around May 28th. That's when my, I have a friend that had a son that has a birthday right around that time. And then -- so that was the Candy Show. And then Fancy Food was mid July, I believe. It was definitely after the 4th of July.

Q. Okay. So at least six weeks --

A. Yes.

Q. -- afterwards. So six weeks later, by Beth's conduct at the Fancy Food Show in Washington, D.C. -- I'll refer to them as cities --

A. Uh-huh.

Q. -- so those shows don't get mixed up. It's at that point you then believe that perhaps at the Hancock

47

Center in Chicago, Henri put an intoxicant in Beth's drink.

A. An intoxicant, including alcohol?

Q. That's a really bad word. You thought that Beth -- I'm sorry -- you thought that Henri put something else other than alcohol in Beth's drink, additionally to alcohol.

A. I don't think at that time I could have conceptualized that happening, and -- because I think that if I had been able to think he drugged her drink, at that time I probably would have said something. I think that at that time I was very suspicious of Henri's behavior in relation to drinking.

Q. His drinking or other people's drinking?

A. His encouragement of other people drinking around him.

Q. So you became very suspicious at that point in D.C.?

A. Yes.

Q. When you became very suspicious of it, who at all did you report the suspicion to?

A. No one.

Q. I need to ask you a little bit about your personal life. I'm not going to get that far into it. Were you -- did you have a significant other at that

48

point?

A. No.

Q. Who was your closest friend in the world at that point?

A. Christina.

Q. The lady who's here?

A. Yes.

Q. Okay. How often would you speak to Christina?

A. Daily.

Q. So you didn't talk to Christina about it?

A. I told her about me seeing Henri pour something into Beth's drink at the Hancock Center.

Q. Well, that's different than nobody.

A. I'm sorry, I misunderstood the question. I thought you meant did I suspect that he poured something else aside from alcohol into her drink.

Q. I asked who you told. Did you tell anybody?

A. Right. The question, in my understanding, was, did you tell anybody that you were suspicious? Because that's what we're talking about right now.

The question I thought I was answering is, did you tell anybody that you were suspicious that Henri Morris was pouring something else other than alcohol into Beth Jackson's drink at the time of the Hancock Center.

Q. Okay.

Unofficial Copy Office of Chris Jensen.com

**49**

A. And the answer to that question is no. I did, however, tell Christina when I got back from the Hancock Center that Henri had poured a bottle of vodka into Beth Jackson's drink.

Q. And what did Christina tell you to do about it?

A. She asked me if I said something, and I said, "No." She was like, "I would have said something."

And I was like, you know, "He made up" -- I did address Henri the next day about it.

Q. Still in Chicago?

A. Still in Chicago. And I was like, "You know, you really just can't do that. That's -- you can't pour something into somebody else's drink without them knowing."

And he said, "No, no, it's because Beth's an alcoholic, and she likes to drink doubles. But you and Trevor don't drink as much as Beth and I do, so I carry around these bottles." And he pulled like, I don't know, three or four of those little mini liquor bottles out of his pockets.

And he was like, "And I add extra to her drink, but she asks me to do it and she wants me to do it."

Q. Did you ever ask Beth if that was the case?

A. No.

Q. So Henri's story is Beth is consenting to this

**50**

conduct?

A. Beth is consenting to this conduct, and she's very embarrassed about it, so don't ask her about it.

MR. ROSENBERG: He had told me that it was, that we're down --

THE WITNESS: Okay.

MR. ROSENBERG: -- to the last little bit. Let's take a break.

THE VIDEOGRAPHER: Time is 11:20. We're off the record.

(Recess from 11:20 a.m. to 11:23 a.m.)

THE VIDEOGRAPHER: Time is 11:23 a.m. We are recording.

Q. (By Mr. Rosenberg) Ms. Farmer, with regard to what you observed with Ms. Jackson, this whole line of questioning started when I asked you about sexually inappropriate things you've seen with Beth, or with people. You said it happened every time you traveled, and you referenced Beth, yourself, and there was one other person. Who was the other person?

A. It was the comptroller for Aunt Sally's. A client, or a prospect.

Q. For the client. All right. You shared some information with me about Beth, about the substance being added to her drink.

**51**

A. Uh-huh.

Q. How is that sexually inappropriate?

A. I guess it's not sexually inappropriate.

Q. Okay. It might have been inappropriate to add something to somebody's drink without their knowledge, notwithstanding Henri's explanation, but there's nothing sexual regarding that.

A. Right.

Q. Okay. You were there for about three months, by your, by your testimony.

A. Uh-huh.

Q. I think that's pretty much what we have. The Aunt Sally's is a New Orleans entity. Right?

A. Uh-huh. Uh-huh. I guess I was there about four months, so all of May, June, July and August. Four months.

Q. Okay. Aunt Sally's is in New Orleans or that area. Correct?

A. Yes.

Q. And of the four trips you went on, is it -- am I right that that's the last one?

A. Yes. Well, I can't recall. I was thinking about this last night, and Trevor and I actually took a trip to Miami. But I can't recall when that trip was in relation to the Aunt Sally's trips. They were close

**52**

together.

Q. Now --

A. So there was five trips total.

Q. Obviously, you don't have any civil claims against the company, and I'm not going to ask you about, about things that happened, with Trevor there and Henri not.

A. Correct.

Q. But I do need to ask, do you have any complaints about Trevor's conduct at all?

A. No.

Q. Okay. That eliminated a whole bunch of questioning. I appreciate that.

The Aunt Sally situation, remind me what the comptroller's name is at Aunt Sally's.

A. You know, I -- in my statement to the FBI, I call her Cheryl the entire time. And I just truly can't remember her name. I think I thought it was Jackie for a couple of days, and it might be Joan. But again, that was so long ago, and it was a brief relationship, and I just feel that from the beginning of our relationship, I was calling her by the wrong name. So I can't be clear. I can tell you her position.

Q. Which is comptroller?

A. Yes.

**53**

Q. And Aunt Sally's is a client of Edible Software?

A. They weren't a current client at the time that I worked there. We were -- they were a prospect, and we were trying to get them to close on Edible Software.

Q. It's a praline, praline company?

A. Praline.

Q. Cookies or candy?

A. Praline.

Q. I know what they are. I can't remember if they're cookies or candy.

A. They're candy.

Q. Okay. What was the incident that you believe was sexually inappropriate between Henri and whoever this comptroller at Aunt Sally's is?

A. Well, there was a point in time that we had gone to New Orleans to meet with them, and they met us up in the concierge lounge at the top of the, it was some sort of Marriott Hotel, to have a drink.

Henri and the comptroller and Tom, who was the CFO of Aunt Sally's at that time, they were drinking pretty heavily at the concierge lounge and at dinner. And then we decided to go to Bourbon Street.

And Henri and the comptroller were very much hanging on each other; Henri posing it as "She's hanging on me"

**54**

because she's drunk." "Oh, come with us. Oh, I have three girls with me." That made me feel uncomfortable at that time.

And then as soon as we got to the bar -- I believe it was Pat O'Brien's. It was some dueling piano bar on Bourbon Street that Henri was very interested in going to. He left with her, and left me there.

Q. With who?

A. By myself.

Q. I'm sorry. I miss-- I mis-asked. Henri left with who?

A. The comptroller.

Q. Who was originally at the dueling piano bar?

A. Tom, the CFO, he didn't go.

Q. CFO for Aunt Sally's?

A. For Aunt Sally's. He didn't go. He went home. So it was, walking from the restaurant to the bar on Bourbon Street, the piano bar on Bourbon Street, it was probably like three blocks.

And when -- the comptroller, she was having a hard time walking and very much like hanging on Henri. And he was reciprocating in what I felt like was an inappropriate way.

And Henri was trying to include me in that kind of drunk walking, one girl on each side. And I remember my

**55**

trying to separate myself from that, but it was a really uncomfortable situation because of the level that they were both at.

And at the moment that we got to the piano bar, Henri said, "Come here. Sit down right here."

Sat down. He was like, "What do you want to drink?" And he was like, "I got to take, I got to get her a cab. I got to, she's got to go home. She's too drunk. She's falling all over the place."

Q. The comptroller?

A. The comptroller. So I said, "No, I'll go with y'all. We can all walk back to the hotel. I want to go to sleep anyway."

He said, "No, no, no, you sit here. I'll come back. I'm just going to get her a cab. She needs to go home."

Q. Where were you before that? You were at the hotel at the concierge level?

A. We were at the hotel at the concierge level.

Q. And then you went to dinner?

A. Then we went to dinner.

Q. Mr. B's?

A. Okay.

Q. I'm not, I'm not suggesting it. I'm asking you.

A. I don't remember the name of the restaurant.

**56**

Q. How many drinks did you have at the concierge level?

A. One. Did I have?

Q. How many did you have?

A. One.

Q. How many do you believe Henri had?

A. Three or four.

Q. How about the comptroller?

A. Three or four as well.

Q. At any point, did you see Henri adding any substance to the comptroller's drink?

A. No, other than more wine.

Q. Other than more wine?

A. (Nodding head.)

Q. But that was open and notorious out of a bottle. Right?

A. Yes.

Q. Okay. The reason why I ask it that way, I believe from your testimony at the Hancock Center, the substance added to Beth's drink was done in a surreptitious fashion; he didn't want anyone to see it.

A. Uh-huh.

Q. Right?

A. Right.

Q. But here at the Marriott concierge, he poured

57

it in plain view.

A. Correct.

Q. Added the wine to the glass in plain view.

A. Correct.

Q. And then y'all went to dinner.

A. Yes.

Q. How many drinks did you have at dinner?

A. Two.

Q. How many drinks did Henri have at dinner?

A. Well, we split a bottle of the wine. The reason I'm saying two is because I know that we split it, so I think I had about two glasses, and then Henri had the rest. So about four glasses in a bottle. And then I don't know if he had another cocktail. At the time it didn't seem relevant for me to count his drinks.

Q. Okay.

A. And then Cheryl and Tom, the CFO, they had two bottles of wine between the two of them.

Q. Cheryl is the comptroller?

A. I'm sorry, that's what I call her.

Q. I understand that, but I want to make sure we're --

A. The comptroller, yes. That's not her name.

Q. And you understand, I'm not being disrespectful to her.

58

A. I understand.

Q. I'm just referring to her as the comptroller because we don't know what her name is.

A. Correct.

Q. Okay. So the comptroller and Tom split a bottle between them?

A. Two bottles.

Q. Had a bottle each?

A. Correct.

Q. Okay. And then y'all go to Pat, to the piano bar?

A. Correct.

Q. And during dinner you had a meal. Right?

A. We had appetizers, a meal and dessert.

Q. A substantial --

A. It was a heavy meal.

Q. -- amount of food?

A. Uh-huh.

Q. Then you go to the piano bar?

A. Correct.

Q. And how much did, how much did you drink there?

A. I had one beer.

Q. One --

A. Beer.

Q. -- beer, and what did Henri have?

59

A. He didn't have anything. He left as soon as we got there, to take the comptroller home.

Q. What did you observe that was sexually inappropriate between Henri and the comptroller that night?

A. I think that the touching was sexually inappropriate. I think that the amount of time that they were gone, maybe I wouldn't call it sexually inappropriate, I don't know, I think it's inappropriate when -- I thought that it was inappropriate that they were gone for so long. Our hotel was not -- it was a couple of blocks away, four at the most. I think it was just two streets over actually, though.

And I can't recall, but not far enough to be gone for over an hour. And I felt, based on their body language with each other, that it was possibly a situation where they maybe just went to the room together, because there was like a flirtation, I guess.

Q. You just speculated?

A. Speculated.

Q. No factual basis to know that anything sexually went on between the two of them.

A. No.

Q. And you say he was walking with her holding her up, but this is a person who you've described as having

60

at least a bottle of wine, and more than that in wine --

A. Uh-huh.

Q. -- and a few drinks as well. Correct?

MR. TODD: Form.

Q. (By Mr. Rosenberg) Correct?

A. Will you repeat that?

Q. Yeah. You said that Henri was holding the comptroller up.

A. Yes.

Q. And that's after the comptroller had --

A. I don't know that I would classify it as -- oh, sorry. Continue your question.

Q. Well, are you getting to my "holding up" characterization?

A. Yes.

Q. Okay.

A. Because I don't feel like he was holding her up, like she couldn't walk. She was walking --

Q. Right.

A. -- fine. She was hanging on him.

Q. She was hanging on him?

A. Uh-huh, and he on her.

Q. Okay.

A. He certainly didn't need to have his arm around her --

61

Q. That's your opinion?

A. -- for her to walk.

MR. TODD: Form.

Q. (By Mr. Rosenberg) But he did.

A. But he did.

Q. And you believe that was sexually inappropriate?

A. Yes.

Q. You don't know whether or not that's consensual?

A. Does it have to be consensual to be sexually inappropriate?

Q. I'm asking you whether or not you know whether or not it was consensual.

A. I don't know.

Q. Okay. Is that the only incident that you recall between Henri and Ms. Comptroller, this comptroller?

A. Yes. But Henri said, when we got back, that she was there at the hotel. And I just know that the story just didn't make sense, because he told me he put her in a cab, several times.

Q. When you got back where?

A. To the hotel. So Henri was gone for upwards of an hour. In that time, I was sitting at a bar on Bourbon

62

Street by myself. And my phone had died, so I was charging it, because I didn't want to walk back to the hotel with a dead phone. And so I was having the bartender charging it.

Well, I was just going to sit there and kind of people watch, but then there were these men who were there, and they were just kind of being men in a bar and kind of wouldn't stop talking to me, and so I decided to leave.

And I asked the bartender -- it was 10:00 o'clock at that point. It was early, and I had never been to Bourbon Street, and so I asked the bartender if there was anywhere else that was neat to go that I should probably go that maybe was a little bit more mellow and not so crazy party-ish.

And so he suggested, I went to this like historic bar that had a mechanically rotating floor. And so I went there, and Henri ended up coming there to meet me.

Q. How did Henri know you were there?

A. Well, I turned on my phone, and told him, "I'm going home." And then it died, and then when I turned it back on, he was like calling me and calling me and calling me and calling me. And so I think I finally texted him and was like, "I'm at this bar." And then he came there.

63

Q. What did he do with you -- what did he do when he got there?

A. He was very disheveled and like sweaty, and his hair was amuck, and he told me he had to run all the way, like that she fell three or four times, and then he put her in a cab, and then she started hitting on him, and so he put her in a cab and he left. And then he ran all the way back to the piano bar, and then he ran there.

And he was being very like animated and very, like disoriented almost about it. Yeah.

Q. But obviously none of, none of what happened when you weren't there you saw.

A. Right. The part that I questioned, and my memory is very fuzzy on this, and it was something that Henri actually told me when we got back into town, so I don't know if I -- I'll just tell you what Henri told me.

Q. Sure.

A. Because I'm not really trusting my memory on this, that when we got back to the hotel lobby, that she was there still.

Q. The comptroller?

A. Yes.

Q. Did you ever see the comptroller there?

A. I feel like I have a memory of that, but it's really fuzzy, and I don't know.

64

Q. When was the last recollection you have of seeing to or speaking with -- seeing or speaking with the comptroller?

A. I spoke to her on the phone when we got back to the office.

Q. That night. I'm sorry.

A. Right. That night was when she was leaving the piano bar.

Q. Okay. When did you get back to the office?

A. The next day.

Q. What did you speak to her about when you got back to the office?

A. Not the next day. Two days later.

Q. When you spoke with her from the office, what did you speak about?

A. She apologized for being so drunk, and then she told me that she got to her house. She was like, "I don't know how I got there. I don't remember. I just woke up in my bed, and then I went outside and my car was there."

But Henri told me that he put her in a cab to get there. And then he told me that he saw her hanging out in the lobby -- that we saw her in the lobby, and that she was still there.

He was like, "Remember, remember, we saw her. She

was in the lobby."

And I was like, "I don't know if I remember that" at that time.

Q. Okay. So you have no way -- your recollection isn't going to allow you to tell us whether or not she was at the bar -- at the hotel lobby or not. You don't know one way or the other.

A. Based on what Henri said, she was there. Based on what I remember, I don't feel comfortable saying either way.

Q. Okay.

A. Because I don't remember a lot about that, so --

Q. We're going to get to you. But I want to know if that's the substance of your information you have regarding Henri being sexually inappropriate with anybody else when you traveled.

A. Yes.

Q. Before we get to you, did you have any observation of Henri acting sexually inappropriate with anybody at the office, physically on the office premises?

A. Physically at the office, I feel like he and Brannen Deville were always like hugging and giving each other back rubs, and I felt like that was inappropriate.

Q. Always hugging?

A. Oftentimes.

Q. Okay. Can you put a degree of frequency, how often during the course of a day that they would be together would they be giving each other back rubs?

A. It wasn't every day.

Q. Okay. How many times a week?

A. It was sporadic.

Q. Okay. From your observation, was it reciprocal?

A. Yes.

Q. Okay. From your observation, was it offensive to Ms. Deville?

A. Sometimes, yes.

Q. On what -- how would you describe the times where it was offensive to Ms. Deville?

A. They had a very playful relationship, but at times I felt like that Brannen didn't think it was funny, that Henri joked with her about the way that she looked or the way that she acted, and then might try and hug her to say, "Oh, you know, I'm just joking." And then she would kind of be like, "No, get off me."

Q. What would he say about the way he, she looked?

A. Well, I mean, he always commented on what everybody wore. So it might be the shirt that she was wearing or the fact that she, you know -- I don't know.

Q. Anything you can recall?

A. No.

Q. Okay. Did Brannen, Ms. Deville, did she ever complain to you that Henri's conduct with her was inappropriate?

A. No. We did not have that type of relationship.

Q. Did you ever hear Ms. Deville complain to anybody else that Henri's conduct with these massages or back rubs were inappropriate?

A. No.

Q. Did you ever see Henri touch any other part of her body that wasn't her back? For example, her breasts or buttocks or anything --

A. No.

Q. -- off base?

A. I don't think I ever saw that.

Q. Did you ever notice any conduct with anybody else in the office, between Henri and anybody else in the office that was sexually inappropriate?

A. No.

Q. When I say "anybody else," I mean vendors or clients that might have visited or anything of that nature.

A. No.

Q. Did you ever work contemporaneously with Keri Hill?

A. No.

Q. Did you ever work contemporaneously with Stacy Stewart?

A. No.

Q. Did you ever work contemporaneously with Michelle Barnett?

A. Yes.

Q. In the roughly four months that you were at Edible Software, how many of those months were with Michelle Barnett?

A. One.

Q. Okay. So you were there with her a very short time?

A. Right.

Q. You didn't know her very well, I take it.

A. No.

Q. Did you ever talk with her about Mr. Morris, Henri's conduct?

A. No.

Q. Let's now go into conduct that you've personally endured with Henri. I want to -- before we do that, I want to get into just some background. It's my understanding that you worked at Edible from May until August 2001.

**69**

A. Correct --

Q. That's not correct. 2011.

A. Right.

Q. Okay. It's my understanding you responded to a LinkedIn posting.

A. Correct.

Q. Were you living in Houston at the time, or did you come to Houston for that job?

A. I was living in Houston at that time.

Q. Were you living alone?

A. No. I had a roommate.

Q. Who was the roommate?

A. Amy Horican. Amy Horican.

Q. How do you spell her last name?

A. H-O-R-I-C-A-N.

Q. Okay. Do you -- are you still in contact with Ms. Horican?

A. Yes.

Q. How do you know her?

A. My, she's a friend.

Q. How did you meet?

A. She is a childhood friend of one of my college roommates.

Q. Where did you go to college?

A. University of Texas.

**70**

Q. When did you begin living with Ms. Horican?

A. In April of 2010.

Q. Do you know what Ms. Horican did for a living at that time?

A. She worked at Memorial Hermann. She was a NICU nurse.

Q. Neonatal Intensive Care Unit?

A. Uh-huh.

Q. Do you know if she's still there?

A. She lives in Houston. She works at Children's as a pediatric ER nurse.

Q. Texas Children's Hospital?

A. Uh-huh.

Q. What was your address in Houston?

A. 3418 was my -- no, that's my current address. Was it 600 Studemont, Apartment 33 -- I can't recall the address. It was -- I believe it was 300 Studemont, Houston, Texas, 77007, but I could be incorrect on the street number.

Q. That's okay. Why was it that you moved to Houston?

A. I moved to Houston in 2009 to start working for a company called, a retail company called Mattress Firm out of college.

Q. Why did you leave Mattress Firm?

**71**

A. I was having a bad relationship with my supervisor at the time.

Q. Were you terminated?

A. Yes.

Q. What did they tell you were the reasons for your termination?

A. For being late.

Q. Tardiness?

A. Uh-huh.

Q. So you were out of work looking for a job when you connected with Edible Software on LinkedIn?

A. Correct.

Q. How long had you been out of work?

A. Two-and-a-half months.

Q. Isn't it true that after you left Edible Software, you went back to work for Mattress Firm?

A. Yes.

Q. Here in --

A. In Corpus Christi.

Q. -- Corpus.

A. It's a franchise, d/b/a Mattress Firm.

Q. Got it. Tell -- describe for me your interview process with Edible Software.

A. I was -- I got a phone call, and had been applying a few different places, and it was Henri. And I

**72**

believe I was running at the time. So I wasn't really like in a place where I could take notes.

Q. When you got the call, you were on a run?

A. Right.

Q. Okay.

A. And so I wasn't in a place where I could take notes, but Henri and his consultant, Charles Butler, were on speaker phone. So we had a brief phone interview, and Henri said, "You know, I don't really know if this is the right position for you, if you're qualified, but I'd like for you to come in. Your resumé and your cover letter intrigued me, and I'd like for you to come in and talk with us. Can you come in?"

And I said, "Yes." I believe that was Tuesday. And I said, "Yes, I can come in tomorrow for an interview."

Q. So you followed that up with an office visit.

A. Uh-huh.

Q. What was discussed there?

A. He told me a lot about the company and his expectations of what he wanted in the role, which was somebody who would be able to develop the marketing and sales department, and to travel to these trade shows and be able to talk to people, and that there was a fair amount of writing that would be involved, and that was, I mean, in a nutshell what it was.

73

Q. Okay. How long did it take for you to be offered a position?

A. I was offered the position that same day.

Q. Did you accept?

A. I officially accepted on that Friday, when I took in my offer letter to sign.

Q. So it was Wednesday when you had the interview, they offered you the position then, and then there was a process in which you obtained an offer letter?

A. Yes. I -- and I can't recall if it was that Wednesday evening or that Thursday evening that I received the offer letter. And I was kind of waiting -- to me, I didn't officially accept until I signed the offer letter, or they didn't officially offer me the position until I signed the offer letter.

Q. You wanted it in writing?

A. Right, and I wanted to see the salary and, I mean, that's just how you get a job.

Q. What was the salary?

A. It was 48,000 a year, with commission, 3 percent on each net sale of the software.

Q. How did that compare to what you were making at the Mattress Firm?

A. It was more. And I was making about the same in salary, and then I -- but I was going to be making the

74

additional commissions at Edible Software. So it was substantially more.

Q. What were your duties and responsibilities when you first started?

A. To set up all of our social media, to maintain and learn how to maintain the website, to learn how to demo the software, to make calls to clients, like cold calls. I would cold call a lot on clients who had, they had been talking to or had reached out to us saying they were interested in the software. And, and I would write different pieces, sales and marketing type pieces about Edible Software.

Q. Do you have experience doing that type of work?

A. Uh-huh.

Q. From where?

A. On the sales side, I sold with Mattress Firm, and I did sales training with them. And when I was in Learning Development at Mattress Firm, I wrote content, training sales content there.

And from a accounting and inventory standpoint, I, in college, had worked at the Crowne Plaza Hotel and did their inventory and accounting for food and beverage, which was the bar, restaurant and room service.

So I guess all of those facets combined. And I did trade shows for Mattress Firm as well.

75

Q. Did you, did you graduate from the University of Texas?

A. I'm one credit away from graduating, so no.

Q. Okay. One credit away?

A. Uh-huh.

Q. Right now?

A. (Nodding head.)

Q. What -- assuming you get that credit, what do you expect your degree to be conferred in?

A. A BA in sociology, with a minor in business.

Q. Okay. When was the last time you've taken courses towards your degree?

A. In 2010, I started a course and didn't finish it.

Q. That was before you gave your statement to the FBI. Correct?

A. Yes.

Q. From the time you began at Edible until the -- let me ask it this way: How much time did, were you, was that you were working at Edible until you took your first trip?

A. Oh, two weeks.

Q. Okay. How did that come about? How did the trip come about?

A. Well, Henri had planned on going to visit a

76

couple of clients there, and two of which were --

Q. Where?

A. In -- there's a client he wanted to visit in Philadelphia, and then one in New Jersey, one in Newark. Or I guess that's New Jersey as well. Somewhere in the like country of New Jersey and then down in the ports of Newark. So the first two were prospects. They weren't Edible Software clients. And then that he wanted to visit a current and very old client in Newark, and then a prospect in Connecticut, and then we were supposed to visit another client in New York as well, but that ended up canceling.

Q. Okay.

A. So he, upon this trip coming up, he said that he thought it would be a really good learning experience for me and suggested that I go.

Q. Were you excited to be going?

A. Yes, absolutely.

Q. Had you ever been to the East Coast before?

A. I had been to the East Coast, like southeast, but not Manhattan, New York area.

Q. So it was an opportunity for a new, a new experience or to visit some place you hadn't been?

A. Yeah, but I mean, I've been a lot of places, so you know, and I certainly -- it was a work trip, so I did

77

understand that it was going to be like in the ports of New York as well, so, yes.

Q. Which is where the clients are?

A. Right.

Q. Especially the seafood people.

A. Right.

Q. How did you -- what was your first stop on the trip?

A. The hotel. What client was my first stop?

Q. No. What city was first?

A. Philadelphia.

Q. How did you get there?

A. By airplane.

Q. Did you travel with Henri or by yourself?

A. I traveled by myself.

Q. Okay. Where did you first meet up with Henri?

A. At the Philadelphia airport.

Q. He picked you up, I take it.

A. Yes. He, I think, had gotten in a little earlier than I had, so he went and got the rental car and then picked me up outside.

Q. Okay. About what time of day was it that you arrived?

A. It was evening, probably like 8:00.

Q. What day of the week?

78

A. Sunday.

Q. Okay. After he picks you up from the airport, where did you all go?

A. We went to the hotel.

Q. Were you present at the check-in process?

A. I don't think I was like standing over him.

Q. All right. He checked you in?

A. Yes.

Q. You got situated in your room?

A. Uh-huh.

Q. Did you know what room he was in?

A. No.

COURT REPORTER: I'm sorry?

Q. (By Mr. Rosenberg) Did you know -- my question was, do you know what room he was in? And then your answer to that question was?

A. No.

Q. Do you know if he knew what your room was?

A. I assume he did. He checked us in.

Q. After you got situated in your room, I imagine you just got to your room, did what you had to do, and went somewhere.

A. Uh-huh.

Q. Correct?

A. Yes.

79

Q. Where did you go?

A. We went -- Henri wanted to go to the concierge lounge, but since it was Sunday, it was closed. That's how I remembered it was Sunday. And he -- so we ended up going to the bar and ordering food from the bar, because that was the only thing that was open at that time. So I went down on my own, and then Henri met me like a couple of minutes later.

Q. When -- how long were you there before Henri was there?

A. Two minutes.

Q. Did you visit with Henri during that time you were there?

A. Yes.

Q. Ordered some snacks or food or something like that?

A. Uh-huh.

Q. How long were y'all there?

A. Maybe an hour-and-a-half.

Q. And what happened next?

A. I went to sleep.

Q. Okay. With regard to that encounter at this non-concierge bar at the Philadelphia Marriott --

A. Uh-huh.

Q. -- are you, do you have any information or

80

testimony about anything sexually inappropriate or sexually offensive that happened between you and Mr. Morris then?

A. No.

Q. What was your conversation like?

A. It was just polite conversation between two people who didn't know each other that well. We talked about our flight. He was talking to the bartender as well. She was a blonde lady. I think there was some sort of sports game on. So nothing substantial.

Q. Okay. This is a Sunday night y'all are getting in there.

A. Uh-huh.

Q. How long was the business trip to last?

A. Okay, let me think. I guess we were to be back that Thursday evening.

Q. Okay. Without going through every bit of detail about the trip and the clients and the customers you've seen, I want you to tell me the first thing that happened on that trip. So it's the one that ended, you believe, the Thursday evening?

A. Uh-huh. Well, we ended up getting back that Thursday morning, because the last client canceled, so we took an earlier flight that Thursday.

Q. I'd like you to tell me anything that happened

81

during that trip that you believe to be sexually offensive or sexually inappropriate between you and Mr. Morris.

A. Can you be more specific?

Q. I mean, do you have any recollection of Mr. Morris engaging in anything during that trip that was sexually offensive or inappropriate with you?

A. Yes. I don't have a recollection of dinner or getting back to the hotel.

Q. On what day?

A. On -- this would have been Monday night.

Q. Okay. So your second night of the trip?

A. My second night there.

Q. And that's a different hotel than where you were the first time?

A. It's a different hotel. It's a Marriott in Newark.

Q. Downtown Newark, or by Newark airport?

A. I don't know.

Q. You just know it was in Newark.

A. Right.

Q. Okay.

A. Because the client that we were meeting the next day was in Newark. So we went to dinner, and I blank out, and I don't remember anything up until waking

82

up with like a pillow and some covers over my face and some blankets around my ankles and hearing somebody take a picture. And when I moved the covers to see, Henri's standing over me, and I'm naked.

And so I was so tired, and I just couldn't even really register what was going on. So I think I like looked and then closed my eyes again, and then I was like, "Wait, I'm not" -- like "What's going on?"

And so I was like, popped up, and I was like, "What are you doing? Are you -- did you just take a picture of me?"

And he was like, "What? No, no."

And I was like, "Why are you in here? What are you doing?" Like "Get out of here, get out of here." I was like, "No, I have to get the picture."

And I was so disoriented and so confused, and the bed was just like really, like the covers were all fluffed up and there were pillows all around. And so I was just like looking around, and I had the covers pulled around me, and I was like, "You need to give me that camera. You can't have that picture."

He was like, "No, no, no. It's fine. It's fine. I didn't take a picture. I didn't take a picture."

So then I don't see the phone anywhere, and it's kind of dark in the room. And so I'm like kind of trying

83

to like pat and like feel on his like pants pockets where his phone is, and I can't find it.

He's like, "Hey, stop. What are you doing? Stop, stop, stop that."

And I'm like, "No, you have to give -- you cannot have a picture of me like that. Why are you in here? What's happening?"

And so then he, he walks out of the room, and I shut the door, and I'm just like, I have no idea what's going on. And then he knocks, and he's like, "See, look, I don't have any pictures of you," and he hands me his BlackBerry.

Well, I start trying to look through it, but I can't like even really figure out how to work the phone. Like I think I was trying to look through the pictures, but like I couldn't think to figure out how to get to where I wanted to go.

And it was really frustrating, I remember, because like I've had BlackBerry forever, and I know how to like look in secret folders and -- or not secret folders, but --

Q. Hard to access folders?

A. Hard to access folders, right, and look in the files. And so that's what, in my mind, I wanted to do, but I just couldn't think about like what I was doing or

84

how to do it or even like -- you know, I just remember having this phone in my hand like "I've got to get this picture off of here," but I couldn't even think to work the BlackBerry.

So I just handed it back to him, and I was like, "You need to leave." And I shut the door and locked it, and then went back in bed and like laid there for a second thinking like, "What in the world just happened?" And then I fell back asleep for like four hours.

Q. Okay. I appreciate your recollection of the transaction, but I want to go back.

A. Uh-huh.

Q. The last recollection you have before waking up with the blanket around you, and as you've described for us, without any clothes on --

A. Uh-huh.

Q. -- what's the last recollection you had?

A. I remember being at dinner, and I, it's like really fuzzy. Like I really don't remember a lot, but I remember there was some comedian there, and that Henri liked him, and he was like taking pictures of him and talking to him.

But it feels like, like I remember it and I know I was present and I know I was talking, but I don't know what I was talking about or if I was making any sense or

anything. But I know that there was a comedian there, and I know that I was sitting at like a table.

(Exhibit 1 marked for identification.)

Q. (By Mr. Rosenberg) Take a look at Exhibit 1 to your deposition.

A. Uh-huh.

Q. What is that?

A. Me and a man.

Q. Do you know who the man is?

A. No.

Q. Is that -- do you recall that as being the comedian you're referring to?

A. I mean, obviously it is who it -- like --

Q. I'm just asking.

A. Based on what I'm wearing and the fact that I remember being there and taking pictures and the context of this conversation, yes.

Q. I'm asking you --

A. Yeah.

Q. You know, I know who this person is because he's a public figure. But I'm asking you.

A. I don't know who this person is.

Q. I understand that. Is this the man who was identified to you as a comedian that night?

A. So that question's confusing, because I'm

telling you I don't remember who the comedian was.

Q. And I'm not asking for his name.

A. I don't even remember his face. Like I vaguely remember I know he looked like he had like a prominent nose and kind of reddish hair, and there was another gentleman with him that was maybe like didn't have a lot of hair, but I don't -- suffice to say I have a good memory.

Q. Uh-huh.

A. And I can't think of details.

Q. Okay.

A. I can't even think of what I had for dinner or the restaurant that I was at.

Q. Let me ask this, is this you?

A. Yes.

Q. Okay. Is this what you were wearing that night?

A. Yes.

Q. All right. I'm not trying to trick you. I'm just trying to --

A. No, I'm just trying to figure out what you want me to -- how you would like me to answer the question.

Q. I just want you to answer the questions as it happened, truthfully, to the best of your knowledge.

A. That's what I'm trying to do.

Q. All right. We know three things. We know that this is a picture of you and somebody. Right?

A. (Nodding head.)

Q. Correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And we know that this picture was taken the night you're talking about, because this is what you were wearing.

A. Yes.

Q. Okay. Where were you before that? Whatever place this picture was taken in, where were you before it?

A. At the -- well, we were a lot of places. Do you want me to start from the beginning?

Q. No. What I want to get at, the clothing, you said you recall what you were wearing.

A. Uh-huh.

Q. To me it looks like a top.

A. Right.

Q. All right. But you know which one it was.

A. Yes.

Q. Was that what you were wearing all day?

A. No.

Q. So you changed into this article of clothing --

A. Yes.

Q. -- before y'all went out to dinner.

A. Yes.

Q. After the work day, you changed outfits.

A. Yes.

Q. Okay. When you changed outfits, you were at that airport -- I'm sorry -- you were at that hotel in Newark?

A. In Newark, right.

Q. And then you went into Manhattan.

A. Yes.

Q. Did you take the train to Manhattan?

A. No. Henri drove the tan rental car.

Q. You remember it being a tan rental car.

A. Uh-huh.

Q. Now, from Newark, there are three ways to get into Manhattan. You could have taken the Lincoln Tunnel, the Holland Tunnel, or the George Washington Bridge. Do you remember?

A. Took a tunnel.

Q. But you don't know which one it was?

A. Do they both go underwater?

Q. Both tunnels go -- yeah. You go actually under the Hudson River.

89

A.  What are the two names of the tunnels?

Q.  Lincoln and Holland. The Lincoln Tunnel gets you out at 42nd Street. The Holland Tunnel gets you out at 14th Street.

A.  I don't know. I'm not familiar.

Q.  All right. You remember taking -- do you remember, do you remember going over a bridge?

A.  We went under a, we went in a tunnel.

Q.  Okay.

A.  And we were on a bridge, yes.

Q.  Do you remember going through the tunnel?

A.  Kind of. It starts getting fuzzy when we were driving there.

Q.  Okay. Prior to driving there, did you have anything to drink?

A.  Yes.

Q.  What?

A.  I met Henri in the concierge lounge. I asked for a glass of wine. Henri was always very like persistent that I have a real cocktail, and I like to drink wine. And I don't really do very well with real liquor. And --

Q.  When you say "real liquor," you mean vodka, gin, bourbon?

A.  Yeah, hard liquor.

90

Q.  Okay.

A.  And so I remember the night before, I was having a glass of wine with dinner at the Philadelphia restaurant, the bar at the hotel. He was like, "Oh, you're not going to have a real cocktail."

And I was like, "I just really like to drink wine."

And so then again, I asked for a glass of wine. I assume it was a red wine. And so he poured me the glass of wine, and then we were talking and eating some appetizers.

And he was like, "Well, let's, you know, we can go either to Atlantic City or we can go into Manhattan. What do you want to do?"

And I was like, "Well, I want to go to Manhattan then." Like I have no interest in going to Atlantic City.

And he's like, "Okay." And he was like, "Well, let's get another drink before we go. But have a real drink, and I'll fix it for you."

And, and so he fixed me this drink, and it was in like a cup just like that.

Q.  It's the court reporter's cup, but it looks like a --

A.  It's a coffee cup.

Q.  -- to-go cup, coffee cup.

91

A.  It's a to-go coffee cup. Like that you have in the hotel, probably about this tall. Twelve ounces maybe, or ten ounces. And I asked for vodka soda. And so he makes it for me. And it was so strong, like so strong I couldn't even drink it. All I could taste was, it tasted like I was drinking a cup of vodka.

And I was telling Henri, I was like, "I cannot drink this. This is too strong." I was like, "Let's make two drinks out of it."

He was like, "No, no, no. It's fine. It's fine. Here, let me get you another bottle of soda, and you can just kind of add to it."

And I was like, "No, I think we should just make this two drinks."

He's like, "No, no, no, just here."

And so I asked the lady -- there wasn't any soda right there, I don't think. And so I asked the lady that like helps the attendant at the concierge lounge, and she brought me a bottle, like a little glass bottle of soda, and I was pouring into it.

So then we're driving, and I'm drinking this drink and kind of like pouring into it at the same time. And I just remember like -- it was kind of a long drive, and it was still light outside, so I guess it was still right around rush hour.

92

And I remember going under the tunnels and through the bridges, and we were stuck in traffic, and the tolls, and just feeling really fuzzy, and like, "Oh, my gosh, I'm getting really tipsy off of this drink, and maybe I haven't eaten a lot today," and just kind of do like a mental check on myself.

And I think that that -- I always try and do that when I'm drinking and I'm starting to feel light-headed, just kind of, okay, recognize how I feel, slow it down, and know that I need to kind of be aware of myself.

But by the time we got into the city and parked by, I guess we parked by Times Square, I was feeling very, like really tipsy and disoriented I guess.

Q.  So you have recollection of getting through the tunnel, parking at least to recognize it was Times Square, or something you thought was Times Square.

A.  Yes.

Q.  Okay.

A.  And then Henri showed me this, it was like a subway or a train station where there were these men carrying this beam. And then it's like it was like an optical illusion painting, where if you look from like two different sides, that it's the same, like they're each carrying the same bench or log or whatever it was. I can't remember.

93

And so he's showing this to me, and he's being kind of like really hands on with me, and I remember it making me feel uncomfortable.

And I remember when we were leaving the concierge lounge, we were in the elevator, and I was kind of like standing like kind of tense. And he was like, "Oh, you have like your -- you look tense right here." And he like kind of pressed on my shoulder.

And I was like, "Oh, yeah, I guess I am, from sleeping in a hotel bed."

And he was like, "Oh, well, I studied anatomy, and I was like -- started to get my degree in massage therapy when I was in Israel, before I was in the Army and I fought in the war."

So I was like, "Okay." And I was like, that's weird, but I don't really want him to rub my back. So I'm just like, "Oh, I'm fine," like "I'm not tense," you know.

And so that was like the first time that he was like kind of touching me. And I was like, ooh, this makes me uncomfortable.

Q. That was in the hotel before you left?

A. That was in, that was in the elevator. And then when we were at the subway station, he kind of like had his hands on my shoulders and was like pointing and

94

like "Look up, look up." And that made me feel uncomfortable too.

Q. Now, the thing you're referring to is the subway station where the murals were?

A. Where the murals were, or the train station. And then -- do we need to take a break?

Q. I'm sorry? Not yet. We're going to get it in about two or three minutes.

A. Okay. So then he stopped and wanted to get a drink at some little bar, like some side-bar, like a side street. And I at that time was like, "I can't drink anything else. I'm already feeling like I can't walk."

And so he got a drink, and he wanted to walk with it on the street. I was like Henri, "I don't think that you're allowed to do that."

And he was like, "Oh, no, it's fine. It's fine."

But then I think the bartender or the bouncer at the door ended up telling him, "No, you can't," so he kind of like guzzled it down.

And then we continued to walk, and then I remember him giving me the option between two restaurants. And I guess I picked one. I don't remember that. Or I don't remember which one it was, but there was like a -- I, it doesn't matter. I couldn't describe it.

But -- and that's where I remember sitting -- and

95

this is where it just starts losing it.

Q. Okay.

A. Like I can't remember anything. I remember the comedian being there. I remember us taking pictures. But I don't remember leaving. I don't remember eating. I don't remember getting into the car.

Q. So if I ask you what you had for dinner, you couldn't tell me?

A. No, I couldn't tell you.

(Exhibit 2 marked for identification.)

Q. (By Mr. Rosenberg) Can you identify Exhibit 2?

A. This is Henri Morris.

Q. Okay.

A. And I don't know who this man is.

Q. But it's the same person as in Exhibit 1?

A. It's the same person as the picture that I'm in.

Q. Very simple, do you recall Henri wearing a shirt that looked kind of like that in this terrible reproduction that night?

A. No. I mean --

Q. Okay.

A. It's a man's shirt, so --

Q. I understand. So you, your testimony is you don't remember anything from that point forward that you

96

just described --

A. Uh-huh.

Q. -- until you get back to the hotel?

A. Right.

Q. So you don't remember driving back to the --

A. No.

Q. -- to New Jersey or anything of that nature?

A. No.

Q. You don't remember what you ate?

A. No.

Q. Don't remember what you might have drank at dinner that night?

A. No.

Q. Or anything like that?

A. (Shaking head.)

Q. All right. This is probably a good time to take a break.

A. Okay.

THE VIDEOGRAPHER: Time is 12:21 p.m. We're off the record.

(Recess from 12:21 p.m. to 12:54 p.m.)

THE VIDEOGRAPHER: The time is 12:54. We are recording.

Q. (By Mr. Rosenberg) Okay. Ms. Farmer, we've had a break. And before the break, we stopped the

97

questioning at, I believe you told me everything you remembered about the dinner in Manhattan --

A. Uh-huh.

Q. -- the night you believe you met someone who was purported to be a comedian who you can't identify.

A. Right.

Q. And you don't remember anything about the trip back to Newark.

A. No.

Q. But you do remember -- you shared with us what you did remember when you did return, when you were at the hotel, and that is Henri in your room with you had no clothes on.

A. Uh-huh.

Q. And you believed he was taking pictures. Correct?

A. I heard like the sound of a BlackBerry camera.

Q. Like a clicking type of a sound?

A. Like a clicking, like the picture sound that a BlackBerry makes when it's taking a picture.

Q. Do you recall with any degree of specificity how much time Henri was in your room?

A. No.

Q. You just know he was there?

A. I mean, I saw him there.

98

Q. So that's how you know he was there, because you saw him?

A. Right.

Q. You said you had no clothes on.

A. Correct.

Q. But the pillows in the bed were situated in a fashion you were able to describe to me.

A. They were, like I guess they were, there was like a lump on -- maybe there was a couple of pillows at the end of the bed, and then most of the pillows were kind of like around me and over my face.

Q. At any point in this transaction -- I know your testimony is that Henri took pictures -- did you take any pictures to, for example, to preserve what the room looked like, or where you were, or anything that would help anybody looking back to reconstruct the scene?

A. No.

Q. You owned a cell phone at that time. Correct?

A. Right.

Q. Was it a phone that had a camera feature in it?

A. Yes.

Q. You told me you don't remember what time this was.

A. Uh-huh.

Q. Right?

99

A. Correct.

Q. But after Henri left, you remember sleeping for about four more hours?

A. Yeah. Because I feel like -- I think I looked at the clock and it was around 4:00 a.m. I believe the question I answered was, "Do you know how long Henri was in your room?" No, I don't know how long he was in my room. When I woke up, I believe it was around 4:00 a.m. And then I remember him knocking on the door and waking me up at around 8:00. That's why I came up with four more hours.

Q. Did you have any reason to believe at that point that you had been physically violated?

A. Yes.

Q. Okay. In what fashion?

A. It was really like red, and I had some bruises on my arm, the top of my arm and on my like hip area.

Q. You didn't take any pictures to preserve that?

A. No.

Q. Okay. Do you believe you had been sexually violated?

A. Yes.

Q. In what fashion?

A. I was having pictures taken of me with my clothes off.

100

Q. Okay. Anything else that would lead you to believe you were sexually violated?

A. I felt like I had been like touched, but not like -- like it didn't feel like anybody had sex with me.

Q. All right.

A. But I was kind of like sore in my female regions.

Q. You believed you were sore in your female regions?

A. Yeah, but not -- like on the outside.

Q. Okay. Where was the bruising? I'm sorry.

A. I had bruising on my hips, and then at the top of my left arm, like on the back side of it.

Q. And without belaboring this, so I can move on, none of this was documented by terms of photographs or other ways to preserve the fact that you had been, experienced some trauma.

A. Well, other than the picture that Henri took.

Q. I'm talking about the bruising. Did the pictures depict bruising?

A. Yes.

Q. Okay. At that point, when did you -- at that point, you never -- you never reported it to anybody at that point. Correct?

A. No.

101

Q. How did you -- tell me how you obtained the pictures.

A. The FBI showed them to me after they had taken them from Henri.

Q. All right. Up until the point of the FBI showing them to you, you had never seen them?

A. No.

Q. And you were able to identify them?

A. Yes.

Q. Did the FBI tell you how they obtained them?

A. They had a search warrant for the technology on Henri's computer and in his office, and they found them on a locked flash drive.

Q. To your knowledge, are those the only pictures he had, that he took of you?

A. No.

Q. Okay. What other pictures were taken of you?

A. There were pictures taken of me in New Orleans.

Q. Okay. New Orleans was a couple of trips later. Correct?

A. Yes.

Q. Because it was the last trip out of a sequence of four that you were --

A. Five.

Q. -- with Henri alone.

102

A. With Henri -- no, I was only with Henri twice alone.

Q. Okay. The New York trip.

A. New York trip.

Q. And the New Orleans trip.

A. And the New Orleans trip.

Q. The next morning, you wake up and Henri calls you?

A. He knocks on my door.

Q. What did you discuss when he knocked on your door?

A. He was like, "Where are you? Are you ready? We have to be at this client." And I guess he had been trying to call me, but I was asleep. And so he knocked on the door, and I kind of cracked the door open. He was like, "You're not ready."

And I was like, "Oh, my gosh, no, I'm not ready." So I just like hopped out of bed and was still -- because I had slept for, you know, a good amount of time between that, still kind of like getting my whereabouts together. And I just quickly threw on my clothes and like ran downstairs and hopped in the car with him.

Q. Okay. So he, you cracked open the door. He's asking --

A. "Are you ready?"

103

Q. -- if you're ready.

A. Uh-huh.

Q. You realize you weren't ready.

A. Uh-huh.

Q. Didn't say anything to him other than you were going to get ready and then you got -- as you described, got dressed?

A. I said, "I'll be down in ten minutes."

Q. Okay. At any point that morning, did you ask him about the previous night?

A. I didn't ask him about it. I said, "I don't know what happened. That was so inappropriate. This is not like who I am. That's completely unprofessional. I don't know what happened between us, but I know that it was wrong."

And I was putting on my makeup in the car, and I felt like that was inappropriate, to be out drinking the night before, and then wake up and your boss is in your room, and then I slept late, and then I was in the car driving to a client and putting my makeup on in front of him.

Like I just felt like the whole situation was incredibly inappropriate and incredibly unprofessional on both of our parts. And I didn't know what had happened, but I knew that at some point I lost control, and I felt

104

like -- what happened? Like I just, I didn't know. I knew it was a mistake, and I knew it was wrong, but I didn't understand how I got from Point A to Point B.

Q. So you don't, you're not in a position to tell us whether or not what happened between you and Henri that night was consensual. You can't tell us, because you don't remember. Is that fair?

MR. TODD: Form.

THE WITNESS: No.

Q. (By Mr. Rosenberg) Why not?

A. If you -- I did not consent to those pictures being taken.

Q. How do you know? You don't remember them being taken.

A. I feel like I don't have to answer this question.

Q. I feel like you do.

A. The photos were taken without my knowledge. Whether I was drugged by Henri, I'm not sure. But I can tell you in my life, I've never taken pictures like that. I can tell you I would never consent to taking pictures like that. I would never consent to having a sexual relationship with my boss, being in a sound state of mind.

Q. Did you have a sexual relationship with your

105

boss that night?

A. I don't know.

Q. Okay. So you don't know if you consented to one or not, because you don't know whether or not you had one.

A. Now I --

MR. TODD: Leading.

THE WITNESS: -- do.

Q. (By Mr. Rosenberg) How do you know?

A. Based on the pictures. Don't you think a sexual relationship is up to and containing somebody taking very explicit naked pictures of you? And don't you think it is not consensual if I was un -- completely unaware of those pictures being taken at the time?

Q. I understand and respect your testimony that you don't recall it. My question to you, and what I'm examining you about is to determine how you know, since you don't remember, what you consented to and what you didn't consent to.

A. There's no way of knowing.

Q. The next day, you're -- do you remember how far the drive was from the hotel in Newark to -- was it a client on the docks?

A. Uh-huh.

Q. So we're talking maybe 15 minutes, if I'm

106

recalling correctly?

A. Maybe a little bit, maybe like 30 minutes.

Q. Okay. You had -- you had conversations with Henri about what happened the night before.

A. I, I talked about it, and saying that it was wrong and inappropriate. And he -- and that I needed to find a different job.

Q. You said that?

A. Uh-huh.

Q. And what did he say?

A. He said, "No, no, no." He was like, "Don't worry about it, Andrea. It's not a big deal. No, no." He was like, "What's inappropriate? It's not inappropriate. There's nothing inappropriate. It's fine. It's fine."

Q. Anything else between the time you got to -- was this a client or a prospect?

A. Client.

Q. Anything else between the time you got to the client?

A. Huh-uh.

Q. At any point did you just, did you come out and say to him, with specifics, "You took pictures of me without my clothes on," or anything pinpointing the exact conduct that you're describing?

107

A. No, because at that time, I still didn't really remember waking up, because I had been back asleep, and because of like the hustle and bustle of me waking up and just, you know, going to get ready with this client and trying to get ready and feeling so sick and nauseous and just very disoriented. I didn't, wasn't thinking about the picture or waking up.

Q. Is it fair to say that you didn't recall the pictures or remember the pictures until the FBI showed them to you?

A. No.

Q. When was the first time you remembered them?

A. I think I remembered it when we were in the Connecticut hotel, once I had kind of calmed down and was thinking back on it. But then I remembered -- I didn't question him on it, because I remembered looking through his phone and not seeing it. So I thought maybe it didn't happen, maybe I imagined it, or maybe it was something else that I heard.

Q. During a, during a visit with this client, was it business as usual?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. I hate to keep doing that to you.

108

A. That's okay.

Q. That night, did you go to dinner?

A. Yes.

Q. Where did you go to dinner?

A. This like Italian place somewhere in Connecticut.

Q. Oh, so you drove from the docks --

A. To Connecticut.

Q. -- into Connecticut?

A. Uh-huh.

Q. Do you remember where in Connecticut?

A. No, wherever the Davidson is.

Q. I'm sorry?

A. Wherever Davidson Foods -- it's a company. It's a big --

Q. The client is named Davidson?

A. Right.

Q. And the city where they're in is the city you were in?

A. Yes.

Q. Okay. You had dinner at an Italian restaurant --

A. Uh-huh.

Q. -- in that area?

A. Uh-huh.

109

Q. Anything unusual happen that night?
A. No.
Q. Anything sexually offensive or inappropriate?
A. No.
Q. Was there drinking?
A. I think maybe we each had a glass of wine.
Q. Okay. Was there anything said about the prior night?
A. Not at that time. It was very like, much like, not a lot of talking.
Q. Well, you had a full dinner --
A. Uh-huh.
Q. -- with some wine?
A. Uh-huh.
Q. And that's it?
A. And that's it.
Q. Was this also a Marriott Hotel?
A. Yes.
Q. With a concierge level?
A. I don't think this one had a concierge.
Q. Okay.
A. I can't remember. I don't think we went to it.
Q. Okay. Did you have drinks before dinner?
A. No.
Q. All right. And you went to bed and you have

110

no, no -- no evidence of anything inappropriate happening that night, no evidence of --
A. No.
Q. -- Henri coming to your room or anything like that?
A. Huh-uh.
Q. Correct?
A. Correct.
Q. All right. What happened the next day?
A. The next day, we were in the room, we were in a board room kind of like this, at Davidson, and had a meeting. And it was -- I think that the CFO, his last name was Davidson as well, but he didn't, he didn't have any relation to Davidson. He was just the CFO at that time, so it was just coincidence.

And he met us for breakfast, and then we went and drove together, because I guess it's in this little town, it's kind of hard to get your way around, so he drove us to the Davidson site. And then we had a meeting with them until fairly late. Like it was only supposed to be I think until like maybe 4:00, and then we ended up being there until like 6:00.
Q. In the evening?
A. In the evening, uh-huh.
Q. Anything inappropriate, sexually offensive or

111

anything about the Davidson trip?
A. No.
Q. Okay. Where did you stay that night?
A. That night -- well, we did have a conversation about what had happened on the way back.
Q. On the way back from Davidson to the hotel?
A. From Davidson to LaGuardia Hotel.
Q. Oh, then you went back to LaGuardia Hotel?
A. We were never at LaGuardia. We were at Newark. And then we ended at LaGuardia.
Q. You stayed one night?
A. In Newark.
Q. Another night in Connecticut?
A. Yes.
Q. And then another night at LaGuardia?
A. Yes.
Q. So you're driving from Davidson to LaGuardia?
A. Uh-huh.
Q. And at that point, you had a conversation about what happened the night in Newark?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. What did y'all discuss?
A. Well, Henri brought it up, and he said, you

112

know, "I want to talk to you about what happened between us the other night. I don't want you to feel uncomfortable about this. We didn't do anything wrong."

He was like, "This is" -- he was like, "I don't know where the attraction came from, but there's definitely an attraction there. And I don't want you to feel -- I want you to feel comfortable in this position, like you can be here for a long time, and I don't want you to go and get another job."

And I said, "Well, Henri, it is wrong, and it is inappropriate, because you're my boss, and I'm not that type of girl that sleeps with her boss." And at this point, I didn't know what happened, but you know, just throwing that out there. And I said, "And you're married." And I was like, "So that's wrong."

And I think at that time I remember talking to him about this guy that I had seen, like gone to dinner a couple of times. And on the way -- because, you know, we were in the car together for a long time. And I had been asking him about his communication style with his wife, Ruth, and like how they communicate and having words and, you know, just making conversation.

So at that time he was like, "Well, you have a boyfriend." And I was like, "That's not an apples-to-apples comparison. First of all, he's not my boyfriend.

**113**

Second of all, you have a wife." And I was like, "And it is" -- and I was like, "I don't know how often you do this, but this is not the sort of thing that I do."

And he was like, "I've never, ever, ever done anything like this before, ever." Like stressing. He was like, "This is the first one and, you know, I really like you."

And I'm like, "No, this can never happen again, and we can never talk about this again."

And he's like, "Well, you know, my marriage has been over for a really long time, and we don't talk, and we have problems."

And I was like, you know, "It really just doesn't matter to me, any of that. It's wrong, and I don't want it to happen again, and I don't want to talk about it ever again."

And he's like, "Well" -- I was just like, "I just want to keep our relationship strictly professional."

And he was like, "Well, but I'm lonely, and I'm an affectionate person. And if I want to give you a hug, then I still want to be able to give you a hug."

I was like, "You know, I really just don't feel comfortable with that. I really just want to keep our relationship professional."

And so he said, "Okay, but I still, I'm still going

**114**

to give you a hug."

And I was like, "Probably not."

And so that was kind of that, like he just -- I expressed to him that I thought that it was wrong and inappropriate and that it could never happen again. And he told me that he and his wife were having problems, and that they didn't really have a marriage anymore, and that he had never done anything like this before, and that -- kind of almost expressing to me like -- well, I don't know. I don't want to assume anything. But it, I got the impression he didn't feel that it was as wrong as I felt it was, and I was not the married one in that situation.

So that kind of made me feel like -- it really did change my opinion of him, if the night before had not, or two nights before had not already, that I like started seeing through his facade of like stuff.

Q. At any point after that, did you start putting feelers out looking for another job?

A. Yes.

Q. In what, in what manner?

A. Well, I mean, I would look online, and I was talking to a friend at Mattress Firm, and also I was interviewing with ADP. It's another like sales company. But that was like later.

**115**

Q. Later, like when?

A. It was like in August or -- yeah, it was in August that I started interviewing with ADP.

Q. That was at the time your employment with Edible was ending.

A. I was still working there.

Q. Close to the end, right?

A. Close to the end. I had checked out at that point with them.

Q. When you say you checked out --

A. Like I didn't want to go there. I didn't want to be there. I didn't want to see Henri. I didn't want anything to do with them at all.

Q. And when did you check out?

A. After the New Orleans trip.

Q. Which was -- remind me when it was. I'm sorry.

A. It was the beginning of August.

Q. When you went from Davidson to LaGuardia, and were talking about the Marriott --

A. Right.

Q. -- in LaGuardia, what time of day did you arrive there?

A. It was late evening. I think it was like probably around like 9:00, because the concierge lounge was still open, and there was a basketball game playing.

**116**

Q. On the television?

A. On the television. And there were a few people up there watching the basketball game. And we had to change our flights, because the other customer that we were supposed to meet that Thursday canceled on us. So we were going to try and take an earlier flight out.

And so I want to say Henri was there before -- at some point we took the rental car back, and we took the shuttle back from the rental car. And then we were up in the concierge lounge, and Henri couldn't get the computer to work.

And so he was like, "Oh, you know, help me. I can't figure this out. It's not working." So I'm like kind of getting where he needs to go.

Q. Computer in the concierge?

A. In the concierge. And there's like these pillars and these big round tables. And I'm kind of like watching the game and figuring this out. And Henri's like, "Oh, do you want a glass of wine?" And like -- or he's like, "Do you want something to drink?"

I was like, "Sure, I'll have a Chardonnay."

So he goes and gets me a Chardonnay, and I take a sip of it, and it just tastes disgusting, like so strong, like alcohol, or medicine, or just very, very like bitter, like alkaline bitter. And --

117

Q. Alkaline bitter?

A. Yeah, like soap or -- what I originally thought, like I was like, "Is there like" -- I was like, "Henri, did you put vodka in this?"

And he was like, "No, no."

And I was like, "Is this like the end of a wine bottle?" I was like maybe somebody else -- I don't know. I was like, "This just doesn't taste right."

He was like, "No, I poured it out -- I got a brand new bottle."

And I was like, "Okay."

So I went and looked at the bottle, and it was a Woodbridge Chardonnay, which is like a regular house that -- I mean, we carried it at the hotel that I worked at for five years. I'm very familiar with the way that it tastes. And I was like, "Oh, this tastes so gross," you know.

So I'm kind of like holding it and not drinking it, and helping Henri and kind of talking to some other people about the basketball game and the concierge, and then we decide to go downstairs for dinner.

Q. Let me stop you for a second.

A. Uh-huh.

Q. I don't mean to interrupt you. But have you -- you've been in the food and beverage business

118

tangentially in different places. Right?

A. Uh-huh.

Q. Have you ever had wine that's been oxidized? Chardonnay?

A. Yes.

Q. Okay. You know what that tastes like?

A. Right.

Q. Have you ever had wine that's been, using the term "corked"?

A. Yes.

Q. Okay. You know what that is?

A. Yes.

Q. Describe what corked wine is.

A. It's kind of like a, it tastes dirty.

Q. That's not the taste you had?

A. No.

Q. But oxidized?

A. Oxidized is like a stronger taste, but this is not the taste.

Q. So you, you're telling the, whoever is reading this or listening to it --

A. I feel like oxidized is almost like a sour taste.

Q. Right.

A. But this is not that taste.

119

Q. All right. So you're, you're, so you're -- because of your knowledge and experience, you're able to rule out corked. Right?

A. Uh-huh.

Q. And you're able to rule out oxidized?

A. Right.

Q. Okay. Just wanted to make sure. Go on. I'm sorry.

A. That's why, and that's why I also checked, like maybe the bottle had been in there for a while, or -- I don't know. I was just so, just why does this -- like trying to figure it out kind of, you know. Like if you have a glass of wine that's kind of vinegared and you're like tasting it like is it vinegared or is it not vinegared?

So I had a few sips of it just trying to figure out what was going on with it, and then I was like, "No, I just can't drink this."

So we got down to the bar, the hotel restaurant/bar area, and I gave it to the waitress and asked her to bring me something else, and she brought me a glass of red wine.

Q. So you didn't drink the bad wine?

A. No. Well, I had a few sips of it.

Q. Okay. A few sips is --

120

A. Three.

Q. -- not a big quantity?

A. No, no.

Q. Okay.

A. It was like barely any -- you couldn't even tell that I had any out of it.

Q. And then you chose varietals altogether -- you switched varietals altogether.

A. Right.

Q. Anything else unusual happen that night?

A. Well, Henri was like -- the concierge lounge was about to close, and we ended up having dinner with these other two gentlemen. They were like, work for this public speaking company.

Q. Did you know them before you got there?

A. Huh-uh. We just started talking to them, and I don't know how I started talking to them. But I think maybe we were still wearing our Edible Software shirts, and they asked about it. And so we just got in a conversation about public speaking, and they ended up joining us for dinner.

And so then we were going back up, because I guess Henri told the lady to like put a piece of dessert out for him in the concierge lounge so he could go get it when he finished.

121

He was like, "Oh, well, come up and have one more drink. Have one more drink."

And I'm like, "I can't, Henri. I'm just so tired."

And so I went upstairs and went to sleep. And then we woke up really, really early the next day for our flight.

Q. And flew back to Houston?

A. And flew back to Houston together.

Q. Do you remember what airline?

A. Continental.

Q. Did you sit first class?

A. No.

Q. Did he?

A. No.

Q. You sat together?

A. Uh-huh.

Q. Was there drinking on the plane?

A. No.

Q. Okay. When was -- this was in May. Right?

A. Uh-huh.

Q. Around May what, would you think, would you believe?

A. The last week of May.

Q. The last week of May?

A. No.

122

Q. Memorial Day?

A. No, no, no. That was the Chicago trip. This was probably the second, first or second week of May. I started the very beginning of the month with them. So May 7th? I don't know.

Q. Was there ever a time after that, within close proximity to it, but after that, that you learned that Henri didn't want to speak with you for one reason or another?

A. Will you expand on that?

Q. I will in a bit, but I just want to see if I can test your recollection. Do you remember any instance after the tri-state trip, New York, New Jersey and Connecticut, that you recall learning that Henri did not wish to speak to you?

A. Yes.

Q. What was that?

A. We had gotten back at like 10:00 a.m., and I told Henri that I wanted to go home and take a nap, because I just felt so tired from the trip and everything.

And he was like, "Oh, sure, sure, sure."

Well, it was my understanding at the time, and it was similar to this at Mattress Firm, and I had discussed this with them upon hiring me, that if I was going to be

123

traveling over a weekend day, as I did on Sunday, that I could flex that time.

So you know, a travel day is a travel day. You don't necessarily have to go back into work. You can if you want to. That day we weren't due back into the office, because we were supposed to come in late from our flight.

So I was like, you know, I'm going to go take a nap, and then I'll go back up, maybe later. On my accord, like deciding if I was going to go up there, it was because I needed to do a few things, not that I had to go back up.

So I took a nap, and I had a missed call from Henri, and he was asking for the notes. And so I called back a little bit later, and I --

Q. What notes?

A. That I had been taking at Davidson. Sorry. I guess I didn't mention that. I took a bunch of notes at Davidson.

Q. For what purpose?

A. I'm a note taker. And he wanted the notes. Or a lot of times he's like, "Write this down." And so I write it down, because I'm already taking notes.

And so I guess he had called me or texted me and said that he wanted the notes. And then -- I don't know

124

if I e-mailed him back that I wasn't planning on coming in, that I would bring him the notes tomorrow. And then he -- I can't remember exactly what happened, but somehow I knew that he was mad that I wasn't bringing him the notes that day.

Q. Okay.

A. Maybe it was based on the message that he left me.

Q. And what was that message?

A. Very heated, like, "I -- this is urgent." Like "I need you to bring me those notes immediately." And so I called the office, and Marlene, the front desk --

Q. Finkelstein?

A. Yes. She answered, and she was like, "I'm supposed to tell you that Henri doesn't wish to talk to you."

And I was like -- I thought, I honestly thought she was joking. Like whatever, like okay, he just must be busy or joking around or something.

And so I was like, "Oh, ha ha. Okay. No, seriously let me talk to Henri."

She was like, "No, he doesn't want to talk to you."

And I was like, "What for?"

And she was like, "Because you didn't come back into the office."

125

And I was like, "What?"

And so I can't remember what -- I think I e-mailed Henri, and I was like, "I'm so sorry. I didn't know that you expected me to come back in. I'll bring you the notes tomorrow." And that was Friday.

And so that was that. And then the next day we went on this demo to Lone Star Coffee, and he was just being very distant and rude and standoffish towards me. And then it ended up that it was because he was mad that I didn't come back in.

Q. This might help.

(Exhibit 3 marked for identification.)

Q. (By Mr. Rosenberg) Can you identify Exhibit 3 to your deposition?

A. Yes.

Q. What is that?

A. An e-mail at 3:45 to Henri.

Q. This is the e-mail you were talking --

A. Uh-huh.

Q. -- you were discussing earlier? So you say, "Henri," exclamation point, "I'm so sorry you don't wish to speak to me." You learned that from Marlene Finkelstein?

A. Yeah. This was kind of like a sarcastic e-mail.

126

Q. You were being sarcastic with your boss?

A. Yes.

Q. Okay. Why?

A. It's just like my personality, I guess.

Q. Okay.

A. Not sarcastic, but like playful.

Q. You were being playful with your boss?

A. Like, like if I were to read this, I'd be like, "Henri, I'm so sorry that you didn't wish to speak with me." Like, "Oh, my gosh, what did I do wrong?" Like kind of like overly dramatic, playful. Borderline sarcastic, but not in a disrespectful way, but just like in a "Is this for real?" Like --

Q. No, that helps. I wanted you to -- because the printed word is the printed word.

A. Right.

Q. And you just helped us.

A. And the context of this is, "Okay, like I didn't know that you wanted me to come in that badly. I'll come in if you want me to."

I really didn't anticipate -- I did anticipate going back into the office, but like I mentioned to Allen and Trevor after that, I didn't think that I had to go back in.

Q. Because of the flex time?

127

A. Because of the flex time, right. And so I was just so taken back by his reaction to me not coming in that I sent him this e-mail to kind of try and lighten the mood and atmosphere. So --

Q. The last sentence, "I'm happy to drive to the office now, but I just wanted to run that by you."

A. Uh-huh.

Q. Did you go back to the office?

A. No.

Q. But you --

A. I don't think so.

Q. You went the next day and --

A. I went the next day.

Q. Did he ever get his notes?

A. Yes.

Q. Okay.

A. Actually, I can't remember if I typed up these notes or if Marlene did. I think Marlene did it for me, the front desk person.

Q. Yeah. They were handwritten notes at first, and then they were transcribed into typing.

A. They were handwritten, and he just like never even looked at them. So they weren't of consequence to him after that.

Q. From that point -- what was the name of the

128

coffee company again?

A. Lone Star.

Q. From the Lone Star Coffee visit, when was the next visit from that point that you did on a road trip, on an out-of-town trip?

A. Was the Chicago trip.

Q. We talked about the Chicago trip already.

A. Right.

Q. Correct? After the Chicago -- and the Chicago trip, I think you said, was the end of May.

A. Uh-huh, the last weekend of May.

Q. Okay. When was the next trip?

A. Was in July, when we went to the Fancy Food.

Q. Which was Washington, D.C.?

A. Correct.

Q. But that wasn't one where you were alone with Henri?

A. No.

Q. Do you have -- remind me if you have a recollection of anything sexually inappropriate or sexually offensive happening on that trip.

A. To me personally?

Q. Yes.

A. No. Oh, yes. Well, this is not -- I mean, call it whatever you want it. I thought it was

129

inappropriate. He called me like really late at night, and it was like 1:30. And this was in the D.C. trip. And that was the night -- and I don't think I mentioned this. I mentioned it in my original statement, because that was like kind of more on a time line.

I had seen -- we had all gone home and all gotten off on our floor, and I was on the highest floor. So Henri got off, Beth got off, Trevor got off, I got off. And then I had to go back downstairs to get something from the front desk. And --

Q. What did you have to get from the front desk?

A. Tampons.

Q. Oh, sorry.

A. And so I went down to get that thing from the front desk, and I saw Henri walking by. And I was like, oh, God, I don't want to talk to him right now. And so I kind of like stood behind the pillar.

Well, when I was walking to see where he was going, I saw him walk back inside with Beth, and he had like his arm around her, and they were kind of like walking towards the elevator together with his arm around her.

And at that moment I was kind of like that's -- I kind of like was suspicious, like "What are they doing?"

And so that was something, other than what I mentioned before on the trip, that I felt was

130

inappropriate. Maybe not sexually inappropriate, but definitely inappropriate.

Q. Inappropriate that the boss would be walking with his arm around her?

A. Yeah. Why were they back downstairs? We all said we were going to sleep. Obviously, I have a valid reason for being down here, but why are they down here?

And so I went back up and was awake, and I was reading, and then my phone rang, and it was Henri. And it was like 1:30 in the morning. And I was like, oh, my God, like --

Q. When you said your phone, it was your cell phone --

A. My cell phone.

Q. Or the one in the hotel?

A. My cell phone.

Q. Okay.

A. And so then I was like, that's not right. Like that's inappropriate. Maybe he's thinking that he can like rekindle something from New York. Not going to happen. So I chose the next day to ask him about it in front of everybody.

Q. What did you say to him when you talked to him that night when he called you?

A. I didn't answer.

131

Q. Oh, the phone just rang.

A. Yeah.

Q. So you don't know whether it was a business-related thing that he might have forgotten or --

A. Right. I don't know. It could have been a pocket dial. All I know is that's not appropriate for him to be calling me at 1:30 in the morning.

Q. So you recognize it could have been a pocket dial?

A. Right.

Q. Okay.

A. So, but then -- like he didn't leave a voice mail, or he didn't -- you know, typically if it's a pocket dial, it will go to voice mail, and then you'll have like a pocket dial voice mail.

Q. Unless it just cuts out.

A. I guess that could happen.

Q. Okay.

MR. TODD: Form.

Q. (By Mr. Rosenberg) Go on.

A. Given what I had just seen, I felt like that wasn't a pocket dial.

So the next morning, I said, "Oh, Henri, did you call me?"

And he was like, "No, I didn't call you."

132

And I'm like, "Oh, I had a missed call from you last night."

If you pocket-dialed somebody, I feel like you would be like, "Oh, I must have pocket-dialed you." He was like, "No, I don't know what you're talking about. I didn't call you at all." And --

Q. Well, you're just guessing that little part.

A. I'm guessing, based on context of knowing Henri and him being very much of an accountant and wanting to like check, check and recheck. Like if I had said that and he had accidentally called me, I'm just speculating, but I can pretty much put my money on the fact that he's going to look at his phone to see if he was going to call me.

Q. But you are speculating?

A. I am speculating. But that's how I feel.

Q. I got it. I just want to make sure when you're speculating, we know what it is you're speculating about. I appreciate the fact you're speculating. I just want to make sure I know that --

A. Right. So, so he was just like, "No, I didn't call you." And he walked away from the whole entire group. So I just felt like that was inappropriate. Obviously, I had proof that he had called me, and I didn't -- I felt like he was -- it made me feel really

**133**

uncomfortable, because I felt like I saw him with Beth, maybe she shot him down, and then he was like, "Oh, I'm going to call Andrea and see what she's doing." Like not appropriate.

Q. Again, you're just speculating that maybe --

A. Right, but that's, that's why it made me feel uncomfortable. So between the Chicago and New York trips, other than that phone call, nothing -- or Chicago and D.C. trips, nothing inappropriate happened --

Q. Okay.

A. -- between Henri and I.

Q. And up until this point, you never reported anything that happened to anybody?

A. No.

Q. The next trip after the D.C. trip was New Orleans. Correct?

A. Yes.

Q. And there wasn't anything that happened in the interim?

A. Huh-uh, just a lot of -- no.

Q. Just a lot of -- I mean, anything in the office that was going bad or anything like that?

A. I mean, I would say -- and I think anybody else would say that our relationship was not good. Like after that point, after D.C. and Chicago, I pretty much just

**134**

dealt with Trevor and just talked to Trevor and rarely would go into Henri's office and talk to him about anything, just because I couldn't stand him or being around him.

Q. Couldn't stand being around Henri?

A. Uh-huh.

Q. And this is a time you're actively looking for another job?

A. I would say in, like June, July wasn't actively looking for another job. Starting in August, I was.

Q. So despite the fact that you can't stand your boss, you were not looking for another job?

A. No.

Q. Why not?

A. I had a lot going on at that time.

Q. What was going on?

A. Well, my roommate had tried to commit suicide.

Q. Your roommate tried to commit suicide?

A. Uh-huh.

Q. Well, obviously that's a traumatic event.

A. It's very traumatic and --

Q. I take it the roommate -- you told me her name once before.

A. Amy.

Q. That obviously wasn't successful.

**135**

A. Well, yeah, because I was there and --

Q. And prevented it?

A. Uh-huh.

Q. Okay. I didn't know any of that. I really don't want to get into that because it's tangential to this, but there was a time -- and I just want to make sure this is what it is, so I don't have to get into it.

A. Uh-huh.

Q. -- that you were running late because you had to help Amy's mom with some stuff in the apartment.

A. (Nodding head.)

Q. Was that related to the suicide?

A. (Nodding head.)

Q. Okay. We're not going to get anywhere near that. Other than that event going on, what else was going on in your life?

A. I mean, I was just really depressed.

Q. About what?

A. About my life, and about what had happened between Henri, and that I felt so trapped, and I felt like a terrible person. And you know, this happened to my roommate, and she is such a wonderful person. And like kind of struggling with that, like -- just like not in a good place at all. Like everything was just going wrong.

**136**

Q. What was, what else was going wrong?

A. I think at that time like I was having a lot of car trouble. I think my car would just randomly not start, and so I was like looking for another car, and that's very stressful, and trying to find another roommate, because -- and acclimating to that and --

Q. Did Amy stop being your roommate?

A. She moved to New York to go to law school.

Q. Okay.

A. And so then my best friend was moving away.

Q. Who was your best friend?

A. It's a different Christina.

Q. Okay.

A. No, but she had been -- let's see. Yes, I think she was like in the point of moving away. So I was losing a close friend. And just, you know, it's life, but it's a lot of really heavy stuff, on top of, oh, my God, like I'm a horrible person because I did this with my boss, this thing that I don't even want to think about. And now he's being really rude to me and mean to me, and I can't get a handle on it. And I just felt like I was sinking.

Q. You're saying it's something you did with your boss?

A. (Nodding head.) That's how I felt at that

137

time.

Q. At any point, did you seek treatment from a physician or a counselor?

A. After Amy had committed suicide, I was having a really hard time with it.

Q. Yes.

A. And kind of trying to decide if it was right that she wasn't successful, I guess. And so I started seeing a therapist at that time.

Q. What therapist?

A. Dr. July out of the Good Samaritans, like this is like a counseling place.

Q. Spell the physician or counselor's last name.

A. July, as in the month.

Q. Oh, okay. Male or female?

A. Male.

Q. What profession? In other words, a medical doctor or a clinical psychologist, if you know.

A. A psychologist, I believe.

Q. Okay. How many visits did you have with Dr. July?

A. Probably like eight.

Q. Did you relate to Dr. July about any of the events that happened while you were employed at Edible Software?

138

A. No.

Q. You -- would this counselor -- what would you like to refer to this person as? A counselor, psychiatrist, psychologist?

A. Whatever you want. It doesn't matter to me.

Q. Well, you're the one who sought this person's services. I'm just trying to figure out what's appropriate.

A. Psychologist.

Q. Okay.

A. I think he had, I know he had his doctorate, so --

Q. You're seeing this psychologist for eight independent visits.

A. Uh-huh.

Q. And I take it this psychologist took a history from you. Correct?

A. Uh-huh.

Q. Because you understand that the way they can diagnose and treat and render advice is to get a complete and accurate history.

A. Right.

Q. Why did you choose not to provide this information you were going through about what you had gone through with Mr. Morris when you were seeking

139

psychological care?

A. Because I just wasn't ready to admit that it had happened to myself or -- I certainly didn't want anybody else to know about it. I was so ashamed. And it just felt like it was the worst thing that anybody could ever do, ever. Regardless of the state I was in, I just had so much guilt and so, like I was so disgusted with myself, and I just wanted it to go away.

Q. You were assigning the blame to yourself for what happened.

A. Yes.

Q. At what point did you decide that the blame shouldn't be assigned to you, it should be assigned to Henri? Was it after the FBI got to you?

MR. TODD: Form, leading.

THE WITNESS: Can you rephrase that question?

Q. (By Mr. Rosenberg) Yeah. At what point did you decide that the blame shouldn't be assigned to you, and that it should be assigned to Henri?

MR. TODD: Form, leading.

THE WITNESS: Can you repeat the question?

Q. (By Mr. Rosenberg) At what point did you decide that the blame shouldn't be assigned to you and should be assigned to Henri?

A. I would say after I started going to

140

counseling -- in May of 2012, I started going to counseling, and then I didn't tell that counselor about it until probably June. And then after discussing it for probably another two or three sessions, then that's when I was kind of starting to see that it might not have been my fault.

But I just felt like there were so many opportunities where I should have seen through what was happening, or that I should recognize it and said something. And then I started finding out about the other women that she, that came forward. And I don't at this point even know who came forward first.

And, and then I had a lot of guilt about her, and I should have said something, and then she wouldn't have experienced this, and I didn't because I was scared or ashamed or felt, didn't want that to tarnish my reputation. And -- but I should have said something and I should have said something about Beth, so I had a lot of guilt about that.

And so I think that I don't hold myself solely accountable for what happened, obviously, but I feel like given that I knew it was wrong and I knew the second time that it happened that it was really wrong, that something really wrong had happened, that I was not okay with, at that time I should have said something to somebody.

**141**

Q. So -- and I would not cut you off, because I wanted you to feel that you're able to say what you wanted to say. But if I understand what you just testified to, you did not realize that this was Henri's fault until the summer of 2012. Right?

A. I didn't reconcile that with myself.

Q. Fair enough. But I just want to make sure I got the date right.

A. June -- yeah.

Q. 2012?

A. 2012.

Q. Late spring, early summer.

A. Yeah.

Q. And that's when you saw another psychologist?

A. Uh-huh.

Q. Who was this psychologist?

A. My current psychologist.

Q. And when was the first time you told your current psychologist about what happened?

A. Late May of 2012.

Q. Okay. Who is that psychologist?

A. I don't wish to answer that.

Q. I'd hate to have you come back here just to get a court order and answer that question. I'm not looking to get any records from this person or anything like

**142**

that. I just want --

A. I still don't want to answer that.

Q. Let me tell you what's going to happen if you don't, and then it's your decision. I'm going to ask the Court to certify the question, because I believe that that person has knowledge of relevant facts.

A. It's medical. It's private medical facts.

Q. I understand. I understand your position. And I respect your position. I'm just telling you what's going to happen. I'm going to ask the Court to certify the question, and we would come down and redepose you on that issue, and we're going to ask the Court that it's at your expense.

A. What if this is not at my expense?

Q. Your choice. Do you not want to answer the question?

THE WITNESS: Do I have to answer that question?

MR. TODD: You can make up your own mind. I mean, he, he did say that, but you're not a party to the civil case. They'll never get those records, and the Court won't compel you to do that, because --

MR. ROSENBERG: And I told her I'm not looking --

MR. TODD: Your, your personal state of mind

**143**

isn't relevant to anything in this civil proceeding, so really I would object. I'll object on the record that you don't need to be asking that because it's not even reasonably related to even reach permissible or admissible evidence. So don't answer the question.

THE WITNESS: Yeah, I don't want to answer it.

MR. ROSENBERG: So you, who are not representing her, told her not to answer the question. Correct?

MR. TODD: I think that she needs to make that decision on her own, but I don't know how it's relevant to anything since she isn't a complainant in this lawsuit.

Q. (By Mr. Rosenberg) Are you going to answer the question?

A. No.

MR. ROSENBERG: Okay. Certify that question, please.

Q. (By Mr. Rosenberg) All right. That physician -- I think you said psychologist. Right?

A. Yes.

Q. All right. You began seeing that psychologist in May of 2012.

A. Uh-huh.

Q. Right? Yes?

**144**

A. Yes.

Q. And believe -- and have testified you're still seeing this psychologist today.

A. Correct.

Q. And I take it you're not going to answer any questions about the treatment of this psychologist?

A. No.

Q. Correct?

A. Correct.

Q. Okay.

A. I mean, if you want to know is Henri the reason I'm going to this psychologist? Yes. Is this situation the reason I'm going to this psychologist? Yes. And that's about as far as I'll go.

Q. I think you just opened the door, and I would -- even he's nodding his head. I would revisit your, your decision not to answer the question.

A. Okay, that's fine.

Q. Since you just volunteered that. You just told me --

A. I just don't want -- I'm telling you I'm not going to tell you who it is. I don't want to answer any questions about it. If you have a Henri specific related question about it, as in, "When did you realize that it might not be your fault? When I started seeing my

**145**

therapist," yes, I'll answer questions like that for you, if they pertain to the case. I'm not going to go into my personal treatment and my private life about my therapy.

Q. I heard what you said. I have questions I need to ask. I'm not going to be guided by a non-party witness to my lawsuit as to what I'm going to ask. I have protection -- I have a job to do. I've got to represent --

A. I understand that.

Q. -- a company and an individual in claims brought against them in a civil suit. That's my job. And I've got to do it ethically and zealously. I've got no choice.

A. If you want to ask me the questions, I'll tell you whether or not I'll answer them. I understand that you have to do a job. I'm trying to be as cooperative as possible. On this matter, I'm pretty firm. But if you ask me a question that I feel comfortable answering, I will answer it.

Q. You won't give me the physician's name?

A. No.

Q. Okay. Well, that's one question that I'm asking that you're not going to give me.

A. Okay.

Q. All right.

**146**

A. Why does it matter what her name is?

Q. Well, because I believe her records -- is it a her or him? I believe that the psychologist's records are relevant -- are reasonably calculated to lead to discovery of admissible evidence in the case I'm defending.

A. No.

Q. Okay. Let's just leave it. Let me certify it. Let me bring it before the Court. You'll get notice of the hearing and have an opportunity to be present in Houston, and we'll go from there. Okay?

A. Okay.

Q. Because I'm not going to sit in here and play games with you.

A. I'm not trying to play games with you.

Q. Yeah, you are.

A. No, I'm not. I'm telling you I do not feel comfortable answering questions about my private personal therapy. You guys have asked me tons of private personal questions all day, and I've answered them. And I've told you things that I didn't want to tell you.

But on this, that is my private -- that's my therapy. That's my healing. And I don't want to answer those questions.

Q. For example, if you're diagnosed with a

**147**

propensity to make things up, I have the right to know.

MR. TODD: Form, leading.

Q. (By Mr. Rosenberg) Those are the things I'm going to be looking at. If you are lying about this and admitted to your doctor that you're lying about it, or if there's something in those records that could assist the defense I have in my lawsuit, I'm entitled to know.

If, on the contrary, the psychologist is going to -- the records say this lady is the most truthful person in the world, and she has a medical reason not to tell me what's going on, that's something I need to know as well.

So I understand your position. You're not represented, so I'm not -- I can't do anything else but tell you where I'm going with this thing.

A. I know.

MR. TODD: Form.

Q. (By Mr. Rosenberg) I just got a sticker for the tape.

A. Well, I want to take a break anyway.

Q. Okay.

THE VIDEOGRAPHER: Time is 1:52. We are off the record.

(Recess from 1:52 p.m. to 2:03 p.m.)

THE VIDEOGRAPHER: The time is 2:03. We are recording.

**148**

MR. ROSENBERG: Pass the witness.

EXAMINATION

BY MR. COGDELL:

Q. Ms. Farmer, good afternoon. My name is Dan Cogdell. I am Mr. Morris' lawyer in the civil case. Okay?

A. (Nodding head.)

Q. Same rules as before. Just because a lawyer asks you a question doesn't mean it's a perfect question. If you don't understand it, please let me know and I'll rephrase it. And please make your responses like you did earlier, audible and not just nodding your head. Okay?

A. Okay.

Q. Did you review any documents prior to your testimony today in anticipation or in preparation for your testimony today?

A. Yes. I read my original statement to the FBI.

Q. Anything else?

A. No.

Q. Did you make any notes?

A. No.

Q. Did you bring any notes with you?

A. Here?

Q. Yes, ma'am.

A. I mean, the only notes that I took were --

these right here.

MR. COGDELL: Can you hand that to me, Gregg?

THE WITNESS: Just like more of like a personal pep talk than anything.

MR. COGDELL: Can you have this marked -- can you mark this as exhibit next, please.

(Exhibit 4 marked for identification.)

Q. (By Mr. Cogdell) Ms. Farmer, this is on the back of what appears to be --

A. My original statement to the FBI, the last page.

Q. Yes, ma'am. I'm just wondering -- can I see your statement, your copy of the statement, your statement? Because it appears to be different than my copy of the statement.

A. It's probably because it's just printed in a different --

Q. I'm sorry?

A. It's probably just because it was printed -- the way I printed it. That's what I took it -- the part labeled 4 right there, I took it from the back. You have it backwards.

Q. Give me just a minute.

Okay. At least the first page and the last page look the same, so I'm going to assume that we're working off the, the same statement.

You wrote at the end of what's now marked, Ms. Farmer, as Exhibit 4, "Thursday: remain composed, stick to the facts, listen to questions and answer that question, don't have to answer with more, think the whole time." Right?

A. Right.

Q. And when did you make those notes?

A. Yesterday.

Q. Did you make those notes, ma'am, when you were having your conversations with Ms. Zack and her assistant?

A. Yes.

Q. I think I know who you're referring to as her assistant.

A. Well, it's not her assistant. It's her partner.

Q. That's how you, that's what you called her.

A. Oh, okay. I certainly don't mean her assistant. I meant her partner.

Q. Okay. You said "assistant." Be that as it may, let's see if the guy I'm thinking about is probably the same guy that you're referring to. Okay?

A. All right.

Q. This fellow's name is John Jocher. Does that sound right?

A. Yes.

Q. John is about 45 years old, white male, brown hair, articulate, typically very well dressed, responsive, personable, professional in his demeanor. Same guy?

A. I mean, those are matters of your opinion, so -- sounds like the same person.

Q. Would you describe him differently?

A. I briefly talked to him over a web, video webinar. I really couldn't see what he was wearing or --

Q. You couldn't see him on a web video?

A. I mean, I could see him, but I couldn't like tell the material of his clothing.

Q. Okay.

A. It sounds like the same guy. And if he's Sherri Zack's partner, then I would assume that it would be the same person.

Q. Okay. And please understand, Ms. Farmer, I'm -- you appear to be catching a tone with me. I'm not here to attack you. I'm not here to denigrate you or anybody else in the process. I'm here to ask --

A. No, this is my normal tone.

Q. This is your normal tone?

A. Uh-huh.

Q. Okay. The meeting, the video conference that you had with the two Assistant United States Attorneys yesterday, whose idea was that?

A. Mine.

Q. And why did you want their counsel?

A. Because I don't have a lawyer of my own, and I didn't know what I was going to be doing, and I was very nervous about it. So I called Sherri and asked her if she would give me some prep on it.

Q. So you initiated the call to Ms. Zack, as opposed to the other way around, her calling you?

A. Yes.

Q. And what time did the conference begin?

A. 2:30.

Q. And what time did it end?

A. 4:30.

Q. That's two hours.

A. Uh-huh.

Q. Tell me the questions that you asked them and the answers that they provided you, as best you can recall.

A. I asked if I had to answer all the questions.

Q. And what were you told?

A. They said, "Yes, try to answer all the questions. It's up to you. We're not going to give you

153

counsel," and --

Q. Well, wait a minute. You said that they told you that they weren't going to give you counsel when you had this discussion with them yesterday.

A. They said, "We're not going to tell you what to answer and what not to answer," I guess.

Q. Okay.

A. I'm paraphrasing.

Q. Okay. What else did you ask them and --

A. And I asked them if I could have Christina in the room.

Q. And what were you told?

A. They said -- Sherri didn't think it was a good idea. She said that she would e-mail Jeff and ask Jeff if that would be okay. I said I was told and encouraged to have some sort of support system with me by --

Q. Who were you told --

A. -- the witness coordinator or the witness person at the FBI.

Q. Okay.

A. And I asked how long it's going to last, what kind of tough questions that they're probably going to ask me.

Q. And what were you told in terms of the tough questions that they were probably going to ask you?

154

A. They said they didn't know what they were, that y'all were going to ask me. They said it would probably be very invasive, and it's going to feel like they're picking on you and bullying you, but they're not, because they have a job to do, and that they're not bad people, they're just in a situation where they have to ask you a lot of uncomfortable questions. And basically that was just kind of the conversation.

Q. Okay. Now, you're sort of regurgitation of the conversation that you had with Mr. Jocher and Ms. Zack lasted a few, just a few minutes between you and I, three or four minutes. Right?

A. I mean, I'm paraphrasing.

Q. I understand. But what consumed the rest of the two hours?

A. He asked some clarifying statements on my original statement to the FBI, because --

Q. Which clarifying questions did he ask?

A. When -- I think it was on Page 145.

Q. We're different, we're different pages, so subject matter --

A. Okay. Well, basically when I start talking about when Beth seemed very inebriated and when she seemed very out of it, I couldn't remember originally when I gave this statement to the FBI -- because you have

155

to remember, me telling this story to the FBI was only the second time that I had ever told the story to anybody.

Q. Okay.

A. And the first time was right before I told the story for the recorder. So I mean, I remembered as much as I possibly could, but it was only the second time that I had ever talked about it. So there are some parts in it that are a little bit confusing. And --

Q. Take me to the part of your statement that Mr. Jocher was asking you to clarify yesterday afternoon.

A. He wanted to know about when Beth was inebriated, was that in Washington or in Chicago, because I'm talking about the Chicago trip, and then I kind of realize that it's in D.C. when she seemed really drunk.

Q. Okay.

A. So just clarifying that. And then also in, when we were in -- he wanted to know how Henri got to the hotel bar that I was at.

Q. Which hotel bar are you talking about?

A. In New Orleans.

Q. Okay.

A. And then what, when I went to the restroom, if I took my drink with me, if I left it there.

Q. Which incident are we talking about?

156

A. Still at the same incident, in Louisiana.

Q. Okay.

A. At the bar with the rotating floor. And then I say that I was feeling okay in the bathroom, but then I came back out and I couldn't find where Henri was, so I was feeling disoriented. And then I realized no, I'm not disoriented, the actual floor of the bar is actually moving.

Q. The room really was spinning?

A. Huh?

Q. The room actually was spinning?

A. The room actually was spinning.

Q. Okay.

A. And, and so he wasn't understanding that it was like a mechanically rotating floor. He thought that I, the room actually was, the room was spinning in my head.

Q. Right.

A. And so it took a good amount of time to clarify that, that -- because he was like not understanding that it was a mechanical rotation, like a slow mechanical rotation. So that took a good amount of time to explain between the three of us.

Q. What else did you clarify for him?

A. I think that was it. I think it was just those three questions, three things.

157

Q. And again, I'm not trying to, to pick at you. I'm just trying to capture as much of what happened yesterday as you can recall. Seems like there would have been other topics you would have discussed to encompass --

A. They talked a long time telling me about telling the truth, and my notes, because I'm a note taker, so I had a pen and pad to take notes. And they said, "No, it's probably not a good idea that you take notes here."

Q. Because then some lawyer like me will want to see the notes?

A. Will want to see the notes. And I'm fine, perfectly fine with you seeing those notes, you know.

Q. All right. Let's -- did you make any notes about this -- you just classified yourself as a note taker.

A. Uh-huh.

Q. Did you make any notes about the actions that you believe were sexually or socially improper --

A. No.

Q. Let me finish the question.

A. Okay.

Q. -- the actions that you believe were sexually or socially improper by, on the part of Mr. Morris?

158

A. No.

Q. Why not?

A. I have just a really hard time talking about it or thinking about it. And putting it on paper creates some sort of proof that somebody might take away from me. And I didn't want that to be floating around my house or anywhere.

Q. Okay. Let's back up. This statement that you made to law enforcement back in February of 2012, you say that that's the first time that you ever -- that day is the first time you ever discussed this incident with anyone.

A. Yes.

Q. However, I think you told us, Ms. Farmer, that you got a call from Agent Gregory in December of 2011.

A. Uh-huh.

Q. And was discussing with you sort of the general topic of they're having some concern with Henri Morris and his female employees while he was traveling. Right?

A. Uh-huh.

Q. You earlier testified that Agent Gregory called you on your cell phone kind of out of the blue.

A. Uh-huh.

Q. And you were expecting, because of the area code, to be someone you knew, and instead it was Agent

159

Gregory.

A. Uh-huh.

Q. Did he explain to you how he got your name?

A. No.

Q. Did you ask him how you got my name?

A. No.

Q. Did you ask him why he was calling you?

A. He told me he was calling me because I was a past employee of Edible Software.

Q. Well, did you find it -- did you wonder why he was calling you?

A. Yeah, but given what I knew -- given my personal experience, I just didn't feel the need to question. I didn't want to say anything. I hadn't decided what I was going to say, so I said, "I think I could have, I could give you, offer you some information."

Q. Okay.

A. And that was it.

Q. You say you didn't know at that time back in December of 2011 what you were going to tell them?

A. Uh-huh.

MR. TODD: Is that a "yes"?

MR. COGDELL: I'm sorry?

MR. TODD: Is that a "yes"?

160

THE WITNESS: Yes.

Q. (By Mr. Cogdell) Thank you. Why wouldn't it be clear to you what you were going to tell them?

A. Because I hadn't made the decision at that point if I wanted to open that door and go through all of this.

Q. Okay. Were you certain in your mind in December of 2011 when it happened? Were you clear in your own mind?

A. I knew that it was wrong, and I felt like if I told what happened, it would open up -- it would be a case. Like I knew --

Q. Try to, if you can, try to answer the question I'm asking. Okay? The question I'm asking is pretty specific. Were you clear in your own mind in December 2011, when you were first contacted by Special Agent Gregory, what had happened?

A. Can you rephrase the question?

Q. Sure. In December 2011, when Special Agent Gregory contacted you for the first time, were you clear in your own mind what had happened between you and Henri Morris?

A. No.

Q. When did you become clear?

A. You know --

161

Q. If you weren't clear in December of 2011, at some point you became clear. So I'm asking you when that point was, in terms of time.

A. I feel like it's a work in progress, because I know my story, and I know what he's been accused of happening, and I know the evidence that I've seen. And I feel like it's a pretty strong amount of evidence proving that.

But even, you know, up to last night, when I was reading through the, my statement, I was like, why didn't I see this? Like why didn't I realize that this was going on, or that he was --

Q. Let me see if I can --

A. I mean, it's just hard to pinpoint it, because I'm not like reconciled with it on my own. I know that what he did was wrong, and I know that something happened to me that was out of my control, and I didn't consent to it, and I didn't want it to happen to me.

But I just, it's always like a learning experience, the more and more information I find out, of just how calculated it was.

Q. Okay. Do you recall the question I asked you?

A. What point in time --

Q. -- did you become clear --

A. -- did I become clear --

162

Q. -- as to what happened? Answer that question, please, ma'am.

A. I guess in, when Glenn Gregory called me and told me that they had found the pills on Henri.

Q. Okay. And when did he tell you that?

A. Was that in March? I don't remember. Whenever --

Q. Well, you met with him in February of 2012.

A. I don't -- when I met with him in February, he didn't tell me. They hadn't gone to arrest Henri yet.

Q. Okay. So --

A. I realized that, what had happened when he called me and said that they did a sting on Henri at the airport and that they found the South African, some form of Ambien on him. That's when it clicked for me.

Q. So to be clear, Special Agent Gregory called you and told you that they had found a South African form of Ambien on Henri when they did a, quote, sting on him, closed quote?

A. Actually, I don't think he told me that.

Q. That's what you just said.

A. I'm trying to recall. I think he was more vague than that. I think I found that out later.

Q. How did you find that out?

A. I think Glenn called me and --

163

Q. By "Glenn," you mean Special Agent Gregory?

A. Yes.

Q. Okay.

A. -- and said that they had done a sting on Henri. He wanted to let me know, since I had already made my statement, and they found enough evidence on him to arrest him. And then I think -- this was after they had already done the sweep of Edible Software, so it was in, a courtesy to me, as a witness coming forward, to let me know what was going on with Henri.

Q. Okay.

A. And so then -- I think I Googled it, and there was like some report by some really small news station in Houston that had reported on the South African Ambien, or a form of -- it said some sort of Ambien that had been brought from the, that Henri had brought from South Africa.

Q. And so it's now your memory or position that the, the discovery of the South African Ambien came from a Google search on your part and not from the lips of Special Agent Gregory?

A. Yes.

Q. Okay.

A. Because I remember being mad that he didn't tell me that, that it was in the news and out for the

164

public, but he didn't tell me that. And I was upset with him for not calling me and telling me that this was a news story or that it was out in the public, because I didn't want any of this to be out in the public.

Q. You didn't want any of what to be out in the public?

A. Anything about Henri that can be linked back to me.

Q. Okay. Is there anything in your statement that's inaccurate?

A. I think there were a few typos.

Q. Other than typos, is there anything in reviewing it -- I mean, I'm assuming, Ms. Farmer, you've reviewed it several times between the time you first got it and the time today?

A. I've read it twice.

Q. Okay. Is there anything in there you wish to change, from a factual standpoint or from an accuracy standpoint?

A. No.

Q. At the very end of the interview -- it's my Page 121. I don't know what your page is --

A. Uh-huh.

Q. -- Ms. Farmer. It's four or five pages from the end. And you say, "But up until coming and visiting

165

you guys, I felt that that was just a mistake that I had made, not even knowing that, you know, that there were other things that had gone on, and maybe this isn't something that has only happened with me. So up until today, I just internalized all that and thought it's my fault." Right?

A. (Nodding head.)

Q. Correct?

A. Correct.

Q. So before you met with the FBI, is it safe to say, or is it accurate to say that you did not believe that Mr. Morris had done anything criminal?

A. No, absolutely not.

Q. Okay. Well, what did you mean by, "But up until coming and visiting you guys, I felt that it was just a mistake I had made"?

A. I felt like it was an isolated instance.

Q. Well, it being an isolated instance is a different kettle of fish than it being a mistake that you made. So what did you mean when you said, "But up until coming and visiting you guys, I felt that it was just a mistake that I had made"? What did you mean by that?

A. I thought it had more to do with me personally.

Q. Meaning what?

A. That it was just me that had been in these

166

blackout situations with Henri.

Q. Okay. What mistake that you made are you referring to? What did you mean by "the mistake that I made"? What mistake?

A. Not being more careful with myself. And I felt like the first time that was just like an outright, I don't know what happened. Like --

Q. All right. Stop. So up until you met with the FBI, the first incident meaning, I'm assuming --

A. New York.

Q. -- New York, you were unclear in your own mind what had happened then.

A. Uh-huh.

Q. So what did the FBI tell you that changed your mind --

A. Um --

Q. -- in this first meeting?

MR. TODD: Form.

THE WITNESS: That this was not just an isolated instance with only having to do with me twice, where the same thing happened twice, where I don't remember, I wake up and I don't remember and I'm naked and I feel nauseous and awful, that that doesn't have to do with just me, that there are other people that Henri has done this to.

167

Q. (By Mr. Cogdell) So they told you this -- let me back up. Gregory calls you in December. You meet with him in February. Right?

A. Right.

Q. You meet with him, I'm assuming, at the FBI offices?

A. At the FBI office here in Corpus.

Q. In Corpus. So he travels from Houston to Corpus.

A. Yes.

Q. How many times do you talk to him, Ms. Farmer, between the first call and the first sit-down face-to-face interview?

A. I think that the first time he, it was like right around Christmas, obviously in December.

Q. Yes, ma'am.

A. And I think he had to reschedule. So I guess I talked -- we had scheduled a date maybe in January -- sometime between the two, and he had to reschedule because he had another engagement that he had to go to, and so he rescheduled for the February time.

Q. Okay. So do you talk with him on the phone about what happened between the December phone call and the February meeting, or is it just scheduling?

A. Just scheduling.

168

Q. He's not providing you any information --

A. No, no.

Q. -- about his investigation during that period of time?

A. Huh-uh.

Q. So how long do you discuss with him what happened before they turn on the tape recorder and this statement is created?

A. This started at, what, 1:10?

Q. 1:10, yeah. Yes, ma'am, 1:10.

A. I think I got there at 11:00.

Q. Okay. So you were with him a couple of hours?

A. Couple of hours.

Q. And during this period of time, is he providing you information?

A. No.

Q. Well, wait a minute. I thought you just got through telling us that they told you that this had happened with other women and it wasn't just you.

A. He wasn't --

MR. TODD: Form.

THE WITNESS: Okay, thank you. He wasn't providing me with specific facts about anything. He said, "We'd like to hear what you'd have to say about your relationship with Henri Morris and, in regards to

169

traveling with him."

He said, "There have been some allegations that have come up against him, and we'd like to hear if you've ever -- what your experiences have been traveling with Henri Morris." Now --

Q. (By Mr. Cogdell) Ms. Farmer, we spent about ten minutes hacking apart this sentence about, "But up until coming and visiting you guys." And during my question and answers about that verbiage, you certainly told us that they had provided you information about what had happened with other women.

A. Right.

Q. And it just wasn't an isolated instance with you.

A. Will you let me finish my answer, so that I can answer the question?

Q. Will you answer my question?

A. I'm trying to.

Q. Okay.

A. So I gave my statement and told them what happened between Henri and I on those two trips. Walked through the entire statement. And then they said, "Andrea, believe it or not, this hasn't only happened to you." This was after I gave my statement, after I told them everything that happened.

170

There are a lot of similarities in what happened. I kind of talked to him about how I never told anybody and that I had a lot of guilt about it. And they said that "We can't get into specifics right now, but there are other women, and you're not the only one that's experienced something like this."

Q. Okay.

A. Then after that, I went back and gave the exact same statement and story that I had given before.

Q. How do you know it was the exact same statement?

A. I mean, it wasn't the exact verbatim, but I mean, I'm pretty -- it was the same -- it was like literally not very long -- it was not very long apart between the first time I told it and the second time I told it. If anything, there are more -- I think that I told -- I say in here "I know I hadn't mentioned this earlier, but" -- and I don't know where I say that, but at some point I say, "I know I hadn't mentioned this earlier, but I remember" -- oh, I know. It was about Beth being really wasted. And that's where I kind of got off. And I said, "I know I didn't mention this earlier, but this is what had happened."

Q. Okay. Your statement began at 1:10.

A. Uh-huh.

171

Q. It ended at 3:47.

A. Uh-huh.

Q. Two-and-a-half hours, more or less.

A. Uh-huh.

Q. Correct?

A. Uh-huh.

Q. So if you got there around 11:00, you had about two hours between the first time you tell it and the second time you tell it. Okay?

A. Uh-huh.

Q. Okay. What information was told by law enforcement to you before you gave this statement, the one we see here?

A. Just that, "Believe it or not, there are some similarities and you aren't the only one that's experienced this."

Q. Okay. Did they tell you how many other women had experienced this?

A. No.

Q. Who all was in the room at the, the warmup session, for lack of a better term?

A. Officer Gregory, Officer Patrowski, or how do you say his last name?

Q. Patrowski I think is right.

A. Patrowski. And then one other court person or

172

the computer, like documenting, is this Henri, and circle and sign, and --

Q. Okay. At one point, you said that you had spoken with Special Agent Gregory about fifty times --

A. Uh-huh.

Q. -- in total, and then you changed that to --

A. To twenty.

Q. -- about twenty times. Give me your best estimate as to the number of times you've spoken with him.

A. The reason I said originally fifty is because I was trying to gauge like, okay, this has been going on for two years, and I talked to him maybe about twice a month. And then I realized no, he only called me a year ago to start talking about this. So I would say he probably calls me when something big happens. Other than that, it's maybe once a month.

Q. Okay. And when he calls you and tells you about something big, color in the details for that for me.

A. He just updates me. "We arrested Henri Morris." "Henri Morris got out of jail." "Henri Morris was put out on bond."

Q. Well, that wasn't all in the same day.

A. I got the information separately, I guess.

173

Q. Okay.

A. Over a couple of different phone calls.

Q. All right.

A. And --

Q. Let me correct myself. If it wasn't the same day, it was within a couple of days.

A. Right. So that would be an example of more times than one time in a month.

Q. Okay.

A. So the other times that he would call me is when the trial would be rescheduled.

Q. Okay. It's been rescheduled twice.

A. Okay.

Q. So that leaves about sixteen calls.

A. And then if there was -- when he goes in and does his arraignments -- I don't know. I feel like there have been a few different meetings and a few different schedules and reschedules. So cancellations, reschedules, him going in and accepting my indictment, then calling and talking to me about what, that they're going to put me as part of it.

Q. Let's talk about that. Originally you understand, or you're aware, Ms. Farmer, that you weren't named as a, as a victim or, or a person associated with the indictment. Right?

174

A. Right.

Q. Clearly, law enforcement was aware of your claims about what happened when Mr. Morris was originally arrested and charged. Right?

A. I don't know any information about that.

Q. Well, of course you do. You met with them before he was arrested. Right?

A. Oh, law enforcement meaning the FBI?

Q. Yes, ma'am.

A. Yes. Yes, sir.

Q. So law enforcement was aware of your claims. Right?

A. Yes.

Q. And you understand that the original charges did not include the claims that you've made.

A. Yes.

Q. What's your understanding of why you weren't included?

A. I, I didn't have an understanding. I just knew that I wasn't, they didn't necessarily need me. I'm a very private person. I didn't want to be in this position where I was a witness.

Q. Did you request -- I'm sorry, I'm stepping on your answer. Did you request not to be included in the charging document?

175

A. Not officially.

Q. Did you request it unofficially?

A. No.

Q. Okay. So they wouldn't have had any directive from you not to be included. Right?

A. Right.

Q. So what is your understanding of why you weren't included?

A. I don't have an understanding of why I wasn't included originally.

Q. Now later, I guess within the last 30, 45 days, they've amended their indictment and included the allegation against you. Right?

A. Yes, sir.

Q. Did you meet with them and go over again what happened with you between this meeting in February of 2012 and the most recent time?

A. No.

Q. In the time that he was, he -- I'm sorry. I had a long, long night for unrelated reasons last night. Did you meet with law enforcement between your original meeting with them in February of 2012 and the time when his charges were enlarged to include your allegations?

A. You're asking me if I met with him --

176

Q. Yes, ma'am.

A. -- face to face --

Q. Yes, ma'am.

A. -- at any other time?

Q. Yes, ma'am.

A. Yes, I did.

Q. Okay. And when was that?

A. Once in Houston.

Q. When?

A. In May.

Q. Of?

A. 2012. May of 2012.

Q. So more than a year ago?

A. Right. And that was two, and then once again --

Q. Let me stop you there. Did you tell them anything in May of 2012 that you hadn't already told them in February of 2012, tell them anything new or different?

A. Well, they found the pictures.

Q. Okay. Did you give them any new information?

A. I confirmed that the pictures were me.

Q. Okay. That was more than a year ago. Right?

A. Right.

Q. Did you meet with them again?

A. Yes.

**177**

Q. When?

A. I really, I mean, I think that you have access to when I affirmed the pictures. I really don't remember when it was. They came down here so that I could do the same thing and affirm the pictures.

Q. But that was in May of 2012?

A. No, they did it twice.

Q. Okay.

A. Because there was one set of pictures they found from New York.

Q. Okay.

A. And then they had to -- Henri had a locked flash drive that they had to get into somehow or get another -- I don't know. They had to do something with this flash drive that they couldn't get into for a while. So then once they got into that locked flash drive, then they found the pictures from the New Orleans trip. So then I had to go and affirm that those were me.

Q. Okay.

A. And --

Q. About how long ago was that? And trust me, this is not a trick question. Just approximately --

A. Six months -- I mean, it's been a while since anything has happened with this.

Q. Okay. It wasn't right before this most recent

**178**

indictment came down?

A. No, no.

Q. Okay. What, if anything, changed between the time that you met with them six or eight months ago and when the indictment was superseded a month or so ago with respect to you?

MR. TODD: Form.

Q. (By Mr. Cogdell) Anything late breaking?

A. I don't know.

Q. Okay.

A. Nothing that I said or did or --

Q. When you were informed that the charges were going to include you -- I'm assuming someone told you that.

A. Uh-huh.

Q. Who did?

A. Glenn.

Q. Okay. And, and what did he tell you? Just that?

A. Yeah, just exactly what -- I mean, not exactly, but what you said.

Q. Okay. And did you ask him why now?

A. I think so.

Q. What did he say?

A. I think it has to do with being able to include

**179**

the pictures.

Q. Being able to include the pictures?

A. Part of my testimony having actual physical media proof or something.

Q. In other words, they needed you to be a victim in the case so they could introduce the pictures?

A. I don't know. I don't know why they're including me.

Q. Okay. Did you ask them, "Why didn't you do this before? Why is this happening now?"

A. I pretty much told them that I didn't, really didn't want to go on trial and that I didn't want really to be included, but it was too late, and --

Q. When did you tell them you really didn't want to be included? After they included you?

A. Before.

Q. Okay. Did you know that that was a possibility, Ms. Farmer, or a likelihood?

A. I did. And I knew that I can -- that's the reason that I had just hesitation in even speaking out and saying anything is because I didn't want to have my very private traumatic thing that happened to me be put under a microscope.

Q. And I'm not suggesting that any of this is fun for you at all. So please --

**180**

A. I don't think that you are.

Q. So please don't --

A. That was my hesitation. Those were the things that I expressed to the FBI. I --

Q. When did you first express to them that you didn't want to be a part of this? Because when we last left that topic --

A. I never said that I didn't want to be a part of it.

Q. Okay. Then I'm confused.

A. Yeah. I never said that I didn't want to be a part of it.

Q. What did you say?

A. I said, "I will be a part of it, and I want to help, but I don't want anybody finding out about this. I don't want to go on trial. I don't want any of these pictures to get out or to be" --

Q. When did you tell -- I'm sorry, my bad.

A. The first time, February.

Q. You told them in February about --

A. Not about the pictures.

Q. Hold on. Let me -- we've got to let each other finish. Okay. You told them in February of 2012 that you didn't want to be a witness?

A. No. That I didn't want to testify.

181

Q. Okay. Well, to me that's the same thing. That you didn't want to testify in court.

A. No, this is fine.

Q. I'm sorry?

A. Like a written statement. They told me that this would be admissible in court, that my statement would be --

Q. They told you that your statement would be admissible in court?

A. You're confusing me.

Q. I'm not trying to. I'm just trying to, I'm just trying to understand what you're saying.

A. They said that I probably wouldn't have to testify.

Q. Okay. And you told them -- I think you were going to tell me that you told them, "Good, I don't want to testify in court."

A. Yes.

Q. Okay. So when was -- and again, it sounds like I'm enjoying this. I'm just not. I'm frustrated with myself. When did you tell them for the first time that you did not want to be a witness in court? In February of 2012?

A. No. I think it was in a moment of frustration a few weeks ago, when I got subpoenaed and then I found

182

out that it was you guys that were subpoenaing me. I was very angry about that, because I don't want to help this case at all.

Q. Do you want to hurt this case?

A. That's not what I said.

Q. No, ma'am. You said you don't want to help. So what, what do you want to do with respect to the case?

A. Nothing.

Q. So you don't want to be involved in the case?

A. No.

Q. You do not wish to testify in the case?

A. In the civil case?

Q. In the civil case or the criminal case.

A. In the criminal case, I will testify.

Q. Okay.

A. I -- and this is exactly the conversation that I had with the FBI. "I will testify. I'll do whatever you guys want in a criminal case." And I've been very clear about that. I want to help with the criminal case.

Q. Okay. I'm --

A. The civil case -- now, let me finish -- is totally different. I asked if I could get out of the subpoena. They checked if I could get out of the subpoena, and I was -- we were told no, that I couldn't.

Q. Okay. I am confused. Let me back up. The

183

civil case wasn't filed in February of 2012. The criminal case wasn't even filed in February of 2012.

A. I didn't say that it was.

Q. No, ma'am, but I thought you told me earlier that you told the FBI early on you did not wish to be a witness in trial, in a courtroom.

A. Right.

Q. When did you tell them that?

A. In February.

Q. Of 2012?

A. Yes.

Q. Okay. The civil case wasn't even filed then. Do you understand that?

A. I understand.

Q. Okay.

A. That's why I was upset when the civil case, that I did receive the subpoena, the first subpoena, because number one, I thought I might have to testify now since this has been drug out for so long, that it's getting to a point where yes, now I'm a witness. Yes, you might have to, it might go to trial.

And you know, all of these things are happening to where it's getting closer, and I probably am going to have to go to the witness stand. Like I said, I told the FBI, I told everybody, I am 100 percent, I will testify

184

in the criminal case.

Q. Okay.

A. But the civil case --

Q. Let's stay on the criminal case, and we'll get to the civil case.

A. Okay.

Q. If I'm understanding you right, in February of 2012, you tell the FBI, "I don't want to testify in the criminal case, in the courtroom." Right?

A. In the courtroom.

Q. Okay. When did you change your mind? Because now you're telling us that you told the FBI, "I'll do whatever you need me to do in the criminal case." When did you change your mind?

A. I guess probably like eight months ago, and I just --

Q. What changed your mind?

A. When the case just continued to move along and it was getting closer and --

Q. The criminal case?

A. The criminal case.

Q. Okay.

A. Was moving along, and it was rescheduled, and then more information and evidence was found, and I was told that it's really now becoming a strong possibility

185

that it is going to trial. And if it does go to trial, then I will probably have to testify.

Q. Was it previously suggested to you that the case wasn't going to go to trial?

A. That was the hope.

Q. The hope of who?

A. Everyone involved.

Q. Meaning the FBI?

A. Yeah.

Q. Meaning the U.S. Attorney's Office?

A. I don't know. I just started talking to the U.S. Attorney's Office --

Q. Okay. When you say, "The hope of all was that the case wouldn't go to trial" --

A. I'm sorry, that was a generalized statement.

Q. Okay. Who are you referring to?

A. I'm referring to mostly Officer Glenn Gregory and Cheryl Shaffer.

Q. Why did they express, or how did they express the fact that they didn't want the case to go to trial? What did they say that led you to believe that?

A. They said hopefully it doesn't go to trial, hopefully that there is a plea, and that thataway none of the witnesses will have to testify in court.

Q. Okay. And if you had your druthers, would you

186

rather testify in court, or I'm assuming you'd rather not testify in court, in the criminal case?

A. Selfishly, I would prefer not to.

Q. That's fair. I understand why, and I think what you're going to tell me is no one would want to have to go into an open courtroom and be identified and say, "Those are my pictures." I understand. I'm not quarreling with that. I just want to make sure that I understand what you mean.

A. As for justice, I guess, and retribution, whatever you want to call it.

Q. Justice or what was the second phrase?

A. Retribution. I don't know if that's the right word or we'll just go with justice, for doing the right thing, I've realized that I probably -- it's -- I'm now willing to testify, because I realize the importance of my testimony.

Q. Okay. Let's get into a few details of the trips. And if these are redundant, I don't mean to be. I just want to make sure I understand as closely as I, or as well as I can. The first trip, the May trip, right?

A. Uh-huh.

Q. That was May 6th, 7th, 8th, somewhere in there?

A. Yes.

Q. And that was about two weeks after you had

187

started at --

A. Yes.

Q. Let me finish answering (sic) my question before you say "yes." You -- look, this is a long day for everybody. It's the longest day probably for you. You want to break for five minutes?

A. No. I just want to get this done.

Q. Okay. That's fine. I'll keep going.

A. Okay.

Q. You had worked there a couple of weeks. Right?

A. Uh-huh.

Q. And it was, was it the first night of that trip that you claim the pictures were taken of you?

A. The second night.

Q. Second night.

A. In Newark.

Q. And that was in Newark, New Jersey?

A. Monday night, uh-huh.

Q. Okay.

MR. COGDELL: The picture, Gregg, that you showed her of --

Q. (By Mr. Cogdell) Now, okay, Exhibit 1 -- and I'm just -- just for clarity --

A. I have it.

Q. Okay. Exhibit 1, and --

188

A. That's Exhibit 2.

MR. ROSENBERG: You're right. I'm sorry. This is 1.

MR. COGDELL: Dammit.

MR. ROSENBERG: Sorry.

Q. (By Mr. Cogdell) If I understood your testimony, you left the hotel with Mr. Morris the second night, y'all came into the city, to Newark. Right?

A. Uh-huh.

MR. TODD: Form.

THE WITNESS: Yes.

Q. (By Mr. Cogdell) And you met this person that was a Jewish comedian. Right?

A. Yes.

Q. You don't remember his name?

A. No.

Q. I'm going to tell you, this guy's name I know is, just a matter of being an old dude -- me, not him.

A. Okay.

Q. -- his name is Jackie Mason.

A. Okay.

Q. Does that name sound familiar?

A. Yeah.

Q. Okay. You had never heard --

A. Yes.

189

Q. -- of Jackie Mason?

A. I'm thinking.

Q. You're not going to insult him. He'll never know one way or another.

A. No, I didn't have a clue and --

Q. Okay.

A. -- who he was. Now, I think I've seen him on, like a, one of, like some, one of the late night shows since then.

Q. Right.

A. When I saw him on the late night show, I still didn't make the recollection, but now you say "Jackie Mason," I'm like, "Okay, maybe I know who that is."

Q. But kind of a Rodney Dangerfield era comedian, an older comedian that's been around for a long time. That's at least now your understanding of the man. Right?

A. No.

Q. Okay. He was a stranger to you that night?

A. Yes.

Q. Okay. And this is one of the last recollections that you have before your memory goes blank?

A. Uh-huh.

MR. TODD: Is that a "yes"?

190

THE WITNESS: Yes.

Q. (By Mr. Cogdell) Look closely at Defendant's Exhibit 1. Do you appear to be intoxicated?

A. It's really hard to see my whole face.

Q. Well, from what you can see of your face, do you -- does it, do you appear to be intoxicated?

A. I don't know.

Q. Okay. Obviously you were with Mr. Morris that night. Right?

A. Uh-huh.

Q. Mr. Morris is in the picture with the same fellow that I'm referring to as Jackie Mason. Right? In this Defendant's Exhibit 2?

A. Yes.

Q. You've got a full-on clear shot of Mr. Morris. Correct?

A. Uh-huh, yes.

Q. Does he appear to be intoxicated?

A. I really can't say that based on a picture.

Q. Okay. How long after meeting Jackie Mason is it that your memory goes, goes blank?

A. I don't have a clear recollection, like that's -- I think I mentioned earlier that I don't really remember what restaurant we were at. I don't really remember where we were sitting. I have vague -- that's

191

where it starts to like pocket in my memories.

Q. Okay. Let's back up then. What time did y'all leave the hotel to go into New Jersey?

A. Probably like 7:00.

Q. Newark.

A. Manhattan.

Q. Okay. I'm sorry.

A. I understood the question.

Q. Good, I didn't.

A. I left to go into Manhattan at or -- I think it was, it was probably like 7:00 o'clock-ish.

Q. Okay. And had you had anything to drink before you left the hotel?

A. Do you just want me to answer these questions again?

Q. Yes, I do.

A. Okay. Yes, I had had one glass of red wine.

Q. Okay.

A. And then Henri Morris fixed me a coffee mug of plastic -- or paper travel to-go cup of a vodka soda.

Q. Okay. So two drinks?

A. Two drinks.

Q. And then how many drinks do you have before you meet this fellow?

A. None.

192

Q. So total of two drinks?

A. Right.

Q. And how long is it before you meet this fellow, Mr. Mason, approximately?

A. How long does it take to get from Newark to Manhattan?

Q. I'll have to ask him.

MR. ROSENBERG: Could be anywhere from fifteen minutes to three hours.

THE WITNESS: I don't have --

Q. (By Mr. Cogdell) What's your memory how long the drive was?

A. I feel like it was probably 45 minutes to an hour.

Q. Now, you are literate in the social media and Facebook and LinkedIn and all that?

A. Uh-huh.

Q. Do you recall posting any pictures that night?

A. I think I did post a picture of us going into the tunnel. I was thinking about that, and I almost went back and looked last night, but I ended up not. I think I posted some pictures of us going into the tunnel.

Q. And were you -- you were certainly sober enough to post something on, on Facebook, right?

A. I mean, I don't think that sobriety has

193

anything to do with posting on Facebook.

Q. Okay. What's this exhibit?

MR. ROSENBERG: 5.

Q. (By Mr. Cogdell) I want to show you -- she's got to mark it first.

(Exhibit 5 marked for identification.)

Q. (By Mr. Cogdell) Show you Exhibit 5. It appears to be posted at 7:39 p.m. in New York by you, "Dinner in NYC," exclamation point, "at Manhattan, New York." Is that you?

A. Yes.

Q. Did you post that?

A. I did.

Q. Okay. So if we've got you going into the city, I'm assuming this is captured real time at 7:39 or shortly thereafter --

A. Uh-huh.

Q. -- how long after this is posted approximately is it before you meet Mr. Mason?

A. Um --

MR. ROSENBERG: Mark this as 6.

THE WITNESS: I don't know, like --

(Exhibit 6 marked for identification.)

THE WITNESS: Not that long. Like it was probably maybe 30 to 45 minutes, I would say.

194

Q. (By Mr. Cogdell) Okay. Look at the next, Exhibit 6. And again, your, you appear to be posting --

A. Yeah.

Q. -- a few minutes later at 8:19 p.m.

A. Right.

Q. You write, "Lincoln Tunnel, Henri asked me if I was claustrophobic," exclamation point. "Answer, no, and we're off."

A. No, I think that these pictures are, these times are wrong.

Q. How would these times be wrong if you're posting them?

A. Maybe, maybe it took a while to post, because we were in the tunnel and in traffic and it wasn't posting.

Q. Well, this looks like before you were going --

A. Because this is before when we were going to Manhattan.

Q. Right.

A. So that doesn't make sense. So maybe I posted this from the restaurant, or maybe I reposted it because it wouldn't go through.

Q. Okay.

A. Because I remember taking this picture, and I was talking about this picture and saying, you know,

195

it -- based on this and my -- I don't know. It's just kind of like a stupid post. I'm like, "Wow, I was kind of tipsy at that point."

Q. With all due respect to the Facebook posters, probably 99 percent of Facebook postings are pretty stupid.

A. Right. But I don't know, it's just like a stupid picture, and I was like, it's --

Q. Look, pull back. Ever been to New York City before?

A. No.

Q. Would you agree with me it's an exciting first time experience for you?

A. Yeah, but that's not really like my personality, I guess.

Q. Well, nobody pulled a gun on you to post --

A. I know. That's why I'm saying, I feel like I was tipsy at that point, because I'm -- I don't know, like it just seems like a tipsy thing that I would post.

Q. Okay.

A. I'm not saying I've never posted anything tipsy on Facebook, because I've had Facebook since before the rest of the world had Facebook, but --

Q. What does that mean?

A. Like Facebook started when I was in college and

196

when only college people could have it, and there were no pictures, and there were no -- it was just posts.

Q. Okay.

A. So I mean, it's not really relevant to anything. I'm just saying I've had a Facebook for, since I was 19.

Q. Okay. Regardless, you made the decision to post this on Facebook.

A. Right.

Q. Certainly Mr. Morris didn't encourage you to do that.

A. No.

Q. And would you agree with me that at the time you're posting this on Facebook, there's certainly, you're not feeling awkward about Mr. Morris --

A. No.

Q. -- or under any pressure or threats or anything and so forth. Right?

A. No.

Q. Generally speaking, and we've got a few minutes left, how often do you post on Facebook? How many times a week?

A. Depends on what I'm doing.

Q. Approximately. What's the low -- what's the sort of the low and the high?

197

A. Low is zero. High is seven.

Q. Okay. About once a day? More or less?

A. No.

Q. Seven times in a week isn't once a day?

A. That's the high.

Q. Okay. You go and you're at this restaurant, you meet Mr. -- what's his name?

MR. MORRIS: Jackie Mason.

Q. (By Mr. Cogdell) -- Mr. Mason, and then everything goes dark. Right?

A. Right.

Q. What is your best recollection of when you got back to the hotel?

A. No idea.

Q. What is your best recollection of when it was that you claim these pictures were being taken of you?

A. I think it was around 4:00 in the morning.

Q. And you base that, I think I heard your answer to Gregg, but you base that on what, the 4:00 in the morning?

A. And now forgive me, because I was very groggy at this time.

Q. Fair enough.

A. I think I recall looking at the bedside table and seeing the time on the alarm clock.

198

Q. And the time on the alarm clock was an alarm clock that was provided by the hotel?

A. The hotel, like a digital.

Q. And you believe that the alarm clock was, the time of it was accurate?

A. I don't know. I had only been --

Q. You assume that it was?

A. At that time I assume that it was.

Q. Now, when the FBI came and showed you pictures that were taken that evening --

A. Uh-huh.

Q. -- did they share with you -- do you know what metadata is? You probably do. Do you know what metadata is?

A. What is it?

Q. Well, are you familiar with the term "metadata"?

A. No.

Q. Okay. Are you aware that, for example, when pictures are taken, or entries are made into a computer, there's a record --

A. Correct, yes.

Q. -- of it time-wise that can be captured?

A. Yes.

Q. And did the FBI share with you the metadata in

199

terms of when the pictures of you were taken?

A. Yes. I can't recall. I think they said it was like a long period of time.

Q. Well, I mean --

A. A few hours.

Q. Let me be clear. To -- that's poorly worded on my part. Do we need a break?

THE VIDEOGRAPHER: Two minutes.

Q. (By Mr. Cogdell) Okay. Really two parts to that question. Did they share with you how long it took to take the pictures?

A. Yes.

Q. Okay. And what did they say?

A. I don't remember.

Q. You said "a fairly long time," I think you said.

A. A fairly long time. Like I remember being surprised, because to my knowledge, there was only one picture taken. And like I think that they had told me that there were pictures starting from like -- I don't even remember. It's been so long ago, and I was so traumatized by seeing the pictures, that there's not a whole lot else I remember from that meeting.

Q. Okay. But according to your memory, the FBI suggested to you that the picture taking lasted some

200

period of time?

A. It was more than one second, which is what I thought that it was.

Q. Okay.

A. So I want to say a couple of hours. I don't really recall.

Q. But the beginning, the first picture would have been taken, and then two hours later the last one was taken?

A. I don't know.

Q. Okay. Did they share with you when in terms of the hours of the day those pictures were taken?

A. Maybe, but like I said, at that time it was my understanding that there was one picture, and I'm sitting here seeing that there are multiple pictures, and I just, that's all I remember from that meeting. I know that they told me a lot of information, but --

Q. Okay. We're out of time, so I'll come back.

A. Okay.

THE VIDEOGRAPHER: The time is 3:03. We're off the record.

(Recess from 3:03 p.m. to 3:11 p.m.)

THE VIDEOGRAPHER: The time is 3:11. We are recording.

Q. (By Mr. Cogdell) Okay. Ms. Farmer, I'm going

201

to try to be as time efficient as possible for all our sakes. Okay? Is it accurate to say that after you woke up in your hotel room on the, in the early, what you believe to be the early morning hours of -- what would that be, May 7th? Is that the date? I'm sorry. May, either the late evening hours of May 9th --

A. May 10th.

Q. -- May 10th. Right. When you woke up in the early morning hours of May 10th, foggy as it was, you certainly had the belief that Mr. Morris had taken pictures of you without your consent. Right?

A. Yes.

Q. Okay. You were at least that clear. Right?

A. Yes.

Q. And would you agree with me that that certainly would have negatively impacted your view of Mr. Morris?

A. Yes.

Q. And likewise, your view of your, of your job. Right?

A. Yes.

Q. Okay. Chicago, let's jump there. You talked about earlier that the late night phone call at 1:30 a.m --

A. Uh-huh.

Q. -- or something like that in Chicago. What was

202

your phone number at the time?

A. The same as it is now, 361-389-1313.

Q. Okay. And who was your provider?

A. T-Mobile.

Q. Was it that evening that y'all went to the John Hancock Building?

A. I think so.

Q. Okay. Did you post a picture from the John Hancock Building?

A. Yes, I did.

Q. Let me show you that, Ms. Farmer.

MR. COGDELL: Do you have it?

MR. ROSENBERG: No.

THE WITNESS: That's it, that's it. Oh, no, that's from Miami.

Q. (By Mr. Cogdell) In any event, you believe that Mr. Morris would have made this late night call after the John Hancock Tower get together?

A. I think so, yeah.

Q. What time were y'all there, that is, at the John Hancock Tower?

A. It was probably around like 10:00 p.m.

Q. Okay. So this phone call would have been three, three-and-a-half hours --

A. Uh-huh.

203

Q. -- after that, something like that? Now, refresh my memory, ma'am, as to who was at the John Hancock Tower.

A. Henri Morris, Trevor Morris, and Beth Jackson and myself.

Q. Okay. And the next morning when you intentionally outed the fact that Mr. Morris had called you, that was in the presence of whom?

A. I believe it was in the presence of Trevor and Beth. But I don't know if they were paying attention.

Q. Okay. You do believe that Mr. Morris said, "What are you talking about?" He, he denied, in essence, that he had called you.

A. Right. He said, "I didn't call you." And I said, "No, I think I have a missed call from you." And I was trying to be vague.

Q. Why were you trying to be vague?

A. Because I felt uncomfortable about outing him.

Q. Why did you do it?

A. But I wanted to set a boundary, that that was inappropriate, like passive aggressively, I guess. And that was my way of setting the boundary and letting him know I'm not going to like have any secrets or allow you to call me at 1:30 in the morning. So that was my way of setting a boundary as kind of letting him know that if

204

you call me at 1:30 in the morning, I will say something about it in front of your son and Beth.

Q. Okay. You used the term "I was passive aggressive," or "kind of passive aggressive."

A. Uh-huh.

Q. Would you characterize yourself as passive aggressive?

A. No, not consistently.

Q. Inconsistently passive aggressive?

A. I think everybody's passive aggressive at some point, maybe even if they don't realize that they're doing it.

Q. Okay. Have you looked back at your phone records for that evening --

A. No.

Q. -- that morning? Have you seen Mr. Morris' phone records for that morning?

A. No.

Q. Okay. New Orleans, the next trip, was that the next trip, or was there D.C. in there?

A. D.C. was in there.

Q. Nothing of a sexual nature happened in D.C.?

A. (Shaking head.)

Q. Okay. Let me just skip over, skip over that. The Aunt Sally's dinner, who was present there at the

205

dinner?

A. Tom, I think it's Tom Langford, but I'm not sure. Tom, who is the CFO of Aunt Sally's; the comptroller, whom I can't remember her name.

Q. All right. You've called Cheryl -- I think you've used the name Cheryl?

A. I used the name Cheryl throughout my statement.

Q. And I'm not trying to play gotcha. Let me throw another name out and see if it might be consistent with your memory. Joan White?

A. Yes.

Q. Now, after I outed, if you will, Ms. --

A. I don't know what her name was. I mean honestly, I thought it was Jackie for like two months because I Googled it on my own, and I saw Jackie. And I was like, "Oh, Jackie, that's right." And then I think I said her name the other day, and then I was like, "Oh, I don't know if that's right." So I don't know what her name was.

Q. And who is Larry Stanton?

A. Oh, Larry. That's the CFO. I'm sorry, I'm like sometimes I create names for people that are not correct.

Q. Okay. So who were you with that night? Let's do it that way.

206

A. Larry Stanton.

Q. Okay.

A. Let me just give you titles. The current, during that time, August of 2011, Aunt Sally's current CFO and comptroller.

Q. Okay. If I told you or if I suggested to you that the identity of those humans would be Larry Stanton and Joan White, would you agree with me?

A. Sounds right.

Q. Sounds like a ring of familiarity?

A. Yeah.

Q. So now thinking back on it, your memory having been refreshed by an aging lawyer, you think that the CFO and the President, or the other way around, the President and CFO were Stanton and Joan White. Right?

A. President?

Q. What is, what is Larry's title?

A. At that time it was CFO.

Q. Okay, CFO. Fair enough. The dinner, where was it?

A. Some restaurant, steak and seafood restaurant on Bourbon Street.

Q. Anything unusual about the dinner?

A. Other than some odd Catholic/Jew bickering, back, Jewish bickering back and forth between the

207

comptroller and Henri, no. But that was kind of uncomfortable.

Q. All right. I'll go there for just a minute. The bickering Catholic/Jewish thing.

A. Right.

Q. Mr. Morris is Jewish?

A. Jewish.

Q. And the comptroller --

A. Catholic.

Q. -- is Catholic. Who started the --

A. I think that she started it. I believe her name was Joan.

Q. Okay.

A. I mean, I don't know her name.

Q. And how animated did that --

A. Towards the end of the dinner, it got to where it was like, okay, like -- at first it was kind of funny, but then it got to where it was like bordering on like, okay, maybe don't say it so loud, and like -- it was just, got really uncomfortable.

Like she kept being like, "You hate me because I'm Catholic." And like, "Oh, you're just Jewish," and it kind of got like borderline racist, I guess, and I felt uncomfortable with it. And I just wanted them to just like stop talking about it.

208

Q. Of the two of them, who was being more inappropriate?

A. The comptroller for sure.

Q. Okay. And so she was yards above, in terms of her --

A. I think Henri was just ignoring her.

Q. Okay. Is she in her cups at that point? Is she becoming intoxicated at that point?

A. Yes.

Q. A little or a lot?

A. Kind of, she was becoming increasingly, having more volume to her voice. So it appeared to me that she was becoming increasingly more intoxicated at dinner.

Q. What about Henri?

A. You can't tell with Henri.

Q. Okay. So at least from a visual observation, he didn't appear to be --

A. He's -- are you familiar with TABC certification?

Q. I've tried about 150 DWIs in my earlier days.

A. Right.

Q. So yes, ma'am.

A. So he's like an experienced drinker. Like he doesn't, to me, other than the time that he seemed very, very drunk when we went to the Hancock Center in Chicago,

209

I really could never tell.

Q. All right. So except those two occasions, he never appeared, at least visually or outwardly to you, to be intoxicated.

A. Uh-huh.

Q. Whether he was in fact or not, you don't know, but you're saying --

A. No. I mean, based on the --

Q. -- he carried his liquor well?

A. Based on the number of drinks that he had, he had to have been intoxicated.

Q. Okay. Are you TABC certified?

A. I have been in my past. Not currently.

Q. When were you TABC certified, and under what circumstances?

A. I guess I've been TABC certified from the time I was 19, and then my certification just expired in April.

Q. I'll give up. Why did you become TABC certified? I think I know the answer.

A. Oh, because I worked in food and beverage.

Q. Okay, and did you work as a, as a hostess, a waitress, or an alcohol server?

A. Everything.

Q. Okay. Do you consider yourself a truthful

210

person?

A. Yes.

Q. What sort of things motivate you to lie?

A. Hmm, avoiding hurting somebody's feelings.

Q. Okay. What else?

A. If I don't want to necessarily talk about something, I will omit information. So it's like lying by omission.

Q. Did you ever lie to customers while you were at Edible?

A. I tried not to.

Q. Did you?

A. I feel that I did, because I found out, as I worked there -- and this was another issue that I had with Edible Software -- that the software didn't perform in the way that it was, we were led to believe that it could, without a lot of extra money being put into it. And that was just my observation in learning what it could and couldn't do, and watching other customers pour more and more billable hours into their customizations.

Q. All right. Let me stop you so that I understand you. At least at today's date, you're telling us that you believe you intentionally exaggerated the capability of the --

A. No, no, not intentionally.

211

Q. Well, then let's get my definition of a lie out there. Okay? A lie is an intentional and false statement, a knowingly false statement or representation. Okay?

A. Uh-huh.

Q. Giving that definition of a lie, did you lie to any customers while you were at Edible's, working for Edible?

A. I mean, the extent of the lie would be, "Oh, let me go. I have another appointment," when I just really wanted to get that customer off the phone.

Q. Okay. Little white lies?

A. White lies.

Q. Okay. Did you ever lie to your employers while you were at Edible?

A. I mean, I'm sure that I made up white lies to them, too.

Q. White lies in terms of what?

A. In terms of probably -- hmm, I can't think of anything specific, like right now.

Q. Okay.

A. I'm sure that in the three months of working there, in my emotional state -- I'm not a liar. I don't intentionally tell lies all the time. I'm not a compulsive liar. But I'm sure that being in the state

212

that I was in during the time I worked at Edible Software and all the personal things going on, that I probably told them something that wasn't wholly true, to get out of having to give a personal fact.

Q. Okay. Do you recall any specific examples?

A. I don't.

Q. You say that you were three hours short of graduating from the university?

A. One class short, so --

Q. How many hours short?

A. I'm not sure. I think that the, it fulfilled a few different credits, so like I needed one more history credit and an upper division credit, and maybe one other, but this one class that I was actually signed up for, upon the time that I walked the stage, it was an online class, was going to fulfill all of those.

Q. So you were three classes short or three hours short?

A. One class -- I was, if I could take one class and fulfill my requirements for graduating, because this one class fulfilled the upper credit, credit that I needed, and --

Q. What upper credit were you lacking?

A. I needed three more hours of upper credit classes.

213

Q. In anything?

A. In anything.

Q. Okay. So you lacked three hours and only three hours to graduate from the University of Texas?

A. And I needed a history credit.

Q. Well, that's more than one class.

A. Okay. Do you understand what I'm saying?

Q. No, I really don't.

A. Okay. So I could take right now Women's Studies in Japanese Culture, in upper division. It would be an upper division level class, and that would suffice three hours for my upper division credit. It would suffice a history credit, and it would suffice a cultures credit.

Q. So you could accomplish all of this by the taking of one three-hour course.

A. One class, yes.

Q. I give up. Why didn't you take the one three-hour class so you could get your sheepskin from the University of Texas?

A. I just got busy with life and was working at the Hyatt at the time, and my sister was getting married. And then right after that, I started working at Mattress Firm, and --

Q. How many years ago was this?

214

A. Four.

Q. And you say you could, you could accomplish obtaining a degree from the University of Texas by taking an online class?

A. Uh-huh.

Q. Why haven't you done that in the past four years?

A. I just haven't.

Q. Okay. The Mattress Firm, when did you --

A. I mean, it costs $500 to do it also, so I've never had like an extra $500 to give to the class.

Q. Never bought a dress that cost $500?

A. No.

Q. Okay. Ever gone on a trip that cost $500?

A. Not since college.

Q. Okay.

A. I have a lot of student loans.

Q. Okay. And so it's the $500 that's the impediment?

A. I mean, it's that, it's the time, it's a lot of different things. And the fact that for the jobs that I've had, those haven't, it hasn't been like, "You need to have this, or else you will not get this job."

Q. Okay. When did you first work for the Mattress Firm?

215

A. I started working in 2009.

Q. And you were let go when?

A. 2011.

Q. So you worked there two years?

A. Uh-huh.

Q. And you were terminated for tardiness?

A. That was the terms in which I was terminated, but obviously I was rehired, and it was just an unamicable relationship with my supervisor.

Q. With who? Who?

A. Her name is Kristin Gullo.

Q. And what was the nature of that dispute over that relationship with Ms. Gullo that was poor?

A. I was just -- like it was just -- I don't know. She just didn't care for me, and I didn't care for her, and it was just a personality clash.

Q. Did you quit, or were you terminated?

A. I was terminated.

Q. By who?

A. Kristin.

Q. Okay. And the stated reason was?

A. Tardiness.

Q. And you disagree with that?

A. Um --

Q. Were you tardy?

216

A. Yeah, but everybody was tardy.

Q. Okay. Were you tardy?

A. I was tardy.

Q. Repeatedly?

A. On occasion.

Q. Okay. Were you warned?

A. It was like a separate type thing.

Q. What does that mean?

A. There had been like a training class that I had, was running late to because the breakfast, the meal that I had to pick up wasn't ready. And it was -- I mean, it's not really relevant, but it was just a stupid type thing where one of her friends -- Mattress Firm is very incestuous, and one of her friends called her and was like, "Yeah, Andrea seemed kind of disoriented and she was late to this training." Well, I wasn't really late. I just wasn't early. So I was there well before this training class started, but I wasn't there when the rest of the District Managers had gotten there.

Q. So let me be clear. So you think that your termination or the justification for your termination of being tardy was a contrived --

A. Yes.

Q. Okay.

A. I mean, they proved it, and that's why

217

ultimately -- but I, walking in --

Q. Well, if they proved it, how could it be contrived?

A. Walking into the office at that point, I was going to quit if they didn't fire me. Does that make sense?

Q. I suppose, at some level.

A. I -- yeah. It was just not a good relationship. I --

Q. So why did you go back?

A. To Mattress Firm?

Q. Yes.

A. It's a huge company. It was a totally different area. I never saw that lady. I, I still have close friendships with a lot of people that I worked with at Mattress Firm. And you know, I, I believe in the company. I think it's a good company. It feels comfortable to me. I'm good at it.

And I was offered a Training Director position in Corpus, which is what I wanted to do anyways. And so, I mean, I had several people tell me after this all happened that they were upset. Because normally you wouldn't get fired, you would get demoted out of that position.

And they -- and then, you know, there were several

218

District Managers, they were like, "What happened? I would have totally taken you on my team."

Q. Wait a minute. You told me three minutes ago that you were going to quit if you didn't get fired.

A. Yeah.

Q. Okay.

A. I'm not saying I would have accepted that position. I needed a break. I needed something different. I needed to be away from that. But I'm just saying like the way that Mattress Firm works, it's a very large company. Decisions are made independently per department. There's, you know, several hundred districts, and each one of those, the district manager makes the hiring decisions. So I wasn't -- I mean, I feel full well that I could go and get a job at Mattress Firm today if I wanted to.

Q. Okay. You, you stated several times that you had a lot going on psychologically. It was a difficult time for you --

A. Uh-huh.

Q. -- in 2011. I know one of the things that's out there, Ms. Farmer, is the reality that your roommate apparently attempted suicide. Was that an ongoing thing? Was that a one-instance situation? How sort of long term was that problem?

219

A. In terms of what?

Q. How long did -- did she attempt suicide one time?

A. How long did she attempt suicide?

Q. No, no. I'm sorry. How many times did she commit, or attempt suicide?

A. Once, around me.

Q. Okay. Were there other occasions where she attempted to do it, as far as you're aware?

A. Yes.

Q. Okay. And we now have the situation that you discussed about your beliefs concerning Mr. Morris. What else was going on in your life that was difficult or emotional for you in 2011?

A. Is that not enough?

Q. I'm not trying to be clever. I'm trying to find out what was going on.

A. Right. Nothing.

Q. Okay. You were seeing a psychiatrist, a Dr. William July?

A. Uh-huh.

Q. He's known primarily as a relationship counselor, is he not?

A. Uh-huh.

Q. Were you seeing him for relationship problems?

220

A. No. I was seeing him because I didn't -- my insurance with Edible Software hadn't kicked in yet at the time that this happened, because it happened in --

Q. What happened?

A. When Amy attempted suicide.

Q. Okay.

A. And so I was looking for something in Houston that didn't, like you didn't need insurance to have a low rate. And he was the one that I found, and I talked to him, and I really liked him.

Q. Okay. Did you connect with him?

A. Uh-huh.

Q. Feel like he did you some good?

A. Yes.

Q. By discussing your problems and what was on your mind?

A. Yes.

Q. Why didn't you tell him about what was going on with Mr. Morris?

A. I wasn't ready to.

Q. And when did you first out that to a care provider?

A. June of 2012.

Q. More than a year after it happened?

A. Uh-huh. Yes.

221

Q. Do you feel like Dr., Dr. July wouldn't have been sympathetic or wouldn't have provided you some assistance?

A. I'm sure he would have, but it wasn't his issue. It's my issue.

Q. Okay. Are you left-handed or right-handed?

A. Right-handed.

Q. Strong and predominant right-handed? Or some people are kind of ambidextrous.

A. I can do things with my left hand.

Q. But you write with your right hand?

A. Yes.

Q. Throw a baseball or golf right-handed or whatever?

A. Yeah.

Q. Tennis right hand?

A. Yeah.

Q. Okay.

MR. COGDELL: Do you want to go with -- do you want me to pass her? I may have a couple of follow-up questions.

MR. ROSENBERG: Yeah.

MR. COGDELL: Probably not.

MR. ROSENBERG: Okay. Pass?

MR. COGDELL: Pass the witness.

222

RE-EXAMINATION
BY MR. ROSENBERG:

Q. Ms. Farmer, I just have some, a few exhibits to go over with you. Some of them are Facebook generated. I just want you to identify them and tell me the sequence and what they are, and we'll go through it. So each one is going to have to be marked and identified.

(Exhibit 7 through 14 marked for identification.)

THE WITNESS: I just remembered of a trip I took. Is that going to make a difference? Because I said I didn't take a trip, but then I remembered one that I did take.

Q. (By Mr. Rosenberg) Okay. We'll get to it in a second. We'll take care of it. I tell you what, why don't we address that now. When was --

A. Oh, no, I think it was before I worked for Edible Software. It was. Does it matter?

Q. Well, you're thinking about a trip. Tell me what -- you volunteered, so I'm going to ask you about it.

A. No, I, I was thinking about -- looking at those Facebook pictures, I remember -- you said, "You haven't, since you've graduated, you haven't taken a trip that cost $500?" Yes, I took a trip to Vegas for a bachelorette party in August of 2010.

223

Q. Before Edible Software?

A. Before Edible Software.

Q. Okay. So that couldn't have anything to do with this case?

A. I'm just like, you're pulling out all these Facebook things, and I'm like, oh, God.

Q. Well, to my knowledge there's nothing in 2010 in these Facebooks. But let me hand you Exhibit, Exhibit Number 8 and ask you if you can identify that.

A. Okay.

Q. All right. That's obviously a Facebook post that you put up on May 9th, 2011, 6:32 via mobile.

A. Uh-huh.

Q. Now, that's a "yes." Right?

A. Yes.

Q. For those of us who are not Facebook literate, that just means you posted from your device.

A. Right.

Q. All right. May 9th was the first day you got there. Right?

A. Um --

Q. Or second day?

A. No. I don't know.

Q. Okay. "Ever since I got to Jersey, my hair is straight as a board. There's no big Texas bounce. I may

224

as well trade in my blush for bronzer. No offense, Amy." The Amy you're talking to is your roommate. Right?

A. Yes, she's from New Jersey.

Q. Okay. That's Amy Marie?

A. Yes, but her last name is Horican. But she put Amy Marie.

Q. That's her, her post?

A. Yes, uh-huh.

Q. Her screen name, I guess that is?

A. Uh-huh.

Q. Right? Yes?

A. Yes.

Q. Okay. Do you know if this was before or after you had the, the dinner where you met the comedian?

A. I think it was after. This post, this original post --

Q. Right.

A. -- was before. My response is after.

Q. Okay. Well, you're checking in also later on, on May 9th, 2011, at the Lincoln Tunnel Heliport.

A. Right.

Q. Now, you weren't at the heliport. That's just where the phone picked up and reconciled with?

A. Right.

Q. You didn't go in a helicopter.

A. No.

Q. It's above the tunnel?

A. Yes.

Q. Okay.

A. Can I clarify this post?

Q. Sure.

A. Because it sounds really bad.

Q. No, go ahead. Clarify it, sure.

A. So Amy is from New Jersey, and she's like a, quote-unquote, Jersey girl with like the straight hair, and she wears a lot of bronzer on her face, and like gym tan, laundry. I mean, that's just like a social standard right now from like Jersey Shore.

Q. Okay.

A. I obviously am not like that. I don't wear bronzer. I don't wear my hair straight. And I don't like guys that are from New Jersey. So this post is -- when I said, "I don't know about that. I've already met two guys since I've been here who are just your type. I'll send you contact info," I did not mean at all for me, or that I had met guys that I was flirting with or interested in.

The two guys that I was talking about were, one, the Billy, the person at Paris Produce, who we went to on the second day that we were there. And he was very like

spikey hair, he liked to tan a lot, the very stereotypical of what you see on television of the Jersey Shore. Just Amy's type.

The second person that I met was at the other client's that we went to that had been clients of Edible Software for a really long time, and he was sitting outside when Henri had asked to have some privacy with them. Well, they kicked him out, too.

And so he and I were both sitting in this like area and I'm taking my notes, and he was kind of, I guess, hitting on me, if you will, and he gave me his card and asked for my card. But again, not my type, not interested. These are just two things that I thought were funny and were very New Jersey.

Q. Well regardless, you, whatever the state of mind you were in when you posted Number 8 -- I mean, one is just a check-in, but the bronze stuff is, is a post you made where, were you, where you were actually in the state of mind to joke and be jovial and have normal conversation with a friend of yours?

A. I think that no matter what I have going on in my life, I'm able to joke and be jovial to get through it.

Q. Okay. But all, all Number 8 is, is you communicating with your friend on a friendly basis about

something that, an inside joke kind of?

A. Yes.

Q. All right.

A. And the original post that I posted was before any of this happened.

Q. The upper sentence.

A. Yes.

Q. Because you're -- that makes sense, because the next post, you're going into the tunnel.

A. This post was an hour later, and I didn't mean to -- I think I mentioned that I was -- that I was kind of feeling tipsy. I think I accidentally checked in to Lincoln Tunnel. I don't think I did that on purpose.

Q. Okay. Here's Exhibit Number 9. That's May 11. Now, can you identify this? Two different posts.

A. Uh-huh.

Q. May 11, 2009, 9:39, 9:37 p.m.

A. Uh-huh.

Q. Which day was May 11? That was the second day of the trip, or the third day?

A. This was the, that day, the night before we went home.

Q. That was the Connecticut day?

A. Right.

Q. Why were you, why was it the longest day ever?

What made you so tired?

A. Because we had gotten up, done, spent, you know, six to eight hours in a room with Davidson, answered questions, kind of brain storming, and then had to drive back from Connecticut to LaGuardia. I had that conversation with Henri in the car, and also -- do you have a boss?

Q. I think I have four.

A. Okay. I don't know --

Q. My wife and -- well, actually seven. My wife and seven kids, but other than that, no.

A. Well, I mean, that's a little bit different. But I mean, think back at a time that you had a boss that was several levels above you. And if you ever had to take a car ride with your boss, it's a little stressful. You have to think of things to say the whole time, and that's straining, and plus all of this other stuff that was going -- it was just a long day. And I was really tired. And I had -- you know, we had eaten dinner, and I was just getting back in, I guess. I don't know.

Q. Okay. But you -- you posted that you loved New York City, but can't wait to be home again.

A. Do you think that everybody is completely honest on their Facebook posts about what's going on?

Q. If you're going to tell me my kids aren't

**229**

honest, we can have a ten-hour deposition going forward.

A. Right. So I don't know why I posted this.

Q. But you, you wouldn't post anything to intentionally lie, right?

A. I mean --

Q. You say, "I love New York City." I'm a New Yorker. I can understand that.

A. Right.

Q. That's probably the most truthful statement anyone's ever said. And "But can't wait to be home again." There's nothing wrong with that. Right?

A. I just feel like this is like trying to allude to the fact that I was really having a great time. And I think that sometimes we're a little less, we're a little maybe more -- I'm a little bit more positive on my updates. So I think that my kind of complaining, I needed to balance it with something positive.

Like rather than what if I had said, "Longest day ever. So tired. Can't wait to be home again." Well, and then Trevor sees that, or somebody else in the company sees that.

Q. So you friended people when you worked there?

A. Yeah, because I controlled the Edible Software Facebook page.

Q. There's Exhibit Number 10. Ma'am. Ma'am.

**230**

Exhibit Number 10.

A. What is this other one? Is it just nothing?

Q. Let me see.

A. The UT article.

Q. Oh, I don't know. I'm not going to ask about it.

A. Oh, okay. I was just wondering the relevance there.

Q. It's just on the same page.

A. Okay, yeah. Okay.

Q. Exhibit Number 10, obviously you're stating you're going home and checking into LaGuardia.

A. Uh-huh.

Q. But the next one, now I realize there have been Facebooks in between all of this, but July 27th, and then there's something blocking it. Obviously you weren't in the Marriott Hotel in Santiago, Chile. That's a Facebook glitch.

A. Right.

Q. You're at Marriott in New Orleans, right? And you said you enjoyed -- you just arrived obviously in New Orleans, you're excited for bananas foster night at the Marriott. Did Henri tell you that's what you were going to eat, or what was happening with, why you would put that on the Facebook?

**231**

A. Wait -- because that's a famous thing to eat in New Orleans.

Q. Is it?

A. And I like bananas foster.

Q. Okay.

A. I think that actually that Larry had told me that we were probably going to go to Mr. B's, like we had talked about that before and talked about bananas foster maybe.

Q. Okay.

A. I don't really remember.

Q. Actually, this is a better one. I'm going to show you Exhibit Number 11.

A. Oh, right.

Q. That's a better version of that. Right?

A. Yeah, I couldn't see what it said.

Q. "Just arrived at NOLA, and I like it already. A little rough, but charming. Nonetheless, I'm excited for bananas foster tonight at Marriott."

A. Uh-huh.

Q. So all 11 is -- I should have pulled this out before, and I apologize -- is a cleaned up version of 10.

A. Right.

Q. All right. Now, you mentioned to us that you did the Facebook social media page for Edible Software?

**232**

A. Uh-huh.

Q. What was your, what were your duties and responsibilities with regard to that?

A. I would just post on it, post articles, try and get other people to "like" us, just cleaned up the page a little.

Q. Why do you want -- I can never understand why you want people to "like" something on Facebook. What's the benefit?

A. It just increases your search engine optimization for your company.

Q. All right. Here is Exhibit Number 12.

A. And if you have a certain number of "likes," then you get to be like an official page on Edible Software.

Q. Okay. So there's a, a business development purpose --

A. Right.

Q. -- of accumulating "likes"?

A. Uh-huh.

Q. Which is, which explains -- I don't want to answer your question for you -- which explains why you're telling your friends --

A. Yeah, so --

Q. -- that everybody should "like" their, your

233

Facebook page.

A. Right. So in this page, I needed like 50 maybe, and I only had 43, I think. Some number. Maybe it was like 48. I can't remember. I needed some number to be able to be like a real page and to write my own posts on it.

Q. Okay. Now, you remember when we started these things, I was looking for Exhibit Number 7 and didn't find it. I just did. I'm going to show you Exhibit Number 7 and identify it -- ask you to identify that.

A. Okay.

Q. This is, you're in, you're into the trip, in New York. Right?

A. Uh-huh.

Q. And you're saying on May 10th, 2011, "I love my new job, but not as much as I miss this sweet boy."

A. Right.

Q. Who is the boy?

A. That is my little friend, Jacob Dudley, who is the son of the person sitting outside.

Q. Got it, who you're close to.

A. Very close to.

Q. All right. But you say, "I love my new job," that being Edible Software. Correct?

A. Uh-huh.

234

Q. Was this -- where was this, May 10th in relation to everything going on?

A. I guess it was the day after.

Q. Okay. The day after the, the nude pictures and things of that nature?

A. I guess so.

Q. Okay. So you had known that those nude pictures were taken of you the day you posted the "I love my new job"?

A. No.

Q. Well, you --

A. I didn't know that the pictures were taken of me until I saw them at the FBI.

Q. Okay. Fair enough. You had known that your boss had seen you without any clothes on, with a blanket wrapped around your ankles at the time you posted that.

A. Yes.

Q. Okay.

A. I want to expand on that.

Q. Go ahead.

A. I think that Facebook is a great outlet. Like I said, I think that I always try and remain positive on Facebook. So maybe in posting this -- you can speculate it any way you want to.

Q. Well, you're speculating. I'm not.

235

A. I'm telling you that like, I was like, man, I wish I was anywhere but here.

Q. Which is why you say, "I love my new job."

A. Right.

Q. Okay.

A. It's -- I don't know. I feel like a lot of people, when they're down and out, will post something like, "Oh, this is so great. I'm having such a great time," but maybe not having a great time.

At that time I was trying to remain positive. I did like the work that I was doing, and I've always maintained that. I did like the work that I did at Edible Software.

Did I love my boss? No. Did I love my job? Yes, I did like my job a lot. And I liked being in control of the Facebook page, and I liked writing marketing material, and I liked meeting with clients. Did I like my boss? No. And that's probably why I stick around.

Q. We could read into the explanation any way you want. And I, I heard it, and I respect it. But I just want to talk about what the facts are.

A. Right.

Q. The night before was the night you found out that your boss had been in your room, with hearing clicking noise, which you allege to be a, a device

236

camera --

A. Right.

Q. -- when you had no clothes on.

A. Right.

Q. The next day, you post saying, "I love my new job, but not as much as I miss this sweet boy."

A. Right.

Q. Okay. Just two more. Exhibit Number 13. Was there a trip to Miami?

A. Yeah, with Trevor.

Q. Okay. So it had nothing to do with, and nothing untoward happened there.

A. No.

Q. So that's what we're looking at on the bottom, the August 8th, 2011 --

A. Right.

Q. -- sweet --

A. And that would be Trevor's driving.

Q. He's a bad driver?

A. (Nodding head.)

Q. Okay.

A. Yes, on the record.

Q. So you think -- that's fine, and you are under oath.

A. I know. He is.

**237**

Q. But that's what this is about. It has nothing to do, Exhibit 13, that Facebook post has nothing to do with Henri or anything like that?

A. No. I was just trying to be able to do stuff on my, on the Facebook page.

Q. Okay.

A. On the Edible Software Facebook page. And then on the bad driving, that would be Trevor.

Q. Okay. Last one, look at Exhibit 14.

A. Right. Okay. This also, I -- see, that's the problem with Facebook. Now I'm never going to write anything on Facebook again. You can read into this for a trial like this as much as you want. But I went down a wrong door trying to get to the pool area and locked myself in this like maid's -- like a lot of times at hotels -- well, I'm familiar with hotels. I worked in them for a lot of years.

They have like back ways and underground, but you have to have a key fob to get in and out of the underground areas. And I didn't have a key fob. So I was kind of like lost in an underground maze. I was by myself. Nothing bad happened to me.

Trevor was with his family somewhere else, in Florida. This is taken out of context maybe.

Q. Well, my question to you is going to be the

**238**

easiest one I've asked you all day.

A. Uh-huh.

Q. Nothing in Exhibit 14 has anything to do with any complaints you have about --

A. No.

Q. -- Henri Morris or Edible Software?

A. No.

Q. Okay. I know it's been a day that you would rather have not gone through. I hope you understand that Mr. Cogdell and I have a job to do.

A. I do understand that.

Q. And that's what we were doing. I want to thank you on the record, because you were extremely courteous and very helpful to us.

MR. ROSENBERG: I pass the witness.

THE WITNESS: Thank you.

MR. COGDELL: You want anything? I'm done with her.

MR. TODD: No, we'll reserve.

MR. COGDELL: Okay.

MR. ROSENBERG: That means we're done.

THE VIDEOGRAPHER: Time is 3:56. We're off the record.

(Deposition concluded at 3:56 p.m.)

**239**

CHANGES AND SIGNATURE OF WITNESS

WITNESS NAME: ANDREA FARMER
DATE OF DEPOSITION: JULY 11, 2013
PAGE/LINE   CHANGE              REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**240**

I, ANDREA FARMER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ANDREA FARMER

THE STATE OF TEXAS  :

COUNTY OF _____  :

Before me, _____, on this day personally appeared ANDREA FARMER, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____ 2013.

_____
NOTARY PUBLIC IN AND FOR _____
THE STATE OF _____

241

CAUSE NO. 2012-65503

KERI HILL and § IN THE DISTRICT COURT
MICHELLE BARNETT §
   Plaintiffs §
         §
VS. § 55TH JUDICIAL DISTRICT
         §
HENRI MORRIS and SOLID §
SOFTWARE SOLUTIONS, INC., §
d/b/a EDIBLE SOFTWARE §
   Defendants § HARRIS COUNTY, TEXAS
   - - - - - -
REPORTER'S CERTIFICATE/FILING CERTIFICATE
ORAL AND VIDEOTAPED DEPOSITION OF ANDREA FARMER
JULY 11, 2013
   - - - - - -

I, MOLLY CARTER, Certified Shorthand Reporter in and for The State of Texas, hereby certify to the following:

That the witness, ANDREA FARMER, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to U.S. Legal Support by _____;

That the amount of time used by each party at the deposition is as follows:

MR. JEFFREY N. TODD: (00:00)
MR. GREGG M. ROSENBERG: (03:15)
MR. DAN COGDELL: (01:26)

242

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

MR. JEFFREY N. TODD, Attorney for Plaintiff(s)
MR. GREGG M. ROSENBERG, Attorney for Defendant(s)
MR. DAN COGDELL, Attorney for Defendant(s)

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceedings was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 22nd day of July 2013.

_Molly Carter_

MOLLY CARTER, CSR, RPR, CRR
CSR NO. 2613, Expires 12-31-13
U.S. LEGAL SUPPORT
Firm No. 342
802 North Carancahua, Suite 2280
Corpus Christi, Texas 78401
Telephone: (361) 883-1716
Fax: (361) 888-6550

243

FURTHER CERTIFICATION UNDER RULE 203

The original deposition was/was not returned to the deposition officer on _____ ;
If returned, the attached Changes and Signature page contains any changes and the reasons therefor; if returned, the original deposition was delivered to MR. GREGG M. ROSENBERG, Custodial Attorney;
That $_____ is the deposition officer's charges to the Defendant(s) for preparing the original deposition transcript and any copies of exhibits;
That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.
Certified to by me this _____ day of _____ 2013.

_____
MOLLY CARTER, CSR, RPR, CRR
CSR NO. 2613, Expires 12-31-13
U.S. LEGAL SUPPORT
Firm No. 342
802 North Carancahua, Suite 2280
Corpus Christi, Texas 78401
Telephone: (361) 883-1716
Fax: (361) 888-6550

# EXHIBIT B

Unofficial Copy Office of Chris Daniel District Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 12-255SS |
| | § | |
| HENRI DESOLA MORRIS, | § | |
| Defendant. | § | |

## PLEA AGREEMENT

The United States of America, by and through Kenneth Magidson, United States Attorney for the Southern District of Texas, and Sherri L. Zack and Suzanne Elmilady, Assistant United States Attorneys, and the defendant, Henri Morris ("Defendant"), and Defendant's counsel, Dan Cogdell, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Count Five of the Superseding Indictment. Count Five charges Defendant with Transportation, in violation of Title 18, United States Code, Section 2421. Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

### Punishment Range

2. The **statutory** maximum penalty for each violation of Title 18, United States Code, Section 2421, is imprisonment of not more than 10 years and a fine of not more than $250,000.00. Additionally, Defendant may receive a term of supervised release after imprisonment of at least 5 years and up to Life. *See* Title 18, United States Code, sections 3559(a) and 3583(k). Defendant

Unofficial Copy Office of Chris Daniel District Clerk

acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, sections 3559(a) and 3583(e) and (k). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

3. The defendant understands that under the Sex Offender Registration and Notification Act, the defendant must register and keep such information current in the jurisdictions where the defendant resides, is employed, and is a student. The defendant further understands that the requirement to keep the registration current includes informing such jurisdictions not later than three (3) business days after any change of the defendant's name, residence, employment or student status. The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, specifically, Title 18, United States Code, Section 2250, as well as applicable state statutes.

## Mandatory Special Assessment

4. Pursuant to Title 18, United States Code, section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

2

## Immigration Consequences

5.   Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States.   Defendant understands that if he is not a citizen of the United States, by pleading guilty he/she may be removed from the United States, denied citizenship, and denied admission to the United States in the future.   Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty.

## Waiver of Appeal and Collateral Review

6.   Defendant is aware that Title 28, United States Code, section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

7.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court.   Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United

3

States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

8. Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

9. The United States agrees to each of the following:

(a)    If Defendant pleads guilty to Count Five of the superseding indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss any remaining counts of the superseding indictment at the time of sentencing;

## Agreement Binding - Southern District of Texas Only

10. The United States agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the superseding indictment. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant. It does not bind any other United States Attorney. The United

States will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### United States' Non-Waiver of Appeal

11. The United States reserves the right to carry out its responsibilities under guidelines sentencing. Specifically, the United States reserves the right:

(a) to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b) to set forth or dispute sentencing factors or facts material to sentencing;

(c) to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d) to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e) to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

12. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should

5

impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

13. Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a) If Defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

(b) At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court; and

(c) At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

14. Defendant is pleading guilty because he is in fact guilty of the charges contained in Count Five of the superseding indictment. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others would be offered to establish Defendant's guilt:

On or about May 8, 2011, HENRI DESOLA MORRIS (MORRIS) traveled in interstate commerce and committed, and attempted to commit, the drug-facilitated sexual assault of A.F.

Unofficial Copy Office of the David District Clerk

6

violating Title18, United States Code, Section 2421.  In the process of attempting to commit the sexual assault against this woman, MORRIS violated the law of New Jersey.  Specifically, as to Count Five, MORRIS violated New Jersey Statutes Annotated 2C:14-9(b), Invasion of Privacy.

Based on their investigation, the FBI obtained a search warrant for MORRIS and his belongings to be executed at IAH on February 27, 2012 when he was scheduled to travel for business.

During the execution of the warrant, several items of evidentiary value were found.  Three (3) fifty (50) milliliter Jack Daniel's bottles containing a clear liquid, which lab tested negative for controlled substances, were located in MORRIS' carry on suitcase.  MORRIS, having heard a conversation between two agents about the fact that Jack Daniels is not a clear liquid, stated something to the effect of "..., there could be a perfectly reasonable explanation for that." MORRIS used the unknown liquid to dilute the drugs he administered to A.F. by adding it to the alcoholic drinks he supplied to her.

The search also uncovered blister packages containing pills.  One package contained, within four (4) individual blisters blue diamond shaped tablets marked "VGR 50" or "VGR 5.0" imprinted on one side.  These pills appear to be the erectile dysfunction drug sold commercially as Viagra.  A four section blister pack with one missing tablet was found which contained Tadalafil.  This is a physician's sample of the drug commercially known as Cialis, another erectile dysfunction drug.

In an unmarked prescription bottle, located in MORRIS' belongings but not contained in the compartmentalized pill box he also possessed, were 5 pills. These pills were analyzed by the Drug Enforcement Administration.  Two of the pills were determined to be Zolpidem which is

commercially known as Ambien. One of the pills was determined to be Oxazepam, a benzodiazepine. The remaining two pills were determined to be diphenhydramine; this drug is commercially known as Benadryl. FBI Supervisory Forensic Chemist/Forensic Toxicologist Marc Lebeau, an expert in drug facilitated sexual assault, reviewed the facts of this case and the toxicology results and determined the symptoms described by the victim are consistent with her being administered these drugs in combination with the ingestion of alcohol.

The Society of Forensic Toxicologists defines drug-facilitated sexual assault (DFSA) as "when a person is subjected to nonconsensual sexual acts while they are incapacitated or unconscious due to the effect(s) of ethanol, a drug and/or other intoxicating substance and are therefore prevented from resisting and/or unable to consent." The Society of Forensic Toxicologists further identify the following as typical symptoms of DFSA: drowsiness, dizziness, loss of muscle control, slurred speech, decreased inhibitions, memory loss or impairment, loss of consciousness, and vomiting. The Society of Forensic Toxicologists compiled a list of drugs, in addition to ethanol, as known to have been associated with DFSA. The drugs found on MORRIS at IAH are on that list.

A.F. was employed by Edible Software from May 2011 through August 2011. Approximately one week after beginning hired and pursuant to a work assignment she had received from MORRIS, A.F. traveled with MORRIS to Philadelphia, Pennsylvania. Continental Airlines confirmed that MORRIS utilized his Continental frequent flyer miles to purchase a ticket for A.F. on United flight #3274, which departed from Houston Intercontinental Airport, Houston, Texas to Philadelphia International Airport, Philadelphia, Pennsylvania on May 8, 2011. Continental Airlines also confirmed that MORRIS traveled on May 8, 2011 on Continental

8

Unofficial Copy Office of Chris Daniel District Clerk

Airlines flight 1676 from Houston Intercontinental Airport, Houston, Texas to Philadelphia International Airport, Philadelphia, Pennsylvania.

Upon arrival in Philadelphia, MORRIS and A.F. met up and checked into a Marriott hotel in close proximity to the airport.

The following day MORRIS and A.F. met with two different clients in the Philadelphia metropolitan area before traveling in a rental car to Newark, New Jersey. Upon arrival in Newark, MORRIS and A.F. checked into a Marriott hotel, in Newark, New Jersey. MORRIS instructed A.F. to meet him in the concierge lounge at the Marriott. A.F. met MORRIS in the concierge lounge. MORRIS asked A.F. if she wanted to have dinner in Manhattan and if she wanted to see the city. MORRIS told A.F. to have a "real drink" and she agreed to have a vodka and soda. MORRIS prepared a drink for A.F. which he drugged and presented it to A.F. in a travel cup. A.F. recalled the drink being extremely strong.

After MORRIS prepared A.F.'s drink and added crushed Ambien pills to it, she and MORRIS departed the hotel in the rental car. A.F. stated after consuming an unknown amount of the drink she began feeling "really, really tipsy" while driving into Manhattan. A.F. described feeling inexplicitly "very intoxicated" when she and MORRIS arrived in Manhattan. A.F. recalled parking on the street in Manhattan, exiting the vehicle, and walking into a train station that had murals on the ceiling. MORRIS stood behind A.F. and had his hands on her shoulders while he talked to her about the murals. A.F. and MORRIS walked to a restaurant to eat dinner. A.F. lost her memory after recalling having their picture taken in the restaurant.

The next memory A.F. had was awakening on her bed in her hotel room. A.F. was completely naked and a pillow was covering the side of her face. The covers were pulled down

around A.F.'s ankles. A.F. heard a "click" sound and observed MORRIS standing over her holding his cellular telephone. MORRIS had been taking pictures of her with his cellular telephone. A.F. never gave MORRIS permission to photograph her nor did she consent to the photographs being taken. These photos were recovered on a thumb drive found in MORRIS' possession during the execution of the search at IAH. The date/time stamps contained in the EXIF data embedded in the photographs corresponds to the date of travel and the time A.F. believes the images were taken between approximately 2am and 4am.

A.F. recalled feeling very "disoriented," "groggy" and "really tired". A.F. stated she was very familiar with operating and navigating through files on a Blackberry phone but was so disoriented and groggy she was unable to properly inspect the phone.

The following morning A.F. observed scratch marks on each of her hips. A.F. described the scratches as being from the front to the back [horizontal, as viewed in a standing position]. A.F. further recalled having some bruising on the back of her upper left arm.

After meeting with clients in Newark, MORRIS and A.F. drove to meet with a client in Connecticut. At the conclusion of the meeting, MORRIS and A.F. drove to the Marriott hotel at LaGuardia Airport. While driving to LaGuardia MORRIS told A.F. that he did not want her to feel awkward about what had occurred in the hotel room in Newark, that he did not want her to feel like she should look for another job, that he wanted her to be part of the company for a long time, and that she had done a great job working with the client in Connecticut. MORRIS told A.F. that he wanted A.F. to feel comfortable to travel with him again. MORRIS told A.F. that he had never "done anything like this before." MORRIS told A.F. that he was "lonely" and that "sometimes I just need a hug."

10

After the search warrant was executed in February of 2012, thumb drives found in the Defendant's belongings were searched. This search revealed photographs of A.F. taken in New Jersey. The photographs taken in New Jersey depict A.F. on a bed. There are full body nude images with her face completely covered by a pillow. There are images of A.F.'s breasts as well as close up images of her vagina. Based on A.F. identifying the images and comparisons on distinct markings on A.F. it was proven that the images are in fact of A.F. These photographs are date and time stamped corresponding to the New Jersey incident charged in the superseding indictment.

Records show that MORRIS and/or his company, Edible Software purchased or redeemed miles to pay for the travel in interstate commerce including airfare and rental car fees. It is clear based on the information provided by the victim, the marks found on A.F., the drugs found during the search, the photos found during the search and the behavior of MORRIS, that MORRIS transported A.F. in interstate commerce with the intent to engage with him in a sexual activity for which he could be charged with a criminal offense, specifically he took photographs of her exposed intimate parts without her consent for which he did not have a license/privilege to do so in violation of New Jersey law.

**Breach of Plea Agreement**

15. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly

11

withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

**Restitution, Forfeiture, and Fines – Generally**

16. This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he has an interest, unless Defendant obtains the prior written permission of the United States.

17. Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement. Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information. Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

18. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents

12

necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of his assets to deliver all funds and records of such assets to the United States.

19. Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

20. Defendant agrees to pay full restitution to the victim(s) regardless of the count(s) of conviction. Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victim(s). Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

### Fines

21. Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions contained in the plea agreement, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

22. This written plea agreement, consisting of 16 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States,

13

Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

23. Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _Houston_ , Texas, on _December 3_ , 2014.

_____
Defendant

Subscribed and sworn to before me on _December 3_ , 2014.

DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

Kenneth Magidson
United States Attorney

By: _____ _____
Sherri L. Zack      Dan Cogdell
Assistant United States Attorney  Attorney for Defendant
Southern District of Texas

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § | CRIMINAL NO. 12-255SS |
| HENRI DESOLA MORRIS, | § § § | |
| Defendant. | § | |

## PLEA AGREEMENT — ADDENDUM

I have fully explained to Defendant his/her rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.



_____
Attorney for Defendant

12/3/14
_____
Date

15

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me.   My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case.   I have read and carefully reviewed every part of this plea agreement with my attorney.   I understand this agreement and I voluntarily agree to its terms.

X _____   12/2/14 _____
Defendant                                                Date

Unofficial Copy Office of Chris Daniel District Clerk

16

# EXHIBIT C

Unofficial Copy Office of Chris Daniel District Clerk

No. 2013-74668

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and | § | |
| SOLID SOFTWARE SOLUTIONS, INC. | § | |
| d/b/a EDIBLE SOFTWARE | § | 215th JUDICIAL DISTRICT |

## PLAINTIFF'S OBJECTIONS, ANSWERS
## TO DEFENDANTS' REQUESTS FOR ADMISSIONS

TO:   Defendants, Henri Morris and Solid Software Solutions, Inc. d/b/a Edible Software, by and through their attorney of record, Gregg M. Rosenberg, 3555 Timmons Lane, Suite 610, Houston, Texas 77027

COMES NOW, Plaintiff ANDREA FARMER in the above styled and numbered cause of action, by and through her attorney of record and states that pursuant to the Texas Rules of Civil Answers to Request Admissions are filed in this cause.

Respectfully submitted,

THE LAW FIRM OF ALTON C. TODD

By: _____

Jeffrey N. Todd
State Bar No. 20092000
312 S. Friendswood Drive
Friendswood, Texas 77546
(281) 992-8633
(281) 648-8633 Facsimile No.
ATTORNEYS FOR PLAINTIFF

Unofficial Copy Office of Chris Daniel District Clerk

1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded to the counsel listed below, via the method(s) indicated, on this the 5th day of January, 2015:

Gregg M. Rosenberg
3555 Timmons Lane, Suite 610
Houston, Texas 77027
Via Facsimile 713.621.6670
Efile or CM/RRR

Jeffrey N. Todd

Unofficial Copy Office of Chris Daniel District Clerk

2

## ANSWERS TO REQUEST FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

That any reference to "AF" in Count 5 on the Superseding Indictment relating to United States of America v. Henri De Sola Morris, In the United States District Court forthe Southern District of Texas, Houston Division, Criminal Action H-12-255SS, attached as Exhibit "A", is a reference to the Plaintiff, Andrea Farmer.

**RESPONSE:**

**ADMIT**

### REQUEST FOR ADMISSION NO. 2:

That any reference to "AF" in Pleas Agreement relating to United States of America v. Henri De Sola Morris, In the United States District Court for the Southern District of Texas, Houston Division, Criminal Action H-12-255SS, attached as Exhibit "B", is a reference to the Plaintiff, Andrea Farmer.

**RESPONSE:**

**ADMIT**

### REQUEST FOR ADMISSION NO. 3:

That every statement made by Plaintiff Andrea Farmer to Special Agent Glenn Gregory of the Federal Bureau of Investigation on February 2, 2012 was true and correct to the best of her knowledge.

**RESPONSE:**

**CANNOT ADMIT OR DENY**

Unofficial Copy Office of Chris Daniel District Clerk

3

# TAB F

1/16/2015 11:32:02 AM
Chris Daniel - District Clerk
Harris County
Envelope No: 3796052
By: SPENCER, JEANETTA

CAUSE NO. 2013-74668

| | | |
|---|---|---|
| ANDREA FARMER | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| | § | |
| HENRI MORRIS and SOLID SOFTWARE | § | |
| SOLUTIONS, INC. d/b/a EDIBLE | § | |
| SOFTWARE | § | 215TH JUDICIAL DISTRICT |
| Defendant. | § | |

## ORDER

On this 27TH day of Febry , 2015, the Court heard Defendants' Motion to Dismiss or alternatively, Traditional Motion for Summary Judgment. After considering Defendants' Motion, and Plaintiff's response thereto, if any, this Court is of the opinion that Defendants' motion is DENIED. ~~has merit and should in all things be GRANTED. It is therefore, ORDERED, ADJUDGED, and DECREED that:~~

~~Defendants' motion is GRANTED. It is further~~

~~ORDERED, ADJUDGED, and DECREED that Plaintiff, take nothing by way of her claim against Defendants. It is further~~

~~ORDERED, ADJUDGED, and DECREED that all costs incurred by Defendants by reason of the lawsuit be paid by Plaintiff.~~

SIGNED on this 27TH day of FEBRUARY , 2015.

_____
PRESIDING JUDGE

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging